## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN SOUTHERN DIVISION

**DAN MEAD** and **JENNIFER MEAD**,

*Plaintiffs,*

v.

**ROCKFORD PUBLIC SCHOOL DISTRICT**; **ROCKFORD PUBLIC SCHOOLS' BOARD OF EDUCATION**,

*Defendants.*

No. 1:23-cv-1313

**VERIFIED COMPLAINT**

## INTRODUCTION

1.      Until the fall of 2022, Dan and Jennifer Mead had no reason to suspect the Rockford Public School District would conceal from them important information about the education and health of their daughter, G.M., then 13 years old.

2.      Why would they? The District had told them when G.M.'s missing assignments started to pile up. And it had told them when her mental health seemed to take a turn for the worse. So the Meads had no reason to think the District would make important decisions about G.M.'s education and health without first telling them—let alone without seeking their consent.

3.      In the past, the District had sought the Meads' consent for all kinds of decisions, from whether G.M. could join the track team or a "social skills" student group led by her school's social worker to how the District would accommodate G.M.'s autism during the school day.

4.      The Meads were stunned when they discovered that the District had— without seeking their consent and while actively concealing information from

them—begun to treat G.M. as a boy, referring to her with male pronouns and a masculine name at school.

5.      As directed by the District's policy, District employees—employees the Meads had trusted with sensitive information about G.M.'s mental health— deliberately changed G.M.'s school records to conceal the fact that the District was treating their daughter as a boy without their knowledge. The Meads only discovered it because one employee forgot to remove the masculine name and male pronouns from one section of G.M.'s records, after removing it from other sections of the same document, and inadvertently gave the Meads the document she had only partially altered.

6.      Yet, even after this revelation, the employee went back and further altered the District's only copy of this document to remove reference to the masculine name and male pronouns the District was using for G.M.

7.      These actions and the other actions detailed below violated the Meads' long-settled constitutional rights. The First Amendment protects their right to exercise their religion by directing G.M.'s education and upbringing, including on fundamental questions of existence like how G.M. identifies herself. And the Fourteenth Amendment guarantees their fundamental right to make decisions about her upbringing, education, and healthcare.

8.      By intentionally concealing from the Meads important information about their daughter's education and health—on a subject as morally fraught as gender confusion—the District denied them these constitutional rights. Absent extraordinary circumstances, a school district's concealment from parents of such information violates the Constitution. The District did not attempt to justify its actions here based on any extraordinary circumstances. Those actions were not

rationally related to any legitimate purpose, let alone narrowly tailored to a compelling one.

9.    Understandably, the District's constitutional violations destroyed the Meads' trust in the counselors, administrators, and other District employees with whom they had shared intimate details about G.M.'s and their lives. So the Meads were compelled to withdraw G.M. from the District's schools. Now the Meads respectfully ask this Court to grant them the relief requested in this Complaint and make clear what the District and its employees should have already known: Schools can't hide important information from parents.

## PARTIES

10.    Plaintiffs Dan and Jennifer Mead are the married, biological parents of two children, including their minor daughter, G.M.

11.    The Meads and their children are residents of Rockford, Michigan.

12.    Defendant Rockford Public School District (also called Rockford Public Schools and hereinafter, "the District" or "RPS") is a general powers school district. RPS Policy Manual 0122 (rev. Mar. 25, 2019), https://bit.ly/49AqOPf; *see* M.C.L. § 380.11a (describing powers and duties of "a general powers school district").

13.    The District operates 20 schools, including East Rockford Middle School.

14.    The District "is a body corporate," RPS Policy Manual 0122; M.C.L. § 380.11a(5), and is thus capable of suing or being sued.

15.    The District is "governed by a school board." RPS Policy Manual 0122; M.C.L. § 380.11a(5).

16.     Defendant Rockford Public Schools' Board of Education (hereinafter, "the Board") is the RPS school board. RPS Policy Manual 0111 (rev. June 22, 2015), https://bit.ly/3szT443.[1]

17.     The District and the Board are political subdivisions of the State of Michigan.

18.     The Meads live within the geographic boundaries served by the District's schools.

19.     G.M. was enrolled in schools operated by the District from kindergarten until October 24, 2022, when Mr. and Mrs. Mead withdrew her from the eighth grade at East Rockford Middle.

20.     While G.M. was a student at East Rockford Middle, District employees acted, pursuant to District policy, practice, usage, and custom, to treat G.M. as a boy named F.M. by referring to her with a masculine name and male pronouns.

21.     District employees treated G.M. as a boy without first seeking consent to do so from Mr. and Mrs. Mead—or even notifying the Meads of these actions—and then took steps to conceal these actions from the Meads.

22.     When District employees failed to notify the Meads or seek their consent, and when they took steps to conceal their actions from the Meads, they acted pursuant to District policy, practice, usage, and custom.

---

[1] This Court has previously declined to decide whether claims under 42 U.S.C. § 1983 filed against a general powers school district in Michigan may proceed against only the district itself or also against the school board. *See, e.g.*, *Ritchie v. Coldwater Cmty. Schs.*, 947 F. Supp. 2d 791, 806–07 (W.D. Mich. 2013) (declining to rule on whether a Michigan school board was "a suable entity," among other reasons, because "the Court determine[d] that the appropriate remedy under the circumstances would be to treat [the plaintiff's] claims as being asserted against the School District").

## JURISDICTION AND VENUE

23. This civil-rights action raises federal questions under the U.S. Constitution, namely its First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

24. This Court has original subject-matter jurisdiction over this action. 28 U.S.C. §§ 1331, 1343.

25. Venue is proper in this District Court and Division, because the parties reside in this Division, 28 U.S.C. § 1391(b)(1), (c)(2); W.D. Mich. LCivR 3.2(e)–(f); and because all the events giving rise to the Meads' claims occurred within this Division, 28 U.S.C. § 1391(b)(2); W.D. Mich. LCivR 3.2(g). *See* 28 U.S.C. § 102(b)(1) (establishing this Division's boundaries).

26. Those same facts grant this Court personal jurisdiction over the District. *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 549 (6th Cir. 2016).

27. This Court has authority to award declaratory relief, 28 U.S.C. § 2201–02; *see* Fed. R. Civ. P. 57; damages, 28 U.S.C. § 1343; and costs and attorneys' fees, 42 U.S.C. § 1988; *see* Fed. R. Civ. P. 54.

## FACTUAL BACKGROUND

### I.    The Meads allowed their daughter to begin visiting a school counselor.

28. The Meads' daughter, G.M., started sixth grade at East Rockford Middle School in August 2020 as an 11-year-old (who would turn 12 later that autumn).

29. As the fall semester progressed, G.M. fell behind in her studies.

30. To help her catch up, in December 2020, Mrs. Mead began to communicate regularly with G.M.'s teachers and other District employees about her progress.

5

31.    Mrs. Mead's communications with District employees initially focused on what assignments G.M. needed to complete but would eventually encompass more general information about G.M.'s mental and emotional health and wellbeing.

32.    After Christmas break, in January 2021, Erin Cole, a school counselor at East Rockford Middle, became actively involved in G.M.'s education, communicating about her academic progress, health, and wellbeing with both Mrs. Mead and with G.M.'s teachers.

33.    According to Ms. Cole's notes, during her first visit with G.M., which was on January 19, 2021, and lasted about 15 minutes, she gave G.M. a "detailed report of missing assignments" and told G.M. she would "check back in."[2]

34.    Counting that first visit, Ms. Cole's records show that G.M. would go to the guidance office 28 times on 27 different days from January 2021 to October 2022, which is when Mr. and Mrs. Mead withdrew G.M. from the District and began to homeschool her.

35.    Over time, Ms. Cole started to discuss more than missing assignments with G.M.

36.    For example, on March 22, 2021, G.M. stayed with Ms. Cole for nearly an hour to discuss how one of her grandparents had recently fallen ill and how her band director's negative classroom-management style frustrated her.

---

[2] The Meads received from Defendants copies of Ms. Cole's notes and many other documents related to the allegations in this Complaint in response to a state-law FOIA request in the summer of 2023. Certain of these documents are attached as exhibits to this Complaint. But many of these documents, like Ms. Cole's notes, for example, contain a large amount of sensitive personal information about the Meads and G.M.

To avoid the need to seek leave to file any documents under seal at this stage of this lawsuit, in some instances, relevant material from these sensitive documents has been excerpted in the Complaint, and the entire document has not been attached as an exhibit. Because the original versions of these documents were created by Defendants and remain in Defendants' possession, custody, or control, there is no risk of prejudice to them posed by this.

37. That same day, Ms. Cole emailed Mrs. Mead to notify her about the substance of this conversation with G.M., including G.M.'s struggles with her grandparent's illness and her band director.

38. In that email, Ms. Cole also volunteered that G.M. had expressed an interest in joining the track team, which Ms. Cole helped to coach.

39. In response, Mrs. Mead agreed that joining the track team would benefit G.M. and closed with a word of gratitude for Ms. Cole: "Thanks for talking with her. She feels safe talking with you."

40. Ms. Cole often sent similar emails to Mrs. Mead notifying her about G.M.'s visits to the guidance office.

41. Ms. Cole and Mrs. Mead corresponded regularly enough that Ms. Cole occasionally heard information about G.M.—such as whether she would be at school on a given day—directly from Mrs. Mead prior to hearing from East Rockford's administrative office.

42. Because of Ms. Cole's open correspondence with Mrs. Mead, the Meads came to trust Ms. Cole and seek her advice about helping G.M., as illustrated by an exchange shortly before the end of the 2020–2021 school year.

43. During a May 27 visit with Ms. Cole, G.M. told her that the Meads wanted her advice about a counselor for G.M. to see over the summer.

44. In an email to Mrs. Mead later that day, Ms. Cole recommended a psychologist for G.M. and said that she had "talked with G[] about trying to meet up in downtown Rockford [over the] summer for ice cream sometime," asking for Mrs. Mead's permission and sharing her cell phone number.

45. That summer, Mrs. Mead and G.M. met Ms. Cole and her own daughter to have ice cream in downtown Rockford.

**II.    The school counselor regularly told the Meads how their daughter was doing at school.**

46.    Soon to be 13-years-old, G.M. started her seventh-grade year at East Rockford in August 2021.

47.    During the fall 2021 semester, Ms. Cole continued her regular visits with G.M., though Ms. Cole's notes contain little detail about those visits.

48.    Ms. Cole also continued notifying the Meads of important details about G.M.'s education, health, and wellbeing, mostly via emails to Mrs. Mead.

49.    For instance, on December 9, 2021, Ms. Cole emailed Mrs. Mead to seek permission for G.M. to participate in a "social skills group[]" that Ms. Cole was developing with Dawn Thorsen, the school's social worker, to help G.M. and other students "work on developing and maintaining healthy friendships."

50.    As the spring semester began, Ms. Cole began communicating more regularly with Mrs. Mead about G.M.'s mental health and wellbeing, and from January 14 to February 3, 2022, Ms. Cole had four visits with G.M.

51.    After the January 14 visit, Ms. Cole emailed Mrs. Mead to say that G.M. was in her office, "having a hard time," and suggested that Mrs. Mead pick G.M. up from school that morning.

52.    In this email, Ms. Cole spoke of her intimate knowledge of G.M.'s mental and emotional health and wellbeing: "[G.M.] mentioned that she has noticed that her mental health has not been as stable as she would like it lately and I would agree that I am seeing her more and more often when the first few months of the year she seemed to be doing much better."

53.    Then, on January 26, the Meads had G.M. evaluated by a psychologist with the Psychological Consultation Center at Pine Rest Christian Mental Health Services.

54.    In February, the Meads received a report from Pine Rest based on that evaluation.

55.    The Pine Rest report detailed G.M.'s developmental, health, and educational history, her emotional functioning and communication skills, and recent stressors faced by her family, including the deaths of Mr. Mead's parents.

56.    Based on this information and on a variety of tests performed on G.M., the Pine Rest report diagnosed her with Autism Spectrum Disorder (without intellectual or language impairment), along with Generalized Anxiety Disorder and Major Depressive Disorder.

57.    The Pine Rest report gave no indication that G.M.'s difficulties stemmed from gender incongruence, broadly speaking, or from gender dysphoria, in particular.

58.    On February 8, the day after the Meads were notified of Pine Rest's autism diagnosis, one of G.M.'s teachers emailed Mrs. Mead to raise concerns about her math grade and her mental health, noting that G.M. "often puts her head down on her desk and won't work."

59.    Adding Ms. Cole to the email chain, Mrs. Mead responded to inform them of G.M.'s diagnosis and about how "[h]er mental health has affected her ability to perform well in school."

60.    As another sign of the Meads' trust in the District, at Ms. Cole's request, Mrs. Mead agreed to share the Pine Rest report with Ms. Cole and other District employees and allow them to share G.M.'s diagnoses with her teachers.

61.    Later that same day, Ms. Cole visited with G.M., whom she noted was "struggling with feelings today," because she "got outside ASD diagnosis," referring to Autism Spectrum Disorder.

62.    About a week later, on February 16, the Meads sent a copy of the Pine Rest report to Ms. Cole.

63.    Ms. Cole exchanged emails with Mrs. Mead about arranging initial accommodations for G.M. based on her diagnosis and whether G.M.'s teachers knew about her needs.

64.    Ms. Cole told Mrs. Mead that she would meet with other District staff that afternoon to discuss a plan to support G.M. and asked Mrs. Mead: "Was there anything that you were hoping for from the school, or anything that you are not on board with at this point?"

65.    Between March and May 2022, Ms. Cole visited with G.M. eight more times, for reasons like a general "check in" or because G.M. was "struggling with depression" or "needed a break."

66.    On May 4, Ms. Cole received a short message from G.M. on Schoology (a computer program for tracking attendance, assignments, and other student information that allows students to communicate with school employees).

67.    That message said: "Hi Could you email my teachers and tell them to call me F[]?"

68.    This name, "F[]," is typically used as a masculine name in the United States.

69.    From then until the end of the school year, just a few weeks later, Ms. Cole corresponded multiple times with Mrs. Mead but did not notify Mrs. Mead of G.M.'s request to use a masculine name.

70.    On May 6, Ms. Cole sent Mrs. Mead a long email "to follow up with [her] after gathering some information and talking to [the] Building Consultation Team regarding next steps" for accommodating G.M.'s needs at school.

71.    Ms. Cole recommended that, in the fall 2022 semester, the District perform "a complete special education evaluation" for G.M., entailing "[a]cademic and social skills testing along with some classroom observations done by the building team as well as parent and teacher input."

72.    Ms. Cole promised open communication with the Meads: "Results of everything would be shared with you and discussed to determine a plan moving forward."

73.    Stating that "[c]oordination of care is very helpful," Ms. Cole sent Mrs. Mead a release form that "would give [her] permission to speak with the new outside therapists that [the Meads] ha[d] set up for G[]."

74.    And Ms. Cole asked Mrs. Mead for permission to share information from the Pine Rest report with the rest of the "building team," sometimes referred to as the "building consultation team" or the "BCT team."

75.    Despite the extensive information in this email—all focused on supporting G.M.'s mental health and wellbeing at school—Ms. Cole did not notify Mrs. Mead that G.M. had, just two days prior, asked that Ms. Cole and her teachers call her F.M., a typically masculine name; nor did Ms. Cole seek Mrs. Mead's permission to begin referring to G.M. as F.M.

76.    The school year ended in June 2022 without any communication from Ms. Cole to the Meads that their daughter asked District employees to refer to her by the masculine name, F.M.

### III.    The District began to treat the Meads' daughter as though she were a boy, but neither the counselor nor any other employee notified the Meads.

77.    G.M., still only 13, started eighth grade on Monday, August 22, 2022.

78.    By time, without seeking the Meads' consent—or even notifying them—the District was already referring to G.M. by the masculine name F.M.

79.     The next day, Ms. Cole visited with G.M. for about half an hour.

80.     The day after that, August 24, Ms. Cole emailed each of G.M.'s teachers the following message:

> When you each have a second, could you please call me or stop down[?] You have a student listed on your roster as G[] M[] that I want to give you a little insight on.
>
> Thanks,
>
> ERIN

81.     Ms. Cole had another visit with G.M. on August 25, although Ms. Cole's notes don't indicate what they discussed.

82.     Around this time, Heather Slater, who works for the District as a school neuropsychologist, began keeping a handwritten "Case Activity Log" about G.M.

83.     On the blank line next to "Student Name," Ms. Slater wrote: "G[]/F[] M[] (F but Trans)."

84.     The first entry, dated August 31, stated: "G[] is female but transitioning to male. Goes by F[] [handwriting illegible] @ school & G[] @ home."

85.     Further down in that entry, Ms. Slater referred to G.M. as though she were a boy named F.M.: "When F[] gets overstimulated/upset he needs a break from the classroom which needs to include processing w/ an adult."

86.     By early September at the latest, District employees were regularly using the masculine name, F.M., and male pronouns to refer to G.M. as though she were a boy.

87.     For example, on Monday, September 5, Ms. Slater wrote to G.M.'s teachers to tell them the District was "initiating a Special Education Evaluation for G[] (F[]) M[]," referring to G.M. both by her correct name and, parenthetically, by

the masculine name the District had begun to use for her, and to request their observations about G.M.'s classroom demeanor and performance.

88. That same week, on Friday morning, Kyle Avink, then an assistant principal at East Rockford Middle, sent an email with the subject line "FM," requesting potential input about G.M.'s wellbeing, in which he stated: "I wanted to reach out to you and let you know that we are currently discussing F[] (G[] in the system) M[] within our BCT team."

89. Later that morning, Ms. Thorsen, the school's social worker, emailed Mr. Avink, Ms. Cole, and Ms. Slater (among others) about G.M.

90. The subject line of Ms. Thorsen's email was "FM," and it referred to G.M. as though she were a boy named F.M.:

> F[] is another person we should add to the library lunch option. He said he would sometimes like to have a quieter environment to eat and he knows [other student name redacted in original] who would be in lunch with him.
>
> Erin, F[] might be stopping by to see you today. He tried earlier and the office was locked which is how he ended up in my office. He's a super cool kid-I really enjoyed my time with him. He's very self aware!
>
> Dawn

91. Then on September 13, Ms. Cole emailed Ms. Thorsen about G.M., with the subject line "FM," which referred to G.M. as though she were a boy.

92. Although the District and its employees were now regularly referring to G.M. with a masculine name and male pronouns at school, they continued to refer to her by her actual name and with female pronouns when speaking to or corresponding with the Meads.

93. A series of September 20 emails from Ms. Thorsen illustrates the confusion caused by the District's decision to begin using a masculine name and male pronouns for G.M. in some contexts but not others, like communications with the Meads.

94.    At 10:27 that morning, Ms. Thorsen emailed G.M.'s math teacher (subject line "F[]"), referring to G.M. as though she were a boy named F.M.:

I met with F[] M[] today and he said he's struggling to understand math and feels "stupid" in it. I told him you're a great person to talk to about extra help. I also suggested he could come to Rob's room prior to school starting which would be a quiet space to work and with Rob's math knowledge, he'd be a great resource.

Thanks,

Dawn

95.    And at 10:28 that morning, Ms. Thorsen emailed Ms. Cole, Mr. Avink, and others, also referring to G.M. as a boy:

F[] M[] has been told he can come up when he gets off of the bus and can work in Rob's room. I don't know if he'll take us up on the offer but wanted you to know it's there.

…

Dawn

96.    But at 10:24 that same morning, Ms. Thorsen had emailed G.M.'s teachers (subject line "F[]"), referring to G.M. as though she were a *girl* named F.M.:

F[] came to me this morning and was not feeling well so we spent some time together and she went back to class. I think she wanted to go home so I'm hoping she's hanging in there.

Dawn

97.    In other words, in a series of emails sent—some to the *same person*—over less than five minutes on the morning of September 20, Ms. Thorsen referred to G.M. both as a girl and as a boy.

98.    Neither the District nor any of its employees notified the Meads that District employees had begun to treat G.M. as a boy named F.M. while at school.

99.    Nor did the District or any of its employees seek the Meads' consent to treat G.M. as a boy named F.M. while at school.

14

100.   In fact, the District and its employees actively concealed that they were treating G.M. as a boy named F.M. while at school.

## IV.   The Meads worked with a school neuropsychologist regarding their daughter's needs but still heard nothing about the District's use of male pronouns and a masculine name for her.

101.   While the District was treating G.M. as a boy named F.M., Ms. Slater continued collecting information for G.M.'s special-education evaluation.

102.   On September 21, 2022, the Meads returned their "Parent Input" form to Ms. Slater, describing G.M.'s health and family history for inclusion in the ongoing special-education evaluation of G.M.

103.   On October 6, 2022, Ms. Slater sent Ms. Cole an email with the subject line "G/F M Question," using both the correct and incorrect first initial for G.M.

104.   In the body of this email, Ms. Slater used G.M.'s correct name, while referring to her with male pronouns:

> Do you know if we have any hard copies of any clinical evaluation reports over there for G[], like in his file or in a confidential file? Also, do you see an eval. report in the file from ECSE? Mom is reporting he was at Meadowridge and he was a micro preemie so I can see him being in ECSE but I'm not finding a report from that in MiPSE.

105.   Later that day, Ms. Slater emailed both of the Meads to schedule a meeting to discuss the District's "review of existing data" (or "REED" evaluation, to use the District's acronym) for G.M.

106.   Although Ms. Slater thanked Mrs. Mead "for taking the time to talk through a few questions with" her, Ms. Slater used G.M.'s correct name in her email and did not inform the Meads that she and other District employees had been referring to G.M. as a boy named F.M. at least since the beginning of the school year.

107.   On the following Monday, October 10, Mr. Mead met with Ms. Slater at 9:00 a.m. to discuss the District's REED evaluation for G.M.

108.    During their October 10 meeting, Mr. Mead and Ms. Slater focused on G.M.'s autism diagnosis and how her symptoms were interfering with her academic performance.

109.    Ms. Slater still made no mention of how she and other District employees were using the District's masculine name for G.M. or referring to G.M. with male pronouns.

110.    Before their October 10 meeting ended, Ms. Slater and Mr. Mead both signed G.M.'s REED evaluation, indicating that Mr. Mead had "consent[ed] to the proposed evaluation plan."

111.    Ms. Slater gave a paper copy of the REED evaluation to Mr. Mead, who took it home.

112.    Ms. Slater then continued with her day, emailing the Meads and other District employees, a short time after Mr. Mead left, to arrange a follow-up meeting regarding G.M.'s academic accommodations.

113.    Ms. Slater then emailed Ms. Cole, Ms. Thorsen, and others that she thought her meeting with Mr. Mead had gone well and that she would be "uploading the signed REED to MiPSE today," referring to Michigan's database for special education recordkeeping.

## V.    The neuropsychologist inadvertently revealed the District's unconstitutional actions to the Meads.

114.    When Mr. Mead returned home on the morning of October 10 with the paper copy of the signed REED evaluation for G.M., Mrs. Mead reviewed it that same morning.

115.    G.M.'s REED evaluation outlined her academic performance and contained a series of comments from her teachers based on their experiences with her in their classrooms.

116.    Many of the comments from her teachers echoed information already known to the Meads, but one teacher's notes surprised Mrs. Mead.

117.    Mrs. Mead quickly emailed the following question to Ms. Slater—at 11:28 a.m. that same morning—about the notes from Susan Trotter:

> Hi Heather,
>
> I read through the teacher notes that Dan brought home and Susan Trotter's notes were for a boy named F[]. Is this an error?
>
> Thank you.
>
> Jennifer

*See* Exhibit 1 (Email J. Mead to Slater).

118.    The October 10 hard copy document Ms. Slater gave Mr. Mead contained these remarks from Ms. Trotter:

> I am really enjoying getting to know F[]! He is pleasant to talk to, funny and a hard worker. He is quiet in class, but willing to chat one on one with me. He usually is in a good mood and agreeable. He loves to read, but is willing to work on missing assignments before he is allowed to read in class. F[] has some awkward tendencies that have come out a couple of times (giggling, fidgeting, using a different voice). When I check F[]'s grades for REACH, overall they are pretty good! It is early in the year though- and he has some missing work for Lang Arts and Math. F[] has a great attitude and I see him put in a lot of effort. As mentioned, it is motivated by reading. If I tell him, "finish 2 of the 3 missing assignments, then you can read" he will agree. F[] is very quiet in class and I do not see him interact with peers at all. I think F[] is listening- but I do think oral expression is a struggle. Sometimes it is hard to understand the story he is telling or to understand his questions. I think F[] is doing great in REACH. It is too early to tell if the class is helpful. He has been absent a lot for me, so that doesn't help!

119.    As it turned out, Ms. Trotter's references to "a boy named F[]" were erroneously included in G.M.'s REED evaluation.

120.    Ms. Slater had intended to delete all references to "a boy named F[]" from Ms. Trotter's and the other teachers' notes and replace them with references to G.M.'s actual name and female pronouns.

17

121.    In fact, Ms. Slater made such deletions and replacements elsewhere in G.M.'s REED evaluation; she simply forgot to do this with Ms. Trotter's notes.

122.    Months later, Ms. Slater would explain to Adam Burkholder, the principal of East Rockford Middle School, how she had made those deletions and replacements before Mr. Mead signed the REED evaluation.

123.    Ms. Slater also explained to Mr. Burkholder how, after Mr. Mead had already reviewed and signed the REED evaluation, she created an altered version of it by making additional changes to Ms. Trotter's notes. *See* Exhibit 2 (Email Slater to Burkholder).

124.    When responding to a state-law FOIA request by the Meads, Mr. Burkholder had asked Ms. Slater to provide him with a copy of the version of the REED evaluation that she and Mr. Mead had signed on October 10.

125.    Ms. Slater responded that she was unsure whether she could provide a copy of the REED evaluation identical to the copy that Mr. Mead had signed on October 10 and taken home, because she had altered the electronic document after Mrs. Mead notified her of the references to a boy named F.M.:

> I'm not sure if a hard copy was filed since it wasn't completed but if it's not in the file then it is in MiPSE and I can print it. I also do have the individual teacher input forms that the teachers submitted. The issue is that they think one teacher referred to him as F[] in their input. Actually several teachers did but because we use the legal name in all legal documents (any Spec. Ed. document) *I edited all the responses to change the ones where they called him F[] and changed it to G[] in the write up*. I did that on the one they saw too but we think I didn't hit save and so it reverted back to F[]. This wasn't to hide anything from parents, *it's just the policy for legal documents*. After they alerted us to it, I went in and fixed it so it's not F[] now I don't think. I'll look tomorrow.

Ex. 2 (emphasis added).

126.    Following District policy, namely "the policy for legal documents," including any documents related to special-education accommodations, Ms. Slater

altered the notes of G.M.'s teachers so that instead of referring to a boy named F.M., they referred to G.M. by her actual name and with correct pronouns.

127.    For example, G.M.'s digital art teacher referred to her as "F[]" throughout his notes.

128.    In G.M.'s REED evaluation, however, Ms. Slater reproduced the art teacher's notes—except for changing each instance of the masculine name "F[]" to the correct name "G[]."

129.    Similarly, Ms. Cole sent Ms. Thorsen a draft of her notes for G.M.'s REED evaluation that was almost identical to the final version, except that the draft referred to G.M. by the District's masculine name and male pronouns.

130.    In this email to Ms. Thorsen, Ms. Cole said:

Currently F[] is in the REACH class and was also in REACH last year for TRI 1 and 2. He wanted to be in some art electives that were really enjoyable to him for third TRI. While he loved his art classes, his grades did suffer and it was decided to place him back into REACH this year. F[] often needs breaks in the counseling office. F[] feels defeating math often but is more capable than confident. Emotional regulation is hard for F[], but he is very self aware of when he is too overwhelmed/ overstimulated to be able to function in the classroom setting. F[] does have some friends he likes to see at lunch.

131.    A nearly identical paragraph, except for the name and pronouns used for G.M., appeared in the REED evaluation as Ms. Cole's observations:

Currently G[] is in the REACH class and was also in REACH last year for TRI 1 and 2. She wanted to be in some art electives that were really enjoyable to her for third TRI. While she loved her art classes, her grades did suffer and it was decided to place her back into REACH this year. G[] often needs breaks in the counseling office. She often feels defeated in math but is more capable than confident. Emotional regulation is hard for G[], but she is very self aware of when she is too overwhelmed/ overstimulated to be able to function in the classroom setting. G[] does have some friends she likes to see at lunch.

132.    Because of Ms. Slater's alterations, the District no longer possesses a version of G.M.'s REED evaluation identical to the October 10 REED evaluation that Mr. Mead signed and took home as a paper copy.

133.    As Ms. Slater told Mr. Burkholder, "the only copy of the REED with the F[] name in it would be the one I gave to dad to take with him at the meeting." *See* Ex. 1 (Email from Slater to Burkholder).

134.    The Meads retained a paper copy of the unaltered REED evaluation, and each page is dated "10/10/22, 10:08 AM" in the header.

135.    In the District's altered copy of the REED evaluation, the pages containing Ms. Trotter's and the other teachers' notes are dated "10/20/22, 1:38 PM" in the header, although it continues to bear Mr. Mead's October 10 signature at the end.

136.    In the District's altered copy of the REED evaluation, Ms. Trotter's notes now refer to G.M. by her actual name and feminine pronouns.

## VI.    The Meads withdrew their daughter from the District, which refused to assure them it would not hide information from them again.

137.    Ms. Slater never responded to Mrs. Mead's October 10 email about the references to a boy named F.M. in her daughter's special-education evaluation. *See* Ex. 1.

138.    Despite being aware of the Meads' concerns, Ms. Slater continued to implement the District's policy of referring to G.M. with male pronouns, at times even when using G.M.'s correct name; for example: "I did observe G[] come down and eat lunch in the counseling office for the full lunch period plus some while reading a book. He didn't need to talk to anyone necessarily, I think he was just trying to avoid the loud cafeteria."

139. The following week, Ms. Slater, Ms. Thorsen, and others discussed whether they should continue following the District's policy of referring to G.M. as a boy named F.M.

140. These District employees were making arrangements for another upcoming meeting with the Meads to discuss the District's plan to accommodate G.M.'s special-education needs.

141. In the middle of an email discussion with the subject line "F[]" (the masculine name for G.M.), Ms. Thorsen posed this question to the group:

> One other clarifying question, are we still referring to F[] by the legal name and using female pronouns? Or, will we be using F[]'s preferred name and gender he identifies with?

142. Ms. Slater responded that District policy required them to use the masculine name and male pronouns when interacting with G.M. but not on G.M.'s paperwork or with her parents at the upcoming special-education meeting:

> Required to use legal name and gender in all paperwork. Use prefer[r]ed pronouns and name when interacting with him. I would ask him what he wants us to do in the meeting with his parents and we will do that.

143. While the District continued to arrange accommodations for G.M.'s academic needs—and continued to refer to her as a boy named F.M.—the Meads began to discuss withdrawing G.M. from the District's schools.

144. The District's concealment from the Meads of its actions treating their daughter as a boy had broken their trust, so they were not sure they could continue to entrust their daughter to the District and its employees given the important information they had hidden from the Meads.

145. Because of the cost, however, private school was not a viable option for their family.

146. Homeschooling G.M. was the Meads' only alternative.

147.    Earlier in the year, Mr. Mead had left his job to take primary responsibility for coordinating with the District to address the Meads' concerns with G.M.'s education, but he had expected to reenter the workforce within a few months.

148.    Homeschooling G.M. would require Mr. Mead to remain out of the workforce longer than the Meads anticipated, so that he could supervise G.M.'s homeschool.

149.    On Thursday, October 20, while the Meads were still weighing the costs and benefits of withdrawing G.M. from the District, G.M. came home from school with a book from Ms. Cole, her school counselor.

150.    The book, *Heartstopper: Volume 1* by Alice Oseman, is a graphic novel about two teenage boys who become romantically involved with one another.

151.    It contains many instances of profanity and crude anatomical references, along with visual depictions of one teenage boy physically assaulting and later forcibly kissing another teenage boy without his consent.

152.    Although Ms. Cole had asked the Meads' permission many times previously before taking actions related to G.M., she did not notify the Meads or seek their consent before providing *Heartstopper* to G.M.

153.    The next day, the Meads kept G.M. home from school to give them time to decide how to respond to this and the District's other actions.

154.    On Sunday, October 23, the Meads emailed Mr. Burkholder, East Rockford's principal, and Mr. Avink, the assistant principal, to inform them they were withdrawing G.M. from East Rockford and any other District school.

155.    Attached to that email was a letter from the Meads, dated October 24, stating that they were withdrawing G.M., effective that date, to "pursu[e] other educational options" and asked that the District send any additional questions in writing.

22

156. A few minutes after receiving it, Mr. Avink forwarded the Meads' email to Ms. Slater and Ms. Cole.

157. Even after the Meads' withdrawal of G.M. from the District's schools, employees continued to refer to her as a boy named F.M.

158. For example, on the effective date of G.M.'s withdrawal from the District, Ms. Thorsen emailed Ms. Slater and others:

> Kyle [Avink] just informed me that F[] has been removed from school and parents are planning on homeschooling him. Heather [Slater] will find out what needs to be done in terms of the evaluation and let us know.
>
> Such a bummer.

159. Later that week, on Friday, October 28, the Meads met with Principal Burkholder.

160. The Meads wanted to ensure Mr. Burkholder knew about how employees at his school had concealed their actions treating G.M. as a boy.

161. During this meeting, Mr. Burkholder made clear to the Meads that District policy and the District's understanding of voluntary guidance from the Michigan Department of Education required employees to treat G.M. as a boy—and to conceal their actions from the Meads.

162. Mr. Burkholder asked the Meads whether he could do anything to convince them to keep G.M. in the District's schools.

163. Mr. Mead told Mr. Burkholder he would, at the very least, need to guarantee that the District would not hide information from the Meads again about G.M.

164. Mr. Burkholder refused to guarantee that.

165. After their meeting with Mr. Burkholder, the Meads had no further communication with the District about G.M. until filing their state-law FOIA request in the spring of 2023.

166. Ms. Slater's file on G.M. closed on November 14, 2022, with a handwritten note labeled "Confidential File" at the top memorializing that "[e]val. was not completed due to parent withdrew student to homeschool," with Ms. Slater's signature at the bottom.

167. Since then, the Meads have homeschooled G.M., using a virtual curriculum that requires them to pay a monthly fee.

168. Homeschooling has required Mr. Mead to remain out of the workforce, which has caused the Meads to lose his income.

169. These and other damages were caused by the District's actions treating G.M. as a boy named F.M. while concealing those actions from the Meads.

## VII. The District performed its unconstitutional actions pursuant to a policy, practice, usage, and custom.

170. When the District failed to notify the Meads of or obtain their consent to the use of a masculine name and male pronouns to refer to G.M., and when it actively concealed its actions from the Meads, it acted pursuant to its policies, practices, usages, and customs.

171. Ms. Slater explained this policy when she defended her decision to alter G.M.'s REED evaluation.

172. She "edited all the responses to change the ones where they called him F[] and changed it to G[] in the write up," because "it's just the policy for legal documents." *See* Ex. 2.

173. This District policy, said Ms. Slater, required her to treat the use of a masculine name and male pronouns for G.M. "as a typo and fix[] it": "Effectively, we treated it as a typo and fixed it because the direction we've been given is that the legal documents have to have the student's legal name in them." *See* Ex. 1.

24

174. Ms. Slater explained to other District employees that they had no choice but to follow this policy.

175. When Ms. Thorsen asked Ms. Slater whether they were "still referring to F[] by the legal name and using female pronouns," or whether they should use "F[]'s preferred name and gender he identifies with," Ms. Slater responded:

> Required to use legal name and gender in all paperwork. Use prefer[r]ed pronouns and name when interacting with him. I would ask him what he wants us to do in the meeting with his parents and we will do that.

176. The District's website contains more information about the policy, practice, usage, and custom followed by Ms. Slater and other employees.

177. That website makes clear that the District has adopted a non-mandatory guidance document from the Michigan Department of Education as the RPS policy for treating students as the opposite sex. *See* Rockford Pub. Schs., *Equity Resources* (accessed Nov. 17, 2023) (reproducing the "State Board of Education Statement (PDF)"), https://bit.ly/3sKP0xN.[3]

178. The State made clear that "[t]hese guidelines are voluntary and should not be considered mandates or requirements." Ex. 3 at 1.

179. The District voluntarily acted to adopt this guidance document as its policy related to gender identity. *See id.* ("Decisions by districts to utilize this guidance should be made at the local level employing the normal community input process.").

180. During the Meads' meeting with Principal Burkholder around the time they decided to withdraw G.M. from the District, Mr. Burkholder confirmed that the District's policy was to follow state guidance regarding the use of opposite-sex pronouns and names for students like G.M.

---

[3] This guidance document, adopted by the District as its policy, is reproduced as Exhibit 3. Mich. State Bd. of Educ., *State Board of Education Statement and Guidance on Safe and Supportive Learning Environments for Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ) Students* (Sept. 14, 2016), https://bit.ly/3SMHfCq.

181.  In an email sent by Ms. Slater months after the Meads' withdrawal of G.M. from the District, still referring to G.M. with male pronouns, Ms. Slater also confirmed that the District followed this non-mandatory guidance as its local policy:

> I cannot recall if I ever met or talked to G[] because *he* was withdrawn from school midway through the evaluation process. I will go back and look at my notes. If I did talk to *him* at any point I would have referred to *him* as F[] and by male pronouns per *his* request and guidance from MDE and NASP.

Ex. 2 (emphasis added).

182.  In that email, "MDE" refers to the Michigan Department of Education and "NASP" to the National Association of School Psychologists.

183.  According to District policy, "school staff should engage in reasonable and good faith efforts to address students by their chosen name and pronouns that correspond to their gender identity." Ex. 3 at 4.

184.  The District followed this policy when it referred to G.M. by a masculine name and male pronouns without first seeking the Meads' consent or even notifying them.

185.  This same policy instructed District employees that they did not need to notify parents or seek their consent to using names or pronouns associated with the opposite sex to refer to a student.

186.  Under the heading "Student Identity," it says:

> When students have not come out to their parent(s), a disclosure to parent(s) should be carefully considered on a case-by-case basis, school districts should consider the health, safety, and well-being of the student, as well as the responsibility to keep parents informed. Privacy considerations may vary with the age of the students.

*Id.*; *see id.* at 5, 8 & n.17 (similar policy language).

187.  When the District failed to notify the Meads about or seek their consent to using a masculine name and male pronouns for their daughter, and when

it affirmatively concealed those actions from the Meads, it acted pursuant to its policy.

188.   The District's policy, practice, usage, and custom is to refer to students by names and pronouns associated with the opposite sex without notifying their parents or seeking parental consent and to conceal these actions from their parents.

189.   By contrast, the District expressly requires parental permission and a doctor's recommendation before a student may take any medication at school. *See* Rockford Pub. Schs., *Medication Authorization Form* (Aug. 29, 2022), https://bit.ly/3QJPjRx ("No medications will be administered to a student without written permission from parent or guardian AND physician recommendations. A permission form must be signed and on file for each child who receives a medication at school.").

## VIII.  The District recklessly attempted to "socially transition" the Meads' daughter without their knowledge or consent.

190.   By using a masculine name and male pronouns for G.M., the District and its employees engaged in a psychosocial intervention for gender dysphoria sometimes called "social transition." *See Mirabelli v. Olson*, No. 3:23-CV-00768, 2023 WL 5976992, at *5–7 (S.D. Cal. Sept. 14, 2023) (describing nature of social transition and summarizing evidence supporting cautious approach to it, particularly without parental involvement).

191.   Gender dysphoria is a health diagnosis defined in the DSM-5, requiring multiple criteria for adolescents including clinically significant distress and other "strong" symptoms sustained for at least six months.[4]

192.   Diagnosis is complex, and children or adolescents presenting for diagnosis very commonly suffer from other clinical mental health conditions, such

---

[4] Am. Psychiatric Ass'n, *Diagnostic and statistical manual of mental disorders* (5th ed. 2013) p. 452–53, https://doi.org/10.1176/appi.books.9780890425596.

as Autism Spectrum Disorder, Generalized Anxiety Disorder, and Major Depressive Disorder, which may lead to misdiagnosis.[5]

193.    Professional organizations generally agree that a thorough psychiatric evaluation by a qualified mental health professional is essential for accurate diagnosis.[6]

194.    Professional organizations also generally agree that other mental health conditions should be addressed before any decision is made about transition.[7]

195.    Gender dysphoria has historically been a very rare phenomenon, impacting almost exclusively small numbers of prepubertal boys and adult men.[8]

196.    In recent years, a very different phenomenon has exploded, with very large numbers of adolescents—the majority girls—asserting that they suffer from gender dysphoria, which is referred to as "adolescent onset" or "rapid onset" gender dysphoria.[9]

197.    The cause of this new trend is unknown. Many experts believe that social influences including social media and peer group pressure are playing an important role in leading girls to identify as the opposite sex.[10]

198.    Increasing numbers of young women who were transitioned during adolescence are now regretting those decisions, detransitioning (that is, identifying

---

[5] Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, J. of Clinical Endocrinology & Metabolism (2017) 102(11), at 3876; Levine et al., *Reconsideration of Informed Consent for Transidentified Children, Adolescents, and Young Adults*, J. Sex & Marital Therapy (2022) at 3, 5.

[6] Hembree et al., (2017) at 3876.

[7] *Id.*

[8] Zucker, *Adolescents with Gender Dysphoria: Reflections on Some Contemporary Clinical and Research Issues*, Archives of Sexual Behavior (2019) at 1–2.

[9] Littman, *Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria*, PLoS ONE, 13(8) e0202330 (2018) at 3–5.

[10] *Id.*; Selin Davis, *A Trans Pioneer Explains Her Resignation from the US Professional Association for Transgender Health,* Quillette (Jan. 6, 2022), https://quillette.com/2022/01/06/a-transgender-pioneer-explains-why-she-stepped-down-from-uspath-and-wpath/.

as female once again), and speaking out to say that they were misled, misdiagnosed, and harmed by those adults who encouraged and assisted them to identify as male.[11]

199.    School staff who lack appropriate training are not qualified to diagnose gender dysphoria.

200.    There is no agreed "standard of care" for treating prepubertal children or adolescents who suffer from gender dysphoria, and there is large disagreement among doctors and mental health professionals in the United States and Europe on this question.[12]

201.    Children who struggle with gender dysphoria often seek professional intervention, including assistance with social transition, which typically includes changes in the use of names and pronouns.[13]

202.    Absent parental consent, school staff are not authorized to treat either gender dysphoria or comorbid mental health conditions in children.

203.    Indeed, school staff are not authorized to provide even the most basic health care, such as providing aspirin to children, without express parental consent. *See supra* ¶ 189.

204.    The involvement of parents is essential for obtaining a thorough psychiatric evaluation of a child, obtaining and supporting treatment of potential preexisting mental health conditions, and treating gender dysphoria.[14]

---

[11] *See generally* Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, Archives of Sexual Behavior (2021).

[12] Levine & Abbruzzese, *Current Concerns About Gender-Affirming Therapy in Adolescents*, Current Sexual Health Reports (2023) at 6.

[13] Zucker, *Different strokes for different folks*, Child & Adolescent Mental Health, (2020) 25(1), at 1.

[14] World Pro. Ass'n for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People* (Version 8) at S58, https://www.tandfonline.com/doi/pdf/10. 1080/ 26895269.2022.2100644.S58.

205.   Leading a child or adolescent to conceal important life changes from his or her parents, and to lead a "double life" presenting different identities at home and at school, imposes a serious risk of worsening the mental health of the child.[15]

206.   No medical organization recommends subjecting children or adolescents to social transition without the knowledge of their parents.

207.   All studies that have claimed to show any improvement in mental health following social transition suffer severe methodological defects, and an independent and thorough systematic review commissioned by the English National Health Service determined that all such studies are of "very low quality."[16]

208.   A new and far more thorough study of all patients treated for gender dysphoria in Denmark since 2000 found no improvement in mental health following the beginning of so-called "affirming" treatment for gender dysphoria.[17]

209.   There is no evidence that social transition is lifesaving. While adolescents who suffer from gender dysphoria also suffer from a range of other serious mental health conditions and high rates of suicidal thoughts, no study has found that any form of transition—whether social or medical—reduces the rate of suicide in these young people.[18]

210.   It is well known that among prepubertal children who suffer gender dysphoria, the vast majority will desist from suffering dysphoria and become

---

[15] Selin Davis (2022).

[16] Nat'l Inst. for Health & Care Excellence, *Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria* (2021) at 4, https://arms.nice.org.uk/resources/hub/1070905/attachment; Nat'l Inst. for Health & Care Excellence, *Evidence review: Gender-affirming hormones for children and adolescents with gender dysphoria* (2021) at 4, https://arms.nice.org.uk/resources/hub/1070871/attachment.

[17] Glintborg et al., *Gender-affirming treatment and mental health diagnoses in Danish transgender persons: a nationwide register-based cohort study,* European J. of Endocrinology (2023) 189, at 342–43.

[18] Levine (2023) at 3–4.

comfortable with their biological sex by adulthood *but only if they do not socially transition.*[19]

211.    Experts who disagree on many things agree that social transition is a powerful psychosocial intervention that greatly reduces the chances that the young person will cease experiencing gender dysphoria and become comfortable with his or her biological sex.[20]

212.    In other words, some evidence shows that social transition "locks" the child into discomfort with his or her biological sex (that is, entrenches rather than cures gender dysphoria), and greatly increases the likelihood that the child will continue on to puberty blockers, cross-sex hormones, or both.[21]

213.    As a result, social transition puts the child on a difficult-to-escape pathway to medicalized transition that will expose the young person to risks of serious harms that are either known to exist or are well recognized as potential risks but have not been meaningfully studied. These risks of harm include lifelong sterility, failure to develop and be able to enjoy healthy sexual responses and relationships, impaired brain development, weakened bones, increased risk of cardiovascular illness, broken family relationships and social isolation in adult life, dependence on regular hormone shots, and more.[22]

---

[19] Zucker, *The Myth of Persistence: Response to "A Critical Commentary on Follow-Up Studies & 'Desistance' Theories about Transgender & Gender Non-Conforming Children" by Temple Newhook et al.*, 19:2 Int'l J. of Transgenderism (2018) 231, at 7.

[20] Zucker (2020) at 2; Hembree et al. (2017) at 3879.

[21] Cass, *Independent review of gender identity services for children and young people: Interim report* (2022) at 38, https://cass.independent-review.uk/publications/interim-report/.

[22] Cass (2022) at 36–38; Levine, *Informed Consent for Transgendered Patients*, J. Sex & Marital Therapy (2018) at 5–9.

214. Instead of benefits, studies that have tracked individuals into life after transition—life a decade or more later—have found strikingly high rates of mental illness, suicide, and mortality from a variety of causes.[23]

215. The District's policy and its actions here contravene the evidence showing the need to include parents when adolescents are struggling with gender confusion or gender dysphoria.

216. By using male pronouns and a masculine name for G.M., the District was recklessly engaging in a psychosocial intervention that increased the odds G.M. would continue to struggle with gender confusion.

## IX. The District's actions violated the Meads' sincerely held religious beliefs and their parental rights.

217. The Meads' Christian faith and religious beliefs are central to the way they live their lives and raise their family.

218. The Meads' beliefs are founded on the Bible.

219. The Meads strive to live out their Christian faith daily by incorporating it into their whole lives, including their work, home, and family life.

220. While the Meads do not impose their Christian beliefs on anyone, those beliefs shape and govern their views about human nature, childrearing, the parent-child relationship, sexuality, and gender identity, among other topics.

221. The Meads believe that God created the family and charged parents with the primary responsibility of raising, guiding, and caring for their children.

222. The Meads believe that parents and family play an essential role in maintaining a child's physical and mental health and wellbeing.

---

[23] Levine (2023) at 1; Glintborg et. al. (2023) at 342–43.

223.    The Meads believe that they have a God-given responsibility to provide for and participate in all aspects of their children's upbringing and in a way that is consistent with their faith.

224.    This responsibility extends not just to spiritual growth and training, but also to the arenas of education and physical, mental, and emotional health.

225.    The Meads' faith also teaches that God created two sexes, male and female, and that these two sexes are a core part of God's intended design for humanity.

226.    The Meads believe that each of us is born with a fixed biological sex that is a gift from God, not an arbitrary imposition subject to change.

227.    The Meads' sincerely held religious beliefs prevent them from personally affirming or communicating views about human nature and gender identity that are contrary to those beliefs.

228.    The Meads also believe that referring to a child using pronouns that are inconsistent with the child's biological sex is harmful to the child because to do so communicates a message to and about the child that is untrue.

229.    The Meads' faith also dictates the advice and guidance they believe they should provide to their children on any number of difficult or potentially life-altering decisions, in whatever arenas those difficulties or challenges may arise.

230.    The Meads believe that, because of children's inexperience and immaturity, children often do not appreciate the long-term consequences of their actions and consequently need the advice and counsel of their parents to reach sound decisions.

231.    The Meads believe they must protect their children from making life-changing decisions their children may later regret.

232.    The Meads believe that children should not be encouraged to undertake "social transition" because of the complexity of the issues involved and children's inability to thoroughly assess the long-term consequences of such actions.

233.    The Meads will not encourage one of their children on a path that distances the child from her biological sex, including the use of pronouns inconsistent with the child's biological sex, which would communicate that the child's sex is subject to change.

234.    Instead, the Meads believe that the best approach to resolve gender confusion is to provide their children with talk therapy to identify and address the underlying cause of the confusion, while continually affirming that their child is "fearfully and wonderfully made," *Psalm* 139:14 (ESV); that God's "steadfast love" for their child "never ceases; his mercies never come to an end," *Lamentations* 3:22; and that they seek to mirror God's own love for their children, *see Psalm* 103:13.

235.    The Meads believe they are called to walk with their children through any struggles, reminding their children that they are loved.

236.    Regardless of their children's feelings, beliefs, or actions, the Meads will never stop loving their children or love them any less.

## CAUSES OF ACTION

237.    All the acts, policies, and practices alleged in this Complaint and attributed to Defendants were undertaken and maintained under color of law.

238.    Pursuant to the District's policies, practices, customs, and usages, Defendants socially transitioned G.M. without notifying the Meads or seeking their consent and while concealing these actions from the Meads.

239.    The policies, practices, customs, and usages that led Defendants to socially transition G.M. without notifying the Meads or seeking their consent and while concealing these actions from the Meads remain in full force and effect.

240.    The actions Defendants took to socially transition G.M. without notifying the Meads or seeking their consent and while concealing these actions from the Meads are not narrowly tailored to a compelling governmental interest.

241.    The actions Defendants took to socially transition G.M. without notifying the Meads or seeking their consent and while concealing these actions from the Meads are not rationally related to a legitimate government purpose.

242.    By failing to grant any process to the Meads before socially transitioning G.M., Defendants denied the Meads due process of law.

### FIRST CAUSE OF ACTION
### Free Exercise of Religion
### (U.S. Const., amends. I, XIV; 42 U.S.C. § 1983)

243.    The Meads repeat and reallege each of the allegations in paragraphs 1–242 of this Complaint.

244.    The First Amendment, incorporated against the States by the Fourteenth Amendment, bars state laws "prohibiting the free exercise [of religion]." U.S. Const., amend. I; *see id.*, amend. XIV.

245.    The Meads' free-exercise rights include the right to raise their children in accordance with their religious beliefs and the right to direct their children's education and upbringing consistent with their religious beliefs, including on fundamental questions of existence like how their children should identify themselves. *E.g.*, *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020); *Emp. Div., Dep't of Hum. Res. v. Smith*, 494 U.S. 872, 881–82 (1990); *Parham v. J.R.*, 442 U.S. 584, 590 (1979); *Wisconsin v. Yoder*, 406 U.S. 205, 213–14 (1972); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 518 (1925).

246.    By referring to G.M. with a masculine name and male pronouns without notifying the Meads or seeking their consent and by concealing these

35

actions from the Meads, Defendants substantially burdened the Meads' ability to exercise their religion.

247.    The Meads were substantially burdened in the exercise of their religion because Defendants subjected their daughter to a social transition that directly violates their beliefs and concealed these actions from them.

248.    The Meads were substantially burdened in the exercise of their religion because Defendants' concealment of its social transition of G.M. interfered with their ability to counteract Defendants' message that people can change their sex.

249.    During the approximately two-month period that Defendants were concealing from the Meads the actions taken to socially transition G.M., the Meads were unable to exercise their religion by choosing to educate G.M. in an environment that would not have undermined their religious beliefs.

250.    The First Amendment bars application of a neutral, generally applicable law to religiously motivated action when that action implicates parents' right to direct the upbringing and education of their children.

251.    Because Defendants have substantially burdened the Meads' right to exercise their religion by directing their daughter's upbringing and education, Defendants' actions receive strict scrutiny.

252.    Defendants' actions also receive strict scrutiny because they were neither neutral towards religion nor generally applicable.

253.    Defendants consider whether to notify parents of a social transition "on a case-by-case basis."

254.    Applying that instruction to the Meads required Defendants to take the Meads' individualized circumstances into consideration when deciding whether

to notify them that Defendants were referring to G.M. by a masculine name and male pronouns.

255. The discretionary nature of this inquiry renders Defendants' actions neither neutral nor generally applicable.

256. Because Defendants' actions interfere with the Meads' First Amendment right to direct their children's education and upbringing, and because those actions are neither neutral toward religion nor generally applicable, they receive strict scrutiny.

257. Defendants' actions burdening the Meads' First Amendment rights fail strict scrutiny because they are not narrowly tailored to any compelling interest—indeed, not even rationally related to a legitimate interest.

258. Defendants performed their actions burdening the Meads' First Amendment rights pursuant to a policy, practice, custom, and usage of the District.

259. Defendants' violation of the Meads' First Amendment rights has caused them to suffer damages, including the cost of G.M.'s homeschooling and the lost income due to Mr. Mead's inability to reenter the workforce as expected.

## SECOND CAUSE OF ACTION
### Fundamental Right to Direct Child's
### Upbringing, Education, and Healthcare
### (U.S. Const., amend. XIV; 42 U.S.C. § 1983)

260. The Meads repeat and reallege each of the allegations in paragraphs 1–242 of this Complaint.

261. The Fourteenth Amendment prohibits the States from "mak[ing] or enforc[ing] any law which shall abridge the privileges or immunities of citizens of the United States," and from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1.

37

262.    This Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

263.    Among the fundamental rights and liberty interests the Supreme Court has recognized is "the [liberty] interest of parents in the care, custody, and control of their children"—"perhaps the oldest of the fundamental liberty interests recognized" by the Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.).

264.    This includes parents' fundamental rights to establish a home and bring up children, including by directing and controlling their children's upbringing, education, and healthcare.

265.    The fundamental right of parents to direct the upbringing, education, and healthcare of their children is "objectively, 'deeply rooted in this Nation's history and tradition.'" *Glucksberg*, 521 U.S. at 720–21 (citation omitted); *see Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 418 (6th Cir. 2019).

266.    Fundamental parental rights have deep common-law roots. *See, e.g.*, 1 William Blackstone, *Commentaries on the Laws of England* *446–53 (describing the rights of parents at common law in England), http://bit.ly/3leX7za; 2 James Kent, *Commentaries on American Law* *189–217 (10th ed. 1860) (same, in the United States), https://bit.ly/3ttTN79.

267.    Fundamental parental rights have long encompassed matters related to education that sweep beyond formal schooling, including parents' right to guide their children through difficult and potentially life-altering decisions, like how to address a child's gender confusion or how to shape a child's core identity.

268.    Parents' fundamental right to guide their children's upbringing, education, and healthcare reaches its peak on matters of great importance.

269.    Questions about children's identity as male or female, what that identity means for their lives, and whether they can change that identity are important matters that fall within parents' right to counsel their children and direct their upbringing, education, and healthcare.

270.    Parental involvement is essential to adequately address the multi-faceted nature of a child's gender confusion or gender dysphoria.

271.    The Constitution requires courts to presume that parents will act in the best interests of their children.

272.    Cutting parents entirely out of decisions concerning such issues is inconsistent with that presumption and deprives them of the opportunity to counter influences on their children that they find inimical to their religious beliefs or the values they wish to instill in their children.

273.    By referring to G.M. with a masculine name and male pronouns without notifying the Meads or seeking their consent and by concealing these actions from the Meads, Defendants interfered with and denied the Meads their fundamental right to direct the upbringing, education, and healthcare of their daughter about important topics like her identity as a young woman.

274.    Defendants also interfered with and denied the Meads their fundamental right to direct the upbringing, education, and healthcare of their daughter by preventing them from counteracting Defendants' messages about sex and gender and from counseling her about important decisions like whether she should socially transition at school, receive therapy related to gender confusion, or take some other course of action.

275.    During the approximately two-month period that Defendants were actively concealing from the Meads their actions to socially transition G.M., Defendants interfered with the Meads' fundamental right to direct the upbringing,

39

education, and healthcare of G.M., because they lacked the knowledge necessary to exercise their right to choose to educate G.M. in an environment that would not have undermined their religious beliefs.

276.    Defendants' actions to deliberately alter G.M.'s records to remove references to the District's masculine name and male pronouns exacerbates the interference with the Meads' fundamental rights.

277.    Additionally, the Constitution generally requires parental consent to any decisions involving children's healthcare.

278.    Deciding how best to help a child struggling with gender confusion or gender dysphoria is the sort of decision for which the Fourteenth Amendment requires parental consent.

279.    When referring to G.M. by a masculine name and male pronouns, Defendants engaged in so-called "social transition," which is a psychotherapeutic intervention for gender dysphoria that scientific evidence demonstrates has a powerful psychological effect on development and the outcomes of a child.

280.    By socially transitioning G.M. without notifying the Meads or seeking their consent, Defendants denied the Meads their fundamental right to direct their daughter's healthcare related to the important topic of gender confusion or gender dysphoria.

281.    Defendants' alteration of G.M.'s school records is an affirmative step of concealment that also violated the Meads' fundamental parental rights.

282.    Because social transition makes it more likely that a child's gender confusion or gender dysphoria will persist into adulthood, Defendants' actions burdened the Meads' exercise of their right to direct G.M.'s healthcare.

40

283.    Strict scrutiny applies to Defendants' violation of the Meads' fundamental rights to direct the upbringing, education, and healthcare of their daughter.

284.    Defendants' actions violating the Meads' fundamental rights are neither narrowly tailored to any compelling interest nor rationally related to a legitimate interest.

285.    Defendants performed their actions violating the Meads' fundamental rights pursuant to a policy, practice, custom, and usage of the District.

286.    Defendants' violation of the Meads' fundamental rights has caused them to suffer damages, including the cost of G.M.'s homeschooling and the lost income due to Mr. Mead's inability to reenter the workforce as expected.

## THIRD CAUSE OF ACTION
### Deprivation of Liberty without Due Process
### (U.S. Const., amend. XIV; 42 U.S.C. § 1983)

287.    The Meads repeat and reallege each of the allegations in paragraphs 1–242 of this Complaint.

288.    The U.S. Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1.

289.    In general, procedural-due-process principles protect persons from deficient procedures that lead to the deprivation of cognizable liberty interests.

290.    To establish a procedural-due-process violation, the Meads need to show that that they have been deprived of a cognizable liberty interest, and that such deprivation occurred without adequate procedural protections. *Schulkers v. Kammer*, 955 F.3d 520, 545 (6th Cir. 2020).

41

291.    The liberty interest of parents in "the care, custody, and control of their children … is perhaps the oldest of the fundamental liberty interests." *Troxel*, 530 U.S. at 65 (plurality op.).

292.    Parents' procedural-due-process rights are violated if parental consent or a court authorization is not obtained before government conduct that can cause physical or psychological injury to a child, unless the child is in imminent danger.

293.    Defendants deprived the Meads of a cognizable liberty interest when they referred to G.M. by a masculine name and male pronouns without notifying the Meads or seeking their consent and when they concealed those actions.

294.    Those actions served to socially transition G.M., a psychotherapeutic intervention that has a powerful psychological effect on the development of an adolescent.

295.    Defendants' actions were sufficiently invasive to trigger procedural safeguards.

296.    But Defendants failed to give, or even attempt to give, notice to the Meads of their intent to "socially transition" G.M.

297.    Defendants also deprived the Meads of a hearing or an opportunity to object to Defendants' actions toward their daughter.

298.    Defendants did not provide the Meads with *any* procedural protection whatsoever before depriving the Meads of a cognizable liberty interest.

299.    Instead, Defendants took affirmative steps to deceive the Meads about their actions to socially transition G.M., which removed any possibility of process before or during the deprivation of the Meads' liberty interest.

300.    Defendants violated the Meads' right to procedural due process.

301.    Defendants performed their actions violating the Meads' procedural-due-process rights pursuant to a policy, practice, custom, and usage of the District.

42

302.   Defendants' violation of the Meads' procedural-due-process rights has caused them to suffer damages, including the cost of G.M.'s homeschooling and the lost income due to Mr. Mead's inability to reenter the workforce as expected.

## PRAYER FOR RELIEF

The Meads respectfully request that this Court enter judgment against Defendants and provide the following relief:

A.   A declaration that the District's policy facially and as applied to the Meads violates the Meads' First and Fourteenth Amendment rights under the United States Constitution;

B.   Nominal damages, compensatory damages, and such other damages to which the Meads may be entitled;

C.   The Meads' reasonable attorneys' fees, court costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and,

D.   All other relief to which the Meads may be entitled.

Dated: December 18, 2023                    Respectfully submitted,

                                            */s/ John J. Bursch*

DAVID A. CORTMAN                            JOHN J. BURSCH
Georgia Bar No. 188810                      Michigan Bar No. P57679
ALLIANCE DEFENDING FREEDOM                  ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E.,            440 First Street NW, Suite 600
  Suite D1100                               Washington, DC 20001
Lawrenceville, Georgia 30043                (202) 393-8690
(770) 339-0774                              jbursch@ADFlegal.org
dcortman@ADFlegal.org

KATHERINE L. ANDERSON                       VINCENT M. WAGNER
Arizona Bar No. 33104                       Virginia Bar No. 98663
ALLIANCE DEFENDING FREEDOM                  ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street                        44180 Riverside Parkway
Scottsdale, Arizona 85260                   Lansdowne, Virginia 20176
(480) 444-0020                              (571) 707-4655
kanderson@ADFlegal.org                      vwagner@ADFlegal.org

*Attorneys for Plaintiffs*

## VERIFICATION OF COMPLAINT

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the factual allegations in paragraphs 1–22, 25–26, 28–189, 217–236 of the foregoing are true and correct to the best of my knowledge, and that these statements are based on my personal knowledge.

Executed on December __16__, 2023.

Dan Mead