**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

DAN MEAD and JENNIFER MEAD,

                Plaintiffs,

v.

ROCKFORD PUBLIC SCHOOL
DISTRICT and ROCKFORD PUBLIC
SCHOOLS' BOARD OF EDUCATION,

                Defendants.

Case No. 1:23-cv-01313

Hon. Paul L. Maloney

Mag. Ray Kent

---

## DEFENDANTS ROCKFORD PUBLIC SCHOOL DISTRICT AND ROCKFORD PUBLIC SCHOOLS' BOARD OF EDUCATION'S BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS

<u>Table of Contents</u>

<u>Page</u>

Index of Authorities ........................................................................................................... iii

Introduction ......................................................................................................................... 1

Allegations ........................................................................................................................... 1

    A.    The SBE Guidance ................................................................................. 1

    B.    Plaintiffs' allegations .......................................................................... 4

Standard of Review ............................................................................................................. 6

Argument .............................................................................................................................. 7

I.    Plaintiffs' Fourteenth Amendment Fundamental Parental Rights Claim
Fails as a Matter of Law. (Count II). ................................................................... 7

    A.    Plaintiffs do not allege interference with a fundamental right. ............... 8

        1.    Plaintiffs do not sufficiently allege that Rockford interfered
with their constitutional right to "direct the education" of
their child. ............................................................................. 8

        2.    Plaintiffs do not sufficiently allege that Rockford interfered
with their constitutional right to make decisions concerning
the care, custody, control, and upbringing of their child. .......... 11

        3.    Plaintiffs do not sufficiently allege that Rockford interfered
with their constitutional right to make medical decisions for
their child. ........................................................................... 17

    B.    Plaintiffs do not state a plausible claim that Rockford violated their
constitutional rights under the Fourteenth Amendment ......................... 19

        1.    Rockford's policy is not subject to strict scrutiny and easily
passes constitutional muster .................................................. 19

        2.    Even if strict scrutiny applied, Rockford's policy of
adhering to the SBE Guidance survives judicial review ............. 20

II.    Plaintiffs' First Amendment free exercise claim fails as a matter of law. ......... 23

    A.    Rockford has not burdened Plaintiffs' religious exercise. ..................... 24

Table of Contents
(continued)

Page

    B.     Rockford's policy is neutral and generally applicable.............................................27

    C.     Rockford's policy is narrowly tailored to a compelling state interest.............................................................................................................30

III.    Plaintiffs' Fourteenth Amendment procedural due process claim fails as a matter of law.  (Count III)...............................................................................31

Conclusion ............................................................................................................32

<u>Index of Authorities</u>

<u>Page</u>

**Cases**

*Anspach ex rel. Anspach v. City of Philadelphia*,
    503 F.3d 256 (3d Cir. 2007)..............................................................................8, 22

*Arnold v. Board of Education*,
    880 F.2d 305 (11th Cir. 1989) .......................................................................12, 13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................................................6

*Bazzetta v. McGinnis*,
    430 F.3d 795 (6th Cir. 2005) ..............................................................................31

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................................6

*Blau v. Fort Thomas Pub. Sch. Dist.*,
    401 F.3d 381 (6th Cir. 2005) ..................................................................7, 10, 19

*Bostock v. Clayton Cnty*,
    140 S. Ct. 1731 (2020)........................................................................................21

*Bowen v. Roy*,
    476 U.S. 693 (1986)......................................................................................24, 25

*Brown v. Board of Educ.*,
    347 U.S. 483 (1954)............................................................................................21

*C.N. v. Ridgewood Bd. of Educ.*,
    430 F.3d 159 (3d Cir. 2005)..................................................................................8

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993)............................................................................................27

*Commonwealth v. Beshear*,
    981 F.3d 505 (6th Cir. 2020) ..............................................................................27

*County of Sacramento v. Lewis*,
    523 U.S. 833 (1998)............................................................................................19

*Craigmiles v. Giles*,
    312 F.3d 220 (6th Cir. 2002) ..............................................................................30

Index of Authorities
(continued)

Page

*Dahl v. Bd. of Trustees of W. Michigan Univ.*,
 15 F.4th 728 (6th Cir. 2021) .................................................26, 29

*Dobbs v. Jackson Women's Health Org*,
 142 S. Ct. 2228 (2022)...........................................................7, 11

*Dodds v. United States Dept. of Educ.*,
 845 F.3d 217 (6th Cir. 2016) ........................................................22

*Doe by & through Doe v. Boyertown Area Sch. Dist.*,
 276 F. Supp. 3d 324 (E.D. Pa. 2017) ............................................18, 22

*Doe No. 1 v. Bethel Loc. Sch. Dist. Bd. of Educ.*,
 No. 3:22-CV-337, 2023 WL 5018511 (S.D. Ohio Aug. 7, 2023) ....................11, 20

*Doe v. Irwin*,
 615 F.2d 1162 (6th Cir. 1980) .................................................12, 17, 22

*Doe v. Miami Univ.*,
 882 F.3d 579 (6th Cir. 2018) ........................................................20

*Eidson v. State of Tennessee Dep't of Children's Servs.*,
 510 F.3d 631 (6th Cir. 2007) .........................................................6

*Employment Division v. Smith*,
 494 U.S. 872 (1990)...............................................................24, 28

*Equal Emp. Opportunity Comm'n v. R.G. &. G.R. Harris Funeral Homes, Inc.*,
 884 F.3d 560 (6th Cir. 2018) ........................................................21

*Foote v. Town of Ludlow*,
 No. CV 22-30041-MGM, 2022 WL 18356421 (D. Mass. Dec. 14, 2022)............17, 18, 20

*Fulton v. City of Philadelphia*,
 141 S. Ct. 1868 (2021)........................................................28, 29, 31

*Grimm v. Gloucester Cnty. Sc. Bd.*,
 972 F.3d 586 (4th Cir. 2020) ........................................................17

*Gruenke v. Seip*,
 225 F.3d 290 (3d Cir. 2000)..........................................................13

*John and Jane Doe Parents 1 v. Montgomery County Board of Education*,
 622 F. Supp. 3d 118 (D. Md. 2022)...............................................14, 15

Index of Authorities
(continued)

Page

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022)......................................................................................................24

*Leatherman v. Tarrant County*,
  507 U.S. 163 (1993)..................................................................................................12, 13

*League of United Latin Am. Citizens v. Bredesen*,
  500 F.3d 523 (6th Cir. 2007) ..........................................................................................6

*Lehnhausen v. Lake Shore Auto Parts Co.*,
  410 U.S. 356 (1973).......................................................................................................30

*Leontiev v. Corbett School District*,
  333 F. Supp. 3d 1054 (D. Or. 2018) ..............................................................................14

*Living Water Church of God v. Charter Twp. of Meridian*,
  258 F. App'x 729 (6th Cir. 2007) ..................................................................................26

*Lyng v. Northwest Indian Cemetery Protective Association*,
  485 U.S. 439 (1988)...........................................................................................24, 25, 26

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*,
  584 U.S. 617 (2018)..................................................................................................27, 28

*Mejia v. Holt Pub. Sch.*,
  No. 5:01-CV-116, 2002 WL 1492205 (W.D. Mich. Mar. 12, 2002)..............................32

*Meyer v. Nebraska*,
  262 U.S. 390 (1923).......................................................................................................8, 9

*Mozert v. Hawkins Cnty. Bd. of Educ.*,
  827 F.2d 1058 (6th Cir. 1987) ......................................................................................25

*Norwood v. Harrison*,
  413 U.S. 455 (1972).......................................................................................................10

*Parents Defending Educ. v. Olentangy Sch. Dist.*,
  ---F.Supp.3d---, 2023 WL 4848509 (S.D. Ohio 2023) ..............................................10, 30

*Pierce v. Soc'y of Sisters*,
  268 U.S. 510 (1925).................................................................................................8, 9, 10

*Planned Parenthood of Cent. Missouri v. Danforth*,
  428 U.S. 52 (1976).........................................................................................................22

Index of Authorities
(continued)

Page

*Reardon v. Midland Community Schools*,
    814 F. Supp. 2d 754 (E.D. Mich. 2011)............................................................13, 14

*Regino v. Staley*,
    No. CV 23-00032-JAM-DMC, 2023 WL 4464845 (E.D. Cal. 2023) ..............................16, 17

*Reno* v. *Flores*,
    507 U.S. 292 (1993)....................................................................................7

*Roberts v. Neace*,
    958 F.3d 409 (6th Cir. 2020) ...........................................................................24

*Runyon v. McCrary*,
    427 U.S. 160 (1976)....................................................................8, 9, 10, 11

*Seal v. Morgan*,
    229 F.3d 567 (6th Cir. 2000) ...........................................................................21

*Tandon v. Newsom*,
    593 U.S. 61 (2021).....................................................................................28

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969)....................................................................................21

*Troxel v. Grandville*,
    530 U.S. 57 (2000)...................................................................................8, 32

*Vandiver v. Hardin Cnty. Bd. of Educ.*,
    925 F.2d 927 (6th Cir. 1991) ...........................................................................25

*Washington v. Glucksberg*,
    521 U.S. 702 (1997)....................................................................................7

*Wilkinson v. Austin*,
    545 U.S. 209 (2005)...............................................................................31, 32

*Willey v. Sweetwater County School District*,
    --F. Supp. 3d--, No. 23-CV-069-SWS, 2023 WL 4297186
    (D. Wyo. June 30, 2023)......................................................15, 16, 17, 27

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972)..............................................................................8, 9, 21

Index of Authorities
(continued)

Page

**Other Authorities**

34 C.F.R. § 300.305 ................................................................................................5

Black's Law Dictionary (11th ed. 2019)................................................................30

U.S. Const. amend. I ..............................................................................................23

## INTRODUCTION

Plaintiffs Dan and Jennifer Mead ("Plaintiffs") brought this action against Rockford Public School District and its Board of Education ("Rockford"), claiming that Rockford's decision to adhere to written guidance from the State Board of Education on "Safe and Supportive Learning Environments for LGBTQ Students" ("SBE Guidance") interfered with their Free Exercise and Due Process rights under the Constitution. Specifically, they claim that Rockford violated these Constitutional rights by—consistent with SBE Guidance—honoring the request of Plaintiffs' middle school child to use a preferred name and pronouns without immediately communicating that request to Plaintiffs. The Complaint is devoid of any allegations that Rockford coerced or encouraged Plaintiffs' child to make this request, or that school personnel in any way discouraged Plaintiffs' child from talking to them about his expressed gender identity. Instead, Plaintiffs' lawsuit attempts to impose on Rockford a Constitutional duty—which has never been recognized by any federal court—to immediately notify parents whenever their children act in a manner at school that would run counter to the parents' personal religious or moral beliefs. No such right is found within the Constitution. Plaintiffs' Complaint should therefore be dismissed.

## ALLEGATIONS

While Rockford challenges the veracity of many of Plaintiffs' allegations, they are taken as true solely for purposes of this motion.

### A.     The SBE Guidance

Plaintiffs allege that Rockford has adopted as its "policy" the SBE Guidance. (Complaint ¶¶ 177, 179-180; SBE Guidance, ECF No. 1-3). In September 2016, the State Board of Education adopted the SBE Guidance, which is intended to ensure a safe and supportive learning environment for LGBTQ Students. The SBE Guidance explains that "[r]esearch indicates that LGBTQ students, nationally and in Michigan, are targeted with physical violence and experience a hostile school

environment more frequently than their non-LGBTQ peers" and that "[s]upportive environments that acknowledge and affirm a student's identity are protective factors that improve health and educational outcomes." (ECF No. 1-3, PageID.52).

The SBE Guidance emphasizes the "increased risks facing transgender and [gender non-conforming] students, as well as the unique circumstances that may arise when working with these students and their families," and therefore provides "additional guidance and recommendations to help ensure these students receive the same educational opportunities as their peers." (*Id.* PageID.54). The SBE Guidance recognizes that "the legal basis for the following recommendations is grounded in the U.S. Department of Education (USED) Office for Civil Rights' (OCR) interpretation of Title IX," which "consistent with courts' and other agencies' interpretations of federal laws prohibiting sex discrimination," and provides that "schools must not treat a transgender student differently from the way they treat other students of the same gender identity, regardless of the student's sex assigned at birth." (*Id.*)

The intent of the SBE Guidance is to "facilitate district compliance with local, state, and federal laws, while furthering the goals of cultivating and sustaining caring, supportive, respectful, and affirming learning environments that provide for the education, safety, and welfare of all students." (*Id.*). The Guidance therefore includes recommendations on how to navigate the complex situation when the student has not yet "come out" to their parent, explaining that "[t]he unique needs and concerns of each student should be addressed on a case-by-case basis, with a student-centered approach that includes the ongoing engagement of the student, the parent(s) (except in situations where educators are aware parental knowledge might threaten the student's safety and/or welfare), and school personnel with a legitimate educational interest per the Family Education Rights and Privacy Act (FERPA)." (*Id.* PageID.54-55). When addressing specific issues

that may arise when a student has not yet "come out" to their parents, the SBE Guidance

recommends that schools balance the school's responsibility to keep parents informed with the

privacy rights and health, safety, and welfare needs of the student:

> (1) Student Identity. Gender identity is . . .  a core part of a person's identity. When a student's gender identity is respected by schools and supported by parents, the student is more likely to learn and thrive. The person best situated to determine a student's gender identity is the individual student. In the case where a student is not able to self-advocate, the request to treat the student in accordance with their gender identity will likely come from the student's parents or guardians. Outside confirmation from medical or mental health professionals, or documentation of legal changes, is not required. **When students have not come out to their parent(s), a disclosure to parent(s) should be carefully considered on a case-by-case basis, school districts should consider the health, safety, and well-being of the student, as well as the responsibility to keep parents informed. Privacy considerations may vary with the age of the students . . . .**

> (2) Names and Pronouns. **When requested by the parent/guardian and/or student, school staff should engage in reasonable and good faith efforts to address students by their chosen name and pronouns that correspond to their gender identity, regardless of whether there has been a legal name change.** Upon request, the chosen name and gender should be included in the district's information management systems, in addition to the student's legal name. District-generated student email addresses should also reflect the student's chosen name, if first names are identifiable in such addresses. These changes inform all staff, including substitute teachers, of the name and pronoun to use when addressing the student, and help avoid inadvertent disclosures.

> (4) Privacy and Confidentiality Regarding Disclosures. A student's transgender status, birth name, and sex assigned at birth are confidential information and considered personally identifiable information (PII) under FERPA. Schools should engage in reasonable and good faith efforts to protect students' and their family's privacy by not disclosing, or requiring students or their parent/guardian to disclose, PII to the school and/or school community. Such disclosures may be harmful, infringe upon the privacy of students and their families, and may possibly violate FERPA or constitutional privacy protections. **When students have not come out to their parent(s), a disclosure to parent(s) should**

> **be carefully considered on a case-by-case basis. School districts should consider the health, safety, and well-being of the student, as well as the responsibility to keep parents informed. Privacy considerations may vary with the age of the students.**

(*Id.* PageID.55-56).

### B. Plaintiffs' allegations

Plaintiffs' child, F.M.,[1] attended Rockford's East Middle School until the fall of 2022 (F.M.'s 8th grade year), when Plaintiffs withdrew F.M. and began homeschooling him. (Complaint, ¶ 34).

During the 2021/22 school year, when F.M. was in 7th grade, Rockford began the process of evaluating F.M. to determine whether he needed special education services, consistent with the requirements of the Individuals with Disabilities Education Act ("IDEA").  (*Id.* ¶¶ 58-64, 71-72, 74). Rockford staff, including school counselors, worked closely with Plaintiffs and F.M. throughout this process. (*Id.* ¶¶ 46-65).

Toward the end of F.M.'s 7th grade year, on May 4, 2022, F.M. sent his counselor, Erin Cole, a message that said: "Hi Could you email my teachers and tell them to call me F[]?" (*Id.* ¶¶ 66-68). This request was initiated entirely by F.M.  Plaintiffs do not allege that the request was in any way influenced or encouraged by Rockford. After receiving F.M.'s request to go by a different name, Plaintiffs allege that Rockford did not affirmatively notify Plaintiffs that F.M. sent this message to his counselor.  (*Id.* ¶ 69).

F.M. returned to Rockford for 8th grade on August 22, 2022. (*Id.* ¶ 77). Following a visit with Ms. Cole on August 23, 2022, Ms. Cole notified F.M.'s teachers of F.M.'s request to use a preferred name, F[], and male pronouns.  (*Id.* ¶¶ 79-86).

---

[1] The name and pronouns that the student currently prefers are not clear from the complaint, so for purposes of this brief, Rockford will use the name and pronouns that the student requested when he was enrolled.

Meanwhile, Rockford's process of evaluating F.M. for special education services remained ongoing. Part of that evaluation included preparing a "review of existing evaluation data," or REED, evaluation.[2]  (*Id.* ¶¶ 71-72, 74).  When collecting information from teachers to include in the REED, Rockford's neuropsychologist, Heather Slater, noted that several teachers had referred to F.M. as F[], but because legal names are used on all special education documents, Ms. Slater edited those responses to make the name G[] in the REED. (*Id.* ¶ 125). Ms. Slater's edits did not save for one of the teachers who had used the name F[] and male pronouns. (*Id.*  ¶¶ 120, 125).

On October 10, 2022, Mr. Mead attended a meeting with Ms. Slater to discuss F.M.'s autism diagnosis and to review Rockford's REED evaluation for F.M.  (*Id.* ¶¶ 105-110).  Ms. Slater gave Mr. Mead a paper copy of the REED to take home. (*Id.* ¶ 111). After that meeting, Mr. Mead noticed that the REED contained comments referring to F.M. as "F[]" and using male pronouns. (*Id.* ¶¶ 114-118).

Plaintiffs allege that in changing F.M.'s REED evaluation to match F.M.'s legal name and pronouns, Rockford "deliberately changed G.M.'s school records to conceal the fact that the District was treating their daughter as a boy without their knowledge."  (*Id.* ¶ 5).  But Ms. Slater's email, attached as an Exhibit to the complaint, explained that "because we use the legal name in all legal documents (any Spec. Ed. document) I edited all the responses to change the ones where they called him F[ ] and changed it to G[ ] in the write up."  (*Id.* ¶ 125).  In fact, Ms. Slater goes on to explain: "This wasn't to hide anything from parents, it's just the policy for legal documents. After they alerted us to it, I went in and fixed it so it's not F[ ] now I don't think."  (*Id.*)

In other words, as the complaint admits, Ms. Slater explained that she changed the REED evaluation because she was required to use the legal name and biological pronouns on paperwork

---

[2] A "REED evaluation" is used as part of the IEP process.  *See* 34 C.F.R. § 300.305.

submitted to the state as part of the IEP process.  The fact that Ms. Slater revised that paperwork again, after learning that Plaintiffs had already seen F.M.'s preferred name, demonstrates that she wasn't attempting to conceal anything from them; she was simply ensuring that F.M.'s REED evaluation complied with the policy for legal documents.  (*Id.*)

In late October 2022—only two months after Rockford had, at F.M.'s request, begun calling him F.M. and using male pronouns, Plaintiffs chose to remove F.M. from Rockford and began homeschooling. On December 18, 2023, Plaintiffs sued Rockford, bringing three constitutional claims, alleging violations of their (1) First Amendment free exercise rights, (2) Fourteenth Amendment substantive due process rights, and (3) Fourteenth Amendment procedural due process rights.  (*See generally* ECF No. 1).  Plaintiffs seek damages to compensate them for the income they lost after they began homeschooling F.M and the cost of homeschooling F.M.  (*Id.* ¶¶ 259, 286, 302). Plaintiffs also seek a declaration that Rockford's policy—and therefore Michigan's SBE Guidance—is unconstitutional facially and as applied. All three of Plaintiffs' claims fail as a matter of law.

## STANDARD OF REVIEW

"[T]o survive a motion to dismiss, the complaint must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Eidson v. State of Tennessee Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007) (citation omitted).  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citation omitted). "The factual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief."  *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## ARGUMENT

I.    **Plaintiffs' Fourteenth Amendment Fundamental Parental Rights Claim Fails as a Matter of Law. (Count II).**

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). The Supreme Court has long recognized that the Due Process Clause protects the rights specifically enumerated in the Constitution, as well as "some rights that are not mentioned in the Constitution" but are so "deeply rooted in this Nation's history and tradition" that they are "implicit in the concept of ordered liberty." *Dobbs v. Jackson Women's Health Org*, 142 S. Ct. 2228 (2022) (quoting *Glucksberg*, 521 U.S. at 721)).  These rights are often referred to as "fundamental rights." The list of fundamental rights "is short," and "the Supreme Court has expressed very little interest in expanding" the list.  *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 394-395 (6th Cir. 2005). In fact, the Supreme Court has expressly counseled lower courts to be "reluctant to expand the concept of substantive due process because guideposts for decision making in this unchartered area are scarce and open-ended." *Id*. at 395. "[T]he doctrine of judicial self-restraint requires a court to exercise the utmost care whenever asked to break new ground in this field." *Id.* (quoting *Reno* v. *Flores*, 507 U.S. 292, 302 (1993) (cleaned up)).

The Sixth Circuit has therefore instructed that "the first (and often last) issue in this area is the proper characterization of the individual's asserted right." *Id.* at 393 (6th Cir. 2005) (citing *Reno*, 507 U.S. at 302). This is because governmental actions that infringe a fundamental right receive strict scrutiny; otherwise, they receive rational-basis review, which requires them only to be "rationally related to a legitimate state interest." *Id.*

7

### A.    Plaintiffs do not allege interference with a fundamental right.

The Supreme Court has long recognized that parents have a "fundamental right" under the Due Process Clause of the Fourteenth Amendment to make decisions about the "care, custody, and control" of their children, including the right to direct their "education and upbringing." *Troxel v. Grandville*, 530 U.S. 57, 65 (2000); *see also Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925); *Meyer v. Nebraska*, 262 U.S. 390 (1923). "The Supreme Court has never been called upon to define precise boundaries" of this parental liberty interest, but "it is clear that the right is neither absolute nor unqualified." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 182 (3d Cir. 2005).  Indeed, "it is well-established that 'minors, as well as adults, are protected by the Constitution and possess constitutional rights." *Anspach ex rel. Anspach v. City of Philadelphia*, 503 F.3d 256, 261 (3d Cir. 2007). Parental interests must therefore be "balanced with the child's right to privacy, which is also protected under the Due Process Clause." *Id.*

Plaintiffs allege that Rockford violated their "fundamental right" to "direct the education, upbringing, and healthcare" of their child by honoring F.M.'s request to use a preferred name and pronouns for two months, without notifying his parents of the request or obtaining their advance consent.  While there is significant overlap, the case law addressing parents' fundamental rights in the context of "education," "upbringing," and "healthcare" have been analyzed somewhat differently so they are addressed separately below.

### 1.    Plaintiffs do not sufficiently allege that Rockford interfered with their constitutional right to "direct the education" of their child.

While the right to "direct the education" of one's child may sound broad, federal courts—including the Supreme Court and the Sixth Circuit—have interpreted that "fundamental right" very narrowly. See *Runyon v. McCrary*, 427 U.S. 160, 177 (1976) (no parental right to educate children

in private segregated schools). The Supreme Court first alluded to the parental right to "control" their children's education in 1923 in *Meyer*, 262 U.S. 390. There, the Supreme Court struck down a law that prohibited schools from teaching students any language but English before 9th grade, finding that the law interfered with "the power of parents to control the education of their own." *Id.* Two years later, in *Pierce*, 268 U.S. at 534–35, the Supreme Court expressly recognized the parental "right to direct the education" of their child. That case involved a compulsory education law that required students to attend public schools and criminalized the decision to send children to private, religious schools. Several decades later, in *Yoder*, the Supreme Court held that Wisconsin's compulsory education law requiring school until age 16 did not prevent Amish parents from removing their children from school after 8th grade for vocational training, as required by their religious beliefs. *Yoder*, 406 U.S. at 232.  *Yoder* emphasized "the fundamental interest of parents, as contrasted with the State, to guide the religious future and education of their children." *Id.*

Following these decisions, courts began to limit parents' rights to "direct the education" of their children to cases where a law or regulation interfered with a parents' right to direct their children's private or religious education, as opposed to directing their public education.  The Supreme Court in *Runyon*, for instance, noted that Supreme Court decisions following *Pierce* have emphasized the limited scope of the right. *Runyon* explained that *Pierce* "len[ds] no support to the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society,' but rather 'held simply that while a State may posit (educational) standards, it may not pre-empt the educational process by requiring children to attend public schools.'" *Runyon*, 427 U.S. at 177 (quoting *Yoder*, 406 U.S. at 239 (White, J. concurring)). The Supreme Court has repeatedly

9

"stressed the 'limited scope of *Pierce*,' . . . which simply 'affirmed the right of private schools to exist and to operate.'" *Id.* (quoting *Norwood v. Harrison*, 413 U.S. 455, 462 (1972))

Consistent with Supreme Court precedent, the Sixth Circuit has likewise held that parents' fundamental right to "direct the education" of their child is limited to *whether* to send their child to public school—it does not give parents the right to direct school operations, curriculum, or other school decisions that would impact children once their parents have enrolled them. *Blau*, 401 F.3d at 395–96; see also *Parents Defending Educ. v. Olentangy Sch. Dist.*, ---F.Supp.3d---, 2023 WL 4848509, *2 (S.D. Ohio 2023) (finding no parental right to "second-guess [school's] efforts to combat harassment" by implementing school policy prohibiting students from intentionally mis-gendering other students).  In *Blau*, for instance, the court rejected a parent's challenge that the school's dress code interfered with his "fundamental right to direct the education of his child," explaining that the "parental right" is limited in scope:

> The critical point is this: While parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child. Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or, as here, a dress code, these issues of public education are generally "committed to the control of state and local authorities."

*Blau*, 401 F.3d at 395–96. (emphasis in original).

Like the dress code in *Blau*, the SBE Guidance addresses *how* a public school teaches its students, and, particularly, the school's fostering of the learning environment. Specifically, it recommends guidelines intended to "facilitate district compliance with local, state, and federal laws, while furthering the goals of cultivating and sustaining caring, supportive, respectful, and affirming learning environments that provide for the education, safety, and welfare of all students."

(ECF No. 1-3, PageID.54).  Rockford's practice of following the SBE Guidance has no impact whatsoever on whether a parent—including Plaintiffs—may send their child to public or private school or what may be taught at a private school. *See Runyon*, 427 U.S. at 177. To the contrary, as the complaint demonstrates, Plaintiffs exercised their fundamental right to "direct the education of their child" when they removed F.M. from Rockford and began to homeschool.

Because Plaintiffs' complaint does not allege any interference with the limited parental right to direct the education of their child—and instead makes clear that Plaintiffs have exercised that right—Plaintiffs' claim fails as a matter of law.

> **2.    Plaintiffs do not sufficiently allege that Rockford interfered with their constitutional right to make decisions concerning the care, custody, control, and upbringing of their child.**

Plaintiffs allege that Rockford "interfered with and denied . . . their fundamental right  to direct the . . . upbringing" of their child by referring to F.M with a masculine name and pronouns without notifying them or obtaining their consent. (Complaint ¶ 274 ). Though Plaintiffs attempt to couch this within the "fundamental rights" language that the Supreme Court has recognized, Plaintiffs are actually advocating for a sweeping expansion of that right. Namely, they are advocating for a constitutional "parental right" to be affirmatively informed of issues occurring at school that might run counter to choices that they would make about their child's upbringing at home.  Plaintiffs' position asks this Court to "break new ground," and push substantive due process further than the Supreme Court has ever extended it. *See Dobbs*, 597 U.S. at 240. Moreover, no public school could possibly adhere to Plaintiffs' standard. See *Doe No. 1 v. Bethel Loc. Sch. Dist. Bd. of Educ.*, No. 3:22-CV-337, 2023 WL 5018511, at *14 (S.D. Ohio Aug. 7, 2023) (recognizing that "[a]ccommodating the different personal, moral or religious concerns of every parent would be 'impossible' for public schools because different parents would often likely . . . prefer opposite and contradictory outcomes related to how schools operate bathrooms").

An unconstitutional interference with parental rights over the "traditional care, custody, and control" of their children only occurs when the state "either require[es] or prohibit[s] some activity." *Doe v. Irwin*, 615 F.2d 1162, 1168–69 (6th Cir. 1980). In *Irwin*, the Sixth Circuit rejected a challenge from a parent group that alleged that a state-run birth control clinic violated their parental rights by discussing and dispensing birth control to children as young as 14 years old without requiring notice to or consent from their parents. *Id. Irwin* explained that the children were not required to avail themselves of the services offered by the clinic, and neither were the parents prohibited from participating in decisions of their minor children on issues of sexual activity and birth control. The *Irwin* Court recognized that there is no constitutional requirement of notice to parents:

> The desire of the parents to know of such activities by their children is understandable. However the only issue before the district court and this court is whether there is a constitutional obligation on the [clinic] to notify them. The record before us does not establish that the [clinic] infringes a constitutional right of the plaintiffs by its practice of distributing contraceptive devices and medication to unemancipated minors without notice to their parents.

*Id.*

By contrast, the only cases where courts have found that a school interfered with a parent's constitutional right to make decisions about the care, custody, and control of their children have been where the school has exerted coercive pressure on a student. In *Arnold v. Board of Education*, 880 F.2d 305, 312 (11th Cir. 1989), *overruled on other grounds by Leatherman v. Tarrant County*, 507 U.S. 163 (1993), the Eleventh Circuit concluded that "a parent's constitutional right to direct the upbringing of a minor is violated when the minor is coerced to refrain from discussing with the parent an intimate decision such as whether to obtain an abortion[.]" In *Arnold*, the school counselors "allegedly coerced the children to agree" to an abortion, and arranged for the funds and

12

transportation to the medical facility to obtain the abortion.  *Id.* at 308-309.  Likewise, in *Gruenke v. Seip*, 225 F.3d 290, 306 (3d Cir. 2000), the Third Circuit concluded that the plaintiffs had sufficiently alleged a violation of their constitutionally protected parental rights when a swim coach repeatedly pressured a student to take a pregnancy test, including "telling others that it was possible [the student] was pregnant." *Id.* at 306. The student agreed to the test "as a result of threats to bar her from swimming in the state championship meet[.]" *Id.*

Plaintiffs have not alleged that Rockford asserted any sort of coercive pressure on F.M. Instead, the facts alleged here are similar to *Reardon v. Midland Community Schools*, 814 F. Supp. 2d 754 (E.D. Mich. 2011), where the parents alleged that the school interfered with their due process right to decide matters concerning the upbringing of their daughter. In *Reardon*, the parents' relationship with their daughter had deteriorated after she began dating a boy and engaging in behaviors that were contrary to their religious beliefs, including having a sexual relationship with her boyfriend. The daughter complained about her parents to her school counselor and teacher, who began secretly working with her to develop an "exit plan" from their home and otherwise interfered with the parents' ability to oversee and interact with her.  The parents alleged that the counseling, advice, financial assistance, and companionship provided by the school to their daughter interfered with their constitutional right. *Id.* at 769. *Reardon*, however, rejected that challenge because school personnel did not exert coercive pressure on the student to leave her home.  The court explained:

> [Student] may have overreacted to her parents rules, rules that may well have been reasonable, but when [Student] turned to [counselor] and [teacher], neither was constitutionally obligated to meet [Student's] request for assistance with silence or a cold shoulder.  Nothing in the Constitution prohibits school teachers or counselors from counseling students, nor does it require that the teachers and counselors obtain parental consent about the character of

13

their counseling in the context of the facts alleged in this
instance.

*Id.* at 771-772.

A more recent court followed *Reardon's* analysis in a "parental rights" case involving a

transgender student, *Leontiev v. Corbett School District*, 333 F. Supp. 3d 1054 (D. Or. 2018)

(citing *Reardon*). In *Leontiev*, the mother alleged that the school violated her right to the "care,

custody, and companionship of her children" and her First Amendment right to the free exercise

of religion, after her 15-year-old transgender son left her home because he felt she did not support

his gender identity. *Id.* at 1059, 1062. The mother alleged that a school teacher, aide, individual

board member, and various school volunteers took "affirmative action" to separate her from her

child by devising a "plan" to prevent her child from returning home. Part of this plan included the

child staying at different people's homes at night to avoid criminal liability for kidnapping or

harboring a runaway. *Id.* at 1066. The court, however, found no evidence of a constitutional

violation, emphasizing the lack of coercion:

> Although the Fourteenth Amendment protects parents' right
> to associate with and control the upbringing of their children,
> it does not impose on others—including school employees—
> an affirmative duty to turn another person's child away when
> that child seeks comfort, advice, or shelter.

*Id.* at 1065-66.

Several courts have recently addressed—and rejected—Plaintiffs' argument that schools

have an affirmative constitutional duty to notify parents when their children request to use a

preferred name or pronoun. Though vacated on other grounds, the District Court of Maryland

conducted a thorough and instructive analysis of this issue. *See John and Jane Doe Parents 1 v.*

*Montgomery County Board of Education*, 622 F. Supp. 3d 118 (D. Md. 2022), *vacated on other*

*grounds*, 78 F.4th 622 (4th Cir. 2023). In that case, the parents challenged guidelines adopted by

14

the board of education related to transgender and gender non-conforming students. While the guidelines instructed that "the needs of students must be addressed on a case by case basis" and encouraged family involvement, they also emphasized that student privacy rights and student welfare needed to be carefully balanced. School personnel were also instructed to inquire about the level of "support" for the student's expressed gender identity at home, and in some cases, parents would not be informed of their student's expressed gender identity. *Id.* at 125-127. The school board moved to dismiss.

The district court in *Montgomery* identified the constitutional right at stake as "whether the Plaintiffs' constitutional rights as parents encompasses a fundamental right to be promptly informed of their child's gender identity, when it differs from that usually associated with their sex assigned at birth, regardless of their child's wishes or any concerns regarding the detrimental effect the disclosure may have on that child." *Id.* at 130.  After surveying the relevant case law, the district court held that the plaintiffs failed to state a claim that the guidelines violated their fundamental right to "direct the education and upbringing" of their children because there was no fundamental right to affirmative notice. The court also considered the limited cases in which federal courts had found that the actions of school personnel interfered with parents' fundamental rights; noted that they all involved an element of coercion over the student not present in the guidelines; and therefore found that plaintiffs' complaint did not allege a violation of any fundamental right.  *Id.* at 133-139.

In *Willey v. Sweetwater County School District*, --F. Supp. 3d--, No. 23-CV-069-SWS, 2023 WL 4297186 (D. Wyo. June 30, 2023), parents alleged that the defendant-school had violated their fundamental parental rights by using the preferred name and pronouns requested by their child for nearly an entire school year, without notifying the parents or obtaining their consent.

Denying the parents' request for a preliminary injunction, the district court found that the parents were unlikely "to demonstrate the Constitution imposes an affirmative obligation on the District to actively disclose information regarding a student—even in the absence of a parent's inquiry or request." *Willey* did find that the school's student privacy policy, which broadly forbid school personnel from disclosing a student's expressed gender identity to their parents without the student's consent, could burden parents' fundamental rights to the extent it (1) required school personnel to lie to parents in response to a direct parent inquiry and (2) did not require the school to determine that honestly responding to the parent's inquiry would pose a threat to the wellbeing of the student. *Id.* at *15. The SBE Guidance adopted by Rockford does not contain that broad prohibition; on the contrary, the SBE Guidance adopted by Rockford specifically recommends that schools include parents, unless doing so would adversely affect the student's well-being. (ECF No. 1-3, PageID.55-56).

Finally, in *Regino v. Staley*, No. CV 23-00032-JAM-DMC, 2023 WL 4464845 (E.D. Cal. 2023), the plaintiff-parent challenged a school regulation that allegedly "permit[ted] school personnel to 'socially transition' students expressing a transgender identity by referring to them by their preferred names and pronouns," and prohibited school personnel from informing the student's parents without the student's express authorization, unless required by law or to preserve the student's health. *Id.* at *1. The parent alleged that the school counselor "socially transitioned" her child by informing teachers of the student's preferred name and pronouns; intentionally concealed her child's request; and even discouraged her child from sharing information with her. *Id.* The district court rejected the parent's constitutional challenge, concluding that she was "advocating for an expansion of her parental substantive due process rights that is not supported by precedent" because no authority "opine[s] on whether the state has an affirmative duty to inform

16

parents of their child's transgender identity nor whether the state must obtain parental consent before referring to a transgender child by the preferred name and pronouns." *Id.* at *3-4.

Plaintiffs have not plausibly alleged that Rockford inferred with their fundamental right to direct the care, custody, control, and upbringing of their child.

### 3. Plaintiffs do not sufficiently allege that Rockford interfered with their constitutional right to make medical decisions for their child.

Plaintiffs' allegation that Rockford interfered with their right to direct their child's healthcare fails for the same reason as their allegation that Rockford interfered with their parental right to make decision concerning the "care, custody or control" of their child—an unconstitutional interference requires some form of compulsion. *Irwin*, 615 F.2d at 1168. Plaintiffs' complaint is devoid of any allegation that Rockford took any affirmative action to compel or coerce F.M. into receiving any healthcare services from Rockford personnel or anyone else. As the complaint admits, it was F.M.—not Rockford—who initiated the request to use a preferred name and pronouns.

Moreover, unlike in *Irwin*, where it was undisputed that the state provided healthcare to minors by examining them and prescribing birth control, Plaintiffs do not even state facts sufficient to conclude that Rockford provided any sort of "healthcare" to F.M.  Plaintiffs allege that, "by referring to [F.M.] by a masculine name and male pronouns," Rockford "engaged in a so-called 'social transition,' which is a psychotherapeutic intervention for gender dysphoria." (Complaint ¶ 279). But, as numerous courts have recognized, being transgender is not a psychiatric condition and "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." *Willey*, 2023 WL 4297186, *10 (citing *Grimm v. Gloucester Cnty. Sc. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020); *see Foote v. Town of Ludlow*, No. CV 22-30041-MGM, 2022 WL 18356421, at *5 (D. Mass. Dec. 14, 2022) (citing *Grimm* and dismissing claim school usurped

parent's right to make medical and mental health treatment decisions); *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 276 F. Supp. 3d 324, 366 (E.D. Pa. 2017), *aff'd*, 890 F.3d 1124 (3d Cir. 2018), and *aff'd*, 893 F.3d 179 (3d Cir. 2018) (finding being transgender is not a medical or psychiatric condition). And while the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders has recognized "gender dysphoria" as a mental health condition, the complaint acknowledges that F.M. was never diagnosed with gender dysphoria. (Complaint ¶ 57). Rejecting the same argument that using a students' preferred name and pronoun constitutes "social transitioning" that amounts to healthcare, the court in *Foote* explained:

> Plaintiffs have not alleged Defendants' actions were undertaken as part of a treatment plan for gender dysphoria or explained how referring to a person by their preferred name and pronouns, which requires no special training or skill, has clinical significance when there is no treatment plan or diagnosis in place . . . Addressing a person using their preferred name and pronouns simply accords the person the basic level of respect expected in a civil society generally, and, more specifically, in Massachusetts public schools where discrimination on the basis of gender identity is not permitted. This is true regardless of an individual's age . . . **In the absence of supporting factual allegations, such as a relevant medically-recognized diagnosis and treatment plan, the court disregards Plaintiffs' conclusory statements describing the use of preferred names and pronouns as mental health treatment.**

2022 WL 18356421, at *5 (emphasis added). Plaintiffs do not plausibly allege that Rockford provided healthcare treatment to F.M., and neither do they plausibly allege that Rockford interfered with their constitutional right to make healthcare decisions for F.M.

**B.      Plaintiffs do not state a plausible claim that Rockford violated their constitutional rights under the Fourteenth Amendment.**

**1.      Rockford's policy is not subject to strict scrutiny and easily passes constitutional muster.**

For all the reasons discussed above, Plaintiffs' attempt to invoke strict scrutiny fails because Plaintiffs have not alleged that Rockford has infringed on a fundamental right.  Therefore, Plaintiffs' challenge is subject to the low bar of rational basis review, and, to the extent that Plaintiffs allege that they were deprived of their substantive due process rights through executive action, Plaintiffs have not alleged that Rockford's actions "shock the conscience."  *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) ("While due process protection in the substantive sense limits what the government may do in both its legislative and its executive capacities, criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue." *Id.* at 846 (citations omitted).

Rockford's policy of following the SBE Guidance is constitutional under rational basis review.  Under rational basis review, the challenged policy need "only to be rationally related to a legitimate state interest." *Blau*, 401 F.3d at 393 (citation omitted).  Rockford's policy of adhering to the SBE Guidance satisfies rational basis review because it is rationally related to a legitimate state interest. Specifically, the SBE Guidance furthers Rockford's commitment "to promoting a safe, supportive, and inclusive learning environment for all students and ensuring that every student has equal access to educational programs and activities." (ECF No. 1-3, PageID.52). The SBE Guidance also "facilitate[s] district compliance with local, state, and federal laws, while furthering the goals of cultivating and sustaining caring, supportive, respectful, and affirming learning environments that provide for the education, safety, and welfare of all students." (ECF No. 1-3, PageID.54).

This is not an easy issue for any school to address. It requires the school's care and attention to the needs and rights of the students, the parents' interest in their children, and the school's obligations under Title IX and federal and state constitutions. Rockford's policy strikes a careful balance in furthering its indisputable interest in fostering the school's learning environment.

To the extent that the "shock the conscience" standard, rather than rational basis review, applies to Plaintiffs' substantive due process challenge, that standard is readily met here. "Executive action shocks the conscience when it is arbitrary, or conscience shocking, in a constitutional sense." *Doe v. Miami Univ.*, 882 F.3d 579, 599 (6th Cir. 2018) (citation and internal quotations omitted). "Moreover, this characterization applies to only the most egregious official conduct, conduct that is so brutal and offensive that it [does] not comport with traditional ideas of fair play and decency." *Id.* (alternations in *Doe*). In a recent case applying this standard, the court found that the actions of school personnel did not "shock the conscience" as a matter of law, where the school disregarded the plaintiff-parents' request that school staff not have conversations with their child about mental health and possible same-sex attraction, and then, consistent with school policy, began honoring their two children's requests to use preferred names and pronouns without notifying the parents. *Foote*, 2022 WL 18356421, at *2, 8. Plaintiffs have not alleged that any Rockford officials violated their substantive due process in an egregious or conscience-shocking manner. But even if they had, Rockford's actions, as alleged, do not meet this high bar.

### 2.    Even if strict scrutiny applied, Rockford's policy of adhering to the SBE Guidance survives judicial review.

But even if Plaintiffs had asserted violation of a fundamental parental right, the Guidelines would survive strict scrutiny because they are narrowly tailored to a compelling state interest. Adhering to the SBE Guidelines furthers at least three of Rockford's compelling interests including: (1) "sustaining caring, supportive, respectful, and affirming learning environments that

provide for the education, safety, and welfare of all students;" (2) not discriminating against transgender and gender nonconforming students; and (3) protecting student privacy.

*First*, Rockford has a compelling interest in "cultivating and sustaining caring, supportive, respectful, and affirming learning environments that provide for the education, safety, and welfare of all students." (ECF No. 1-3, PageID.54). The Supreme Court has long held that the state has a powerful interest in educating its citizens. *See Brown v. Board of Educ.*, 347 U.S. 483, 493 (1954) ("[E]ducation is perhaps the most important function of state and local governments"); *Yoder*, 406 U.S. at 221 (agreeing that the state has a compelling interest in educating its youth, to prepare them both "to participate effectively and intelligently in our open political system," and "to be self-reliant and self-sufficient participants in society"). Rockford's compelling interest encompasses its interest in ensuring the safety of its students. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969) ("[T]he Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools."); *Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000) ("Schools, of course, have an unquestionably powerful interest in maintaining the safety of their campuses and preserving their ability to pursue their educational mission." (citation omitted)). As the SBE Guidance observes, "[r]esearch indicates that LGBTQ students . . . are targeted with physical violence and experience a hostile school environment more frequently than their non-LGBTQ peers."  (ECF No. 1-3, PageID.52).  Rockford balances the compelling interest in student safety by evaluating disclosure on a case-by-case basis.

*Second*, Rockford has a compelling interest in not discriminating against transgender and gender nonconforming students. *See, e.g.*, *Equal Emp. Opportunity Comm'n v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 576 (6th Cir. 2018), *aff'd sub nom. Bostock v. Clayton Cnty*,

140 S. Ct. 1731 (2020) (concluding that "discrimination against transgender persons necessarily implicates Title VII's proscriptions against sex stereotyping"); *Dodds v. United States Dept. of Educ.*, 845 F.3d 217 (6th Cir. 2016) (denying school's request for preliminary injunction against DOE's enforcement of Title IX's anti-discrimination provisions and school's attempt to prevent transgender student from using bathroom associated with her gender identity); *Boyertown Area Sch. Dist.*, 276 F. Supp. 3d at 390 (concluding that the school district had "a compelling state interest not to discriminate against transgender students"). Rockford's policy of following the SBE Guidance ensures that "every student"—including LGBTQ students—"has equal access to educational programs and activities" and ensures that all students are "treated equally, fairly, and [are] protected from discrimination based on their real or perceived sexual orientation, gender identity, and gender expression."  (ECF No. 1-3, PageID.52).

**Third**, Rockford has a compelling interest in protecting the privacy of its students. *See Planned Parenthood of Cent. Missouri v. Danforth*, 428 U.S. 52, 74 (1976) ("Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights.").  The Sixth Circuit has long held that "[t]hough the state has somewhat broader authority to regulate the conduct of children than that of adults, minors do possess a constitutionally protected right of privacy."  *Irwin*, 615 F.2d at 1166 (citations omitted).  In *Irwin*, the Sixth Circuit concluded that there was "no deprivation of the liberty interest of parents in the practice of not notifying them of their children's voluntary decisions to participate in the activities" of a voluntary birth control clinic.  *Id.* at 1168; *see also Anspach*, 503 F.3d at 271 (recognizing that "minors are individuals who enjoy constitutional rights of privacy under substantive due process").  The SBE

Guidance advances Rockford's compelling interest in balancing the students' rights to privacy with the parents' rights to direct their child's upbringing.

Rockford's policy of adhering to the SBE Guidance is narrowly tailored to these three compelling interests. The SBE Guidance is tailored to "[t]he unique needs and concerns of each student," directing that these concerns "should be addressed on a case-by-case basis, with a student-centered approach that includes the ongoing engagement of the student, the parent(s) . . . , and school personnel with a legitimate educational interest."  (ECF No. 1-3, PageID.55).  In cases where the student has not come out to their parents, the SBE Guidance instructs that parental disclosure should be "carefully considered on a case-by-case basis," and that schools "should consider the health, safety, and well-being of the student, as well as the responsibility to keep parents informed." (*Id.* PageID.56). The SBE Guidance therefore contemplates and encourages parental involvement under the appropriate circumstances. Moreover, the SBE Guidance does not coerce students into disclosing issues related to gender identify, nor does it pressure students to withhold information related to gender identity from their parents.

The SBE Guidance is the least burdensome means of advancing Rockford's compelling interests. The policy of immediate parental disclosure under any circumstances, as Plaintiffs' challenge would require, would disable Rockford's ability to ensure a safe and supportive educational environment, as well as jeopardize Rockford's ability to comply with anti-discrimination laws and laws protecting students' privacy.

## II.    Plaintiffs' First Amendment free exercise claim fails as a matter of law.

The Free Exercise Clause of the First Amendment, applied to the states through the Fourteenth Amendment, states: "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const. amend. I. To state a viable claim for a free exercise violation, Plaintiffs must plausibly allege that the District has "burdened [their] sincere religious practice pursuant to

a policy that is not 'neutral' or 'generally applicable.'"  *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (quoting *Employment Division v. Smith*, 494 U.S. 872, 877 (1990)). A neutral and "generally applicable law that incidentally burdens religious practices usually will be upheld" under rational basis review.  *Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020) (citation omitted). Plaintiffs have not pleaded a viable free exercise claim.

> **A.    Rockford has not burdened Plaintiffs' religious exercise.**

Plaintiffs' free exercise claim fails at the outset because Plaintiffs have not plausibly alleged that Rockford's policy burdens their religious exercise in a manner that triggers First Amendment protection. The First Amendment does not give the Plaintiffs the right to direct Rockford's internal policy: "The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures."  *Bowen v. Roy*, 476 U.S. 693, 700 (1986).

The Supreme Court has long held that government action that does not "prohibit"—in other words, does not coerce or penalize—religious exercise does not violate the First Amendment.  For example, in *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988), the Supreme Court held that the free exercise clause did not prevent the government from logging and constructing a road on land used for tribal religious purposes—even though the government's actions indisputably interfered with religious practice. *Id.* at 441-442. The Supreme Court emphasized:  "The crucial word in the constitution is 'prohibit': 'For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can extract from the government.'" *Id.* at 451 (citation omitted).

*Lyng* held that "[w]hatever may be the exact line between unconstitutional prohibitions on the free exercise of religion and the legitimate conduct by government of its own affairs, the location of the line cannot depend on measuring the effects of a governmental action on a religious

24

objector's spiritual development." *Id.* This was true even though the government did not dispute

that "the logging and road-building projects at issue . . . could have devastating effects on

traditional Indian religious practices." *Id.* This is, as the Supreme Court explained, for good reason:

> "However much we might wish that it were otherwise, **government
> simply could not operate if it were required to satisfy every
> citizen's religious needs and desires** . . . The First Amendment
> must apply to all citizens alike, and it can give to none of them a
> veto over public programs that do not prohibit the free exercise of
> religion. **The Constitution does not, and courts cannot, offer to
> reconcile the various competing demands on government, many
> of them rooted in sincere religious belief, that inevitably arise in
> so diverse a society as ours.** That task, to the extent that it is
> feasible, is for the legislatures and other institutions.

*Id.* at 452 (emphasis added); *see also Bowen*, 476 U.S. at 699 ("Never to our knowledge has the

Court interpreted the First Amendment to require the Government *itself* to behave in ways that the

individual believes will further his or her spiritual development or that of his or her family."

(emphasis in original)); *Vandiver v. Hardin Cnty. Bd. of Educ.*, 925 F.2d 927, 934 (6th Cir. 1991)

(citing *Bowen*); *Mozert v. Hawkins Cnty. Bd. of Educ.*, 827 F.2d 1058, 1065 (6th Cir. 1987)

(holding that the plaintiff's free exercise claim failed when there was no "governmental

compulsion").

The Sixth Circuit has likewise emphasized that, to violate the First Amendment,

government action must coerce or penalize religious exercise: "[W]hile the Supreme Court

generally has found that a government's action constituted a substantial burden on an individual's

free exercise of religion when that action forced an individual to choose between 'following the

precepts of her religion and forfeiting benefits' or when the action in question placed 'substantial

pressure on an adherent to modify his behavior and to violate his beliefs,' . . . it has found no

substantial burden when, although the action encumbered the practice of religion, it did not

pressure the individual to violate his or her religious beliefs." *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 734 (6th Cir. 2007) (citations omitted).

At base, as the Supreme Court held in *Lyng*, "[t]he crucial word in the constitutional text is 'prohibit,'" and the free exercise clause does not address "what the individual can extract from the government." 485 U.S. at 451. Plaintiffs have not plausibly alleged that Rockford's policy prohibits their religious exercise in any constitutionally meaningful way. They have not alleged that the policy subjects them to improper penalties or coercion, even in an indirect manner. *See Dahl v. Bd. of Trustees of W. Michigan Univ.*, 15 F.4th 728, 732 (6th Cir. 2021) ("The Free Exercise Clause, we reiterate, 'protects against indirect coercion or penalties on the free exercise of religion.'" (citation omitted)).

Plaintiffs instead allege that Rockford's alleged failure to inform them of F.M.'s request to use different pronouns meant that they were unable to exercise their religion by choosing to educate G.M. in an environment that would not have undermined their religious beliefs." (Complaint ¶ 249). Absent from Plaintiffs' complaint is any allegation of that Rockford applied "coercive force" or "threatened a penalty to impede" Plaintiffs' religious exercise. *Dahl*, 15 F.4th at 732. As Plaintiffs' complaint recognizes, pursuant to its policy of following the SBE Guidance, Rockford responded to F.M.'s request to be called by a particular name and with particular pronouns. Those actions did not impermissibly burden F.M.'s parents' religious exercise rights in violation of the free exercise clause.

At base, Rockford's policy was limited to how the school interacted with F.M. at school, and nothing about Rockford's adoption of the SBE Guidance reached into Plaintiffs' home and coerced Plaintiffs. During the two months that Rockford was using F.M.'s requested name and pronouns, Plaintiffs remained free to use G[] and female pronouns. Plaintiffs remained free to take

F.M. to church, and to otherwise direct F.M.'s upbringing in a manner that aligned with their religious values.

In a very similar case, *Willey*, 2023 WL 4297186, at *19, the District of Wyoming concluded that the plaintiff-parents were unlikely to succeed on the merits of their free exercise claim at the "burden" prong:

> What is notably absent is any allegation of coercion or compulsion. As parents, they are not being coerced or compelled into recognizing any individual in any particular way inconsistent with their religious beliefs. Nor are they being compelled or coerced to lie to anyone, or to "speak" any particular truth. Rather, the District is recognizing a third-party—in this case, the Student—by the Student's requested preferred name and allegedly not sharing that information with them. Under the case law such a causal relationship is likely to [sic] attenuated to create the requisite "burden" on religious beliefs.

*Id.* The same is true here. Plaintiffs' free exercise claim fails as a matter of law because Plaintiffs have not plausibly alleged that Rockford's policy burdens their religious practice in violation of the First Amendment.

### B. Rockford's policy is neutral and generally applicable.

Even if Plaintiffs had pleaded that Rockford's policy burdened their religious exercise in violation of the First Amendment, Rockford's policy is neutral and generally applicable and is therefore subject to rational basis review. *See Commonwealth v. Beshear*, 981 F.3d 505, 509 (6th Cir. 2020). The policy clears that low constitutional hurdle.

The Supreme Court has identified several circumstances under which governmental action is not neutral and generally applicable. First, the government "cannot impose regulations that are hostile to the religious beliefs of affected citizens," including "even 'subtle departures from neutrality.'" *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 584 U.S. 617, 638 (2018) (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993)). Second, government regulations cannot "treat any comparable secular activity more favorably than

religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (citation omitted) (emphasis in *Tandon*).  Third, a governmental policy may not "invite[] the government to consider the particular reasons for a person's conduct by creating a mechanism for individualized exemptions."  *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1871 (2021) (citing *Employment Division v. Smith*, 494 U.S. 872, 884 (1990)).

Rockford's policy is neutral on its face, and it makes no reference to specific religious practices.  Plaintiffs likewise do not allege that Rockford's policy is "hostile to religious beliefs." *See Masterpiece Cakeshop*, 584 U.S. at 638.  Neither do Plaintiffs allege that Rockford's policy treats "comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62.

That leaves whether Rockford's policy contains "a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1871. Plaintiffs allege that, under Rockford's policy, "Defendants consider whether to notify parents of a social transition 'on a case-by-case basis[,]'" and that "[t]he discretionary nature of this inquiry renders Defendants' actions neither neutral nor generally applicable." (Complaint ¶¶ 253, 255). This argument fails as a matter of law, for two reasons.

First, Plaintiffs allege that Rockford deprived them of their free exercise rights pursuant to Rockford's policy. And Plaintiffs allege that *Rockford's policy* is to follow the SBE Guidance: "The District voluntarily acted to adopt this [the SBE] guidance document as its policy related to gender identity." (Complaint ¶ 179). Plaintiffs allege that Rockford's policy is a wholesale adoption of the SBE Guidance: "[Principal] Burkholder confirmed that the Rockford's policy was to follow state guidance regarding the use of opposite-sex pronouns and names for students like

G.M."  (*Id.* ¶ 180; *see also id.* ¶ 181 ("Ms. Slater also confirmed that the District followed this non-mandatory guidance as its local policy[.]")).

Rockford's policy, therefore, is simply to adhere to the SBE Guidance. Plaintiffs have not alleged that Rockford has altered or deviated from the SBE Guidance in any way. Plaintiffs have not alleged that Rockford's policy adopting the SBE Guidance contains "a mechanism of individualized exemptions." To the contrary, Rockford's alleged policy contains no discretion at all—Rockford's policy is simply to adopt the SBE Guidance.  It makes no difference that the SBE Guidance is "voluntary" or "non-mandatory." Voluntary or not, Rockford's alleged policy is to follow it. To the extent that Plaintiffs object to the "case-by-case" guidance, their quarrel is with State Board of Education—not Rockford.

But even if Rockford's own policy directly provided for evaluating parental disclosure on a case-by-case basis, Rockford's policy would still not run afoul of *Fulton*. Under the *Fulton* line of cases, a policy is not generally applicable if it contains a discretionary *exemption* procedure. In *Fulton*, the challenged provision required agencies to provide services "to prospective foster parents regardless of their sexual orientation," but provided for exceptions to be granted at the commissioner's "sole discretion." *Fulton*, 141 S. Ct. at 1878. Following *Fulton*, the Sixth Circuit in *Dahl*, concluded that the university's policy of requiring vaccinations for "all student-athletes" but providing that "[m]edical and religious accommodations will be considered on an individual basis" was not generally applicable. 15 F.4th at 733. In both cases, the government's policy required adherence to particular conduct—but permitted discretionary exemptions or deviations from otherwise required behavior.

But Plaintiffs here do not allege that they must be permitted to "opt out" of Rockford's policy due to their religious beliefs—instead, there is nothing to "opt out" of.  It is simply a policy

addressing how the school will respond to particular requests made by students. Put differently, Plaintiffs have not alleged a policy that forces *parents* to use their child's preferred name at school, while  Rockford, in its discretion, may waive that requirement under individualized circumstances. Rockford's policy neither subjects Plaintiffs to any coercion whatsoever, nor permits any exemptions from such coercion.  Plaintiffs have therefore not alleged that either Rockford's policy of following SBE Guidance or the SBE Guidance itself contains "a mechanism for individualized *exemptions*." *See* Black's Law Dictionary (11th ed. 2019) (defining "exemption" as "[f]reedom from a duty, liability, or other requirement; an exception"). Indeed, all policies by their nature require decisionmakers to apply that policy to a set of facts. That's all the SBE Guidance does—it counsels governmental entities following the SBE Guidance to consider the unique facts of each circumstance before applying the policy to that set of facts. That does not render Rockford's policy anything other than neutral and generally applicable.

Rockford's policy is neutral and generally applicable and therefore must be upheld under rational basis review. There is a "strong presumption of validity" under rational basis review, and "[t]hose seeking to invalidate a statute using rational basis review must 'negative every conceivable basis that might support it.'" *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002) (quoting *Lehnhausen v. Lake Shore Auto Parts Co*., 410 U.S. 356, 364 (1973)). For all the reasons discussed above, *supra* Section I.B., Rockford's policy meets this low threshold.

### C. Rockford's policy is narrowly tailored to a compelling state interest.

Even if Plaintiffs had plausibly alleged that Rockford's policy impermissibly burdens their free exercise rights, and even if Plaintiffs had plausibly alleged the policy was not neutral and generally applicable, Plaintiffs' free exercise claim still fails as a matter of law because it survives strict scrutiny.

First, for all the reasons explained above, *see supra* Section I.B., Rockford's policy is narrowly tailored to a compelling state interest.

Second, Plaintiffs rely on *Fulton*'s principle to allege that Rockford's policy is not generally applicable, but they have not alleged that Rockford has refused to extend religious exemptions to the policy to cases of religious hardship without a compelling reason. *Fulton* held that, where a challenged policy is not generally applicable because it contains "a mechanism for individualized exemptions," the government "may not refuse to extend that [exemption] system to cases of 'religious hardship' without compelling reason." *Fulton*, 141 S. Ct. at 1878 (citation omitted). In conducting the tailoring analysis, "courts must "scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Id*. at 1881 (cleaned up). In this context, "[t]he question, then, is not whether [Rockford] has a compelling interest in enforcing its [] polic[y] generally, but whether it has such an interest in denying an exception to [Plaintiffs]." *Id*. But Rockford has no burden to meet here because Plaintiffs have not alleged that they were denied an "exception."

## III.    Plaintiffs' Fourteenth Amendment procedural due process claim fails as a matter of law.  (Count III).

"The Fourteenth Amendment protects an individual from deprivation of life, liberty or property, without due process of law." *Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005). "[T]hose who seek to invoke its procedural protection must establish that one of these interests is at stake." *Id.* (quoting *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)). "A procedural due process analysis addresses two questions.  '[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State, the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'" *Id.* (citation omitted). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word "liberty," or it

may arise from an expectation or interest created by state laws or policies." *Wilkinson*, 545 U.S. at 221 (citations and quotations omitted).

Plaintiffs allege that Rockford, without sufficient due process, deprived Plaintiffs of their liberty interest in their fundamental right under *Troxel* in the "care, custody, and control" of their child in. (Complaint, ¶¶ 291, 300). But, as explained above, Plaintiffs fail to allege a fundamental right. *See supra* Section I. Because Plaintiffs' procedural due process claim is premised in their substantive due process claim, it therefore fails for the same reasons. *See Mejia v. Holt Pub. Sch.*, No. 5:01-CV-116, 2002 WL 1492205, at *7 (W.D. Mich. Mar. 12, 2002) (holding that the plaintiffs' procedural due process claim failed because the plaintiffs could not establish that the defendant school violated their fundamental right to direct the "care, custody, and control" of their child).

## **CONCLUSION**

Rockford asks this Court to dismiss Plaintiffs' complaint with prejudice.

MILLER JOHNSON
Attorneys for Defendants

Date:  February 8, 2024

By: */s/ Catherine A. Tracey*
Catherine A. Tracey (P63161)
45 Ottawa Ave SW, Suite 1100
Grand Rapids, MI 49503
(616) 831-1742
traceyc@millerjohnson.com