## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **DAN MEAD** and **JENNIFER MEAD**, | Case No. 1:23-cv-01313 |
| *Plaintiffs*, | |
| v. | ORAL ARGUMENT REQUESTED |
| **ROCKFORD PUBLIC SCHOOL DISTRICT**; **ROCKFORD PUBLIC SCHOOLS' BOARD OF EDUCATION**, | |
| *Defendants.* | |

## RESPONSE IN OPPOSITION TO DEFENDANTS
## ROCKFORD PUBLIC SCHOOL DISTRICT AND ROCKFORD
## PUBLIC SCHOOLS' BOARD OF EDUCATION'S MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................iii

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND ................................................................................ 2

LEGAL STANDARD .......................................................................................... 5

ARGUMENT ...................................................................................................... 5

I.   The complaint states a plausible claim that Rockford violated the Meads' fundamental right to direct their daughter's upbringing, education, and healthcare. (Second Cause of Action) ........................................ 6

    A.   The complaint's allegations sufficiently plead that Rockford violated the Meads' fundamental rights. ...................................................... 8

        1.   Allegations that Rockford treated the Meads' daughter as a boy without their consent sufficiently state a violation of the Meads' parental rights. ........................................................... 8

            i.   The Sixth Circuit has held that parental consent is key. .............. 9

            ii.   None of the decisions Rockford cites undermine the importance of parental consent. ..................................................... 12

        2.   Allegations that Rockford concealed its actions from the Meads sufficiently state a violation of their parental rights............... 16

    B.   Rockford cannot satisfy strict scrutiny, nor even rational basis, particularly at this motion-to-dismiss stage. ............................................. 20

        1.   Rockford never asserts a compelling interest in deceiving the Meads in particular. ................................................................ 21

        2.   Rockford also does not explain how it narrowly tailored its actions to the Meads. ............................................................... 22

        3.   Rockford cannot even show how its actions would satisfy the rational-basis standard. ........................................................... 23

II.   The complaint also states a plausible claim that Rockford violated the Free Exercise Clause. (First Cause of Action) ........................................... 23

A.  The Meads allege that Rockford conditioned their access to public education on forgoing their religious exercise. ................................ 24

B.  Rockford must satisfy strict scrutiny because it forces the Meads to choose between their faith and a public benefit, Rockford engaged in discretionary decisions, and Rockford burdens a hybrid of rights. ........................................................................... 27

    1.  According to the complaint, Rockford's policy is not neutral or generally applicable. ........................................................ 28

    2.  The complaint alleges that Rockford's violates the Meads' right to direct the religious upbringing of their daughter.................. 30

C.  Rockford cannot satisfy strict scrutiny, particularly at this motion-to-dismiss stage. ...................................................... 31

III. The complaint alleges facts that state a plausible claim of a denial of procedural due process. (Third Cause of Action) ........................................ 32

CONCLUSION ........................................................................ 33

CERTIFICATE OF COMPLIANCE.......................................................... 34

CERTIFICATE OF SERVICE............................................................... 35

## TABLE OF AUTHORITIES

**Cases**

*Alfonso v. Fernandez,*
  606 N.Y.S.2d 259 (N.Y. App. Div. 1993).................................................... 13, 14

*Anspach ex rel. Anspach v. City of Philadelphia,*
  503 F.3d 256 (3d Cir. 2007) .............................................................. 15

*Arnold v. Board of Education of Escambia County,*
  880 F.2d 305 (11th Cir. 1989) .......................................................... 17

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .................................................................... 7, 20

*Bartell v. Lohiser,*
  215 F.3d 550 (6th Cir. 2000) ........................................................... 32

*Blau v. Ft. Thomas Public School District,*
  401 F.3d 381 (6th Cir. 2005) ....................................................... 8, 18, 19

*Bowen v. Roy,*
  476 U.S. 693 (1986) .................................................................. 26, 27

*C.N. v. Ridgewood Board of Education,*
  430 F.3d 159 (3d Cir. 2005) ........................................................... 7, 30

*Carson ex rel. O.C. v. Makin,*
  596 U.S. 767 (2022) ................................................................... 26, 27

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) ..................................................................... 27

*Country Mill Farms, LLC v. City of East Lansing,*
  280 F. Supp. 3d 1029 (W.D. Mich. 2017)................................................... 2, 5

*Country Mill Farms, LLC v. City of East Lansing,*
  No. 1:17-CV-487, 2023 WL 5345236 (W.D. Mich. Aug. 21, 2023) ............. 28, 29

*Dahl v. Board of Trustees of Western Michigan University,*
  No. 1:21-CV-757, 2021 WL 12178384 (W.D. Mich. Sept. 13, 2021) .... 24, 25, 28

*Dahl v. Board of Trustrees of Western Michigan University,*
  15 F.4th 728 (6th Cir. 2021) ...................................................... passim

*Deanda v. Becerra,*
  No. 23-10159, 2024 WL 1059721 (5th Cir. Mar. 12, 2024)............................... 14

*Deanda v. Becerra,*
 645 F. Supp. 3d 600 (N.D. Tex. 2022) ............................................................. 14

*Dobbs v. Jackson Women's Health Organization,*
 597 U.S. 215 (2022) ..................................................................................... 6, 7

*Doe v. Irwin,*
 615 F.2d 1162 (6th Cir. 1980) ......................................................................... 15

*Edwards v. Aguillard,*
 482 U.S. 578 (1987) ................................................................................... 15, 30

*Employment Division v. Smith,*
 494 U.S. 872 (1990) ................................................................................... 28, 30

*Espinoza v. Montana Department of Revenue,*
 140 S. Ct. 2246 (2020) ..................................................................................... 26

*Foote v. Town of Ludlow,*
 No. 22-CV-30041-MGM, 2022 WL 18356421 (D. Mass. Dec. 14, 2022) .......... 12

*Fulton v. City of Philadelphia,*
 593 U.S. 522 (2021) ..................................................................... 20, 21, 28, 30

*Gruenke v. Seip,*
 225 F.3d 290 (3d Cir. 2000) ..................................................................... 14, 19

*H.L. v. Matheson,*
 450 U.S. 398 (1981) ........................................................................................... 9

*Hodgson v. Minnesota,*
 497 U.S. 417 (1990) ......................................................................................... 16

*Illinois ex rel. McCollum v. Board of Education,*
 333 U.S. 203 (1948) ......................................................................................... 15

*Kanuszewski v. Michigan Department of Health & Human Services,*
 927 F.3d 396 (6th Cir. 2019) ................................................................... passim

*Kissinger v. Board of Trustees of Ohio State University,*
 5 F.3d 177 (6th Cir. 1993) ............................................................................... 30

*L.W. ex rel. Williams v. Skrmetti,*
 83 F.4th 460 (6th Cir. 2023) ........................................................................... 15

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,*
 507 U.S. 163 (1993) ......................................................................................... 17

*Lee v. Weisman,*
    505 U.S. 577 (1992) ........................................................................ 15

*Lyng v. Northwest Indian Cemetery Protective Ass'n,*
    485 U.S. 439 (1988) ........................................................................ 25

*Mahanoy Area School District v. B.L. ex rel. Levy,*
    141 S. Ct. 2038 (2021) .................................................................... 15

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) ....................................................... 5, 31

*Meyer v. Nebraska,*
    262 U.S. 390 (1923) ....................................................................... 6, 9

*Mirabelli v. Olson,*
    No. 3:23-CV-00768, 2023 WL 5976992 (S.D. Cal. Sept. 14, 2023) ...... 12, 21, 23

*Monell v. Departmnet of Social Services,*
    436 U.S. 658 (1978) ........................................................................ 26

*Mozert v. Hawkins County Board of Education,*
    827 F.2d 1058 (6th Cir. 1987) ........................................................ 27

*Parham v. J.R.,*
    442 U.S. 584 (1979) ....................................................................... 8, 9

*Pierce v. Society of Sisters,*
    268 U.S. 510 (1925) ....................................................................... 6, 9

*Pittman v. Cuyahoga County Department of Children & Family Services,*
    640 F.3d 716 (6th Cir. 2011) .......................................................... 32

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ........................................................................ 20

*Regino v. Staley,*
    No. 2:23-CV-00032-JAM-DMC, 2023 WL 4464845 (E.D. Cal. July 11,
    2023) .............................................................................................. 12

*Ricard v. USD 475 Geary County, Kansas School Board,*
    No. 5:22-CV-04015, 2022 WL 1471372  (D. Kan. May 9, 2022) ............... 22, 23

*Runyon v. McCrary,*
    427 U.S. 160 (1976) ........................................................................ 18

*Seal v. Morgan*,
  229 F.3d 567 (6th Cir. 2000) ............................................................. 7

*T.F. v. Kettle Moraine School District*,
  No. 2021CV1650, 2023 WL 6544917 (Wis. Cir. Ct. Oct. 3, 2023) ....... 12, 13, 22

*Tatel v. Mt. Lebanon School District*,
  637 F. Supp. 3d 295 (W.D. Pa. 2022) ............................................... 14

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  582 U.S. 449 (2017) ..................................................................... 24, 26

*Troxel v. Granville*,
  530 U.S. 57 (2000) ......................................................................... 7, 16

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ....................................................................... 6, 32

*Willey v. Sweetwater County School District*,
  No. 23-CV-069-SWS, 2023 WL 4297186 (D. Wyo. June 30, 2023) ...... 17, 18, 20

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ................................................................... passim

## **Constitutional Provisions**

U.S. Const. amend. XVI, § 1 ........................................................... 6

## **Statutes**

Alabama Code § 26-26-5(2) ............................................................. 22

Idaho Code § 33-6001(2)(d) ............................................................ 22

Iowa Code § 279.78(2) ................................................................... 22

North Carolina General Statutes § 115C-76.45(a)(5) ............................ 22

North Dakota Century Code § 15.1-06-21(4)(b) ................................... 23

## **Other Authorities**

1 William Blackstone, *Commentaries on the Laws of England* ................ 9

2 James Kent, *Commentaries on American Law* (10th ed. 1860) .............. 9

Martin Guggenheim, *The (Not So) New Law of the Child*,
  127 Yale L.J. F. 942 (2018) ............................................................ 8

## INTRODUCTION

For years, Dan and Jennifer Mead partnered with the Rockford Public School District to educate their daughter, then 13 years old. Rockford's employees communicated openly with them about their daughter. And when she began to struggle at school, that communication only increased in frequency. Ultimately, after an outside evaluation diagnosed her with autism, the Meads and Rockford started a process to determine educational accommodations available to their daughter. The Meads soon discovered that Rockford had been far less open with them than it seemed. For two months, Rockford employees treated their daughter as a boy—using a masculine name and male pronouns—without first seeking the Meads' consent. And once Rockford had decided on that treatment, it began active steps to conceal its actions from the Meads. Staff members carefully used their daughter's given name and female pronouns when speaking with her parents, while using a masculine name and male pronouns with her. One employee then altered education records before sending them home to remove references to the masculine name. The Meads only found out because of an accidental failure to fully alter a document.

By treating the Meads' daughter as a boy, Rockford violated the Meads' free-exercise and parental rights. And by concealing its decision, Rockford doubled down on those violations and kept the Meads from preventing the harm to their daughter.

Rockford's motion to dismiss under Rule 12(b)(6) (ECF No. 12 PageID.76) presents only one overarching question—whether the Meads' complaint states plausible claims for relief. The complaint contains hundreds of detailed factual allegations supporting its claims that Rockford violated the Meads' fundamental right to direct the religious upbringing of their daughter, among other rights. And Rockford has not proved, as a matter of law, that its actions satisfy strict scrutiny. So the Court should deny the motion to dismiss.

## FACTUAL BACKGROUND

To rule on Rockford's motion to dismiss, the Court "must accept as true all factual allegations" in the Meads' complaint. *Country Mill Farms, LLC v. City of E. Lansing*, 280 F. Supp. 3d 1029, 1038 (W.D. Mich. 2017) ("*Country Mill I*"). Those factual allegations describe Rockford's decision to treat the Meads' then-13-year-old daughter G.M. as a boy named F.M. without their consent and while actively concealing it from them. (Compl. ¶¶ 154-65, PageID.22-23.) Despite the Meads' claims that Rockford's treatment of their daughter as a boy violated their constitutional rights, Rockford remarkably continues to use a masculine name and male pronouns for her in its briefing here. (*See* Br. PageID.88 n.1.) That persistent refusal to respect the Meads' clear instructions underscores why they are unable to "continue to entrust their daughter to" Rockford. (Compl. ¶ 144, PageID.21.)

At one time, the Meads placed significant trust in Rockford. The complaint alleges how Rockford employees met regularly with G.M. and communicated openly with the Meads about her academic progress, health, and wellbeing. (Compl. ¶¶ 29-52, PageID.5-8.) After G.M. was diagnosed with autism, the Meads shared that diagnosis with Rockford employees, who initiated a process to identify possible academic accommodations for G.M. (Compl. ¶¶ 53-64, PageID.8-10.) But no one at Rockford told the Meads when G.M. asked its employees to refer to her with the masculine name F.M. and male pronouns. (Compl. ¶¶ 67-69, 76, PageID.10-11.) Nor did anyone at Rockford tell the Meads when employees began to treat G.M. as a boy named F.M. (Compl. ¶¶ 78, 98-99, PageID.11, 14.)

When Rockford decided to treat G.M. as a boy, it also concealed that decision from the Meads. (Compl. ¶ 100, PageID.15; *see* Compl. ¶¶ 170-89, PageID.24-27 (detailing Rockford's concealment).) During Rockford's evaluation of potential accommodations for G.M.'s autism, employees regularly referred to her as a boy named F.M. in internal communications but always deceptively used her correct

name and female pronouns when communicating with the Meads. (Compl. ¶¶ 87-92, 101-13, PageID.12-13, 15-16.) If an employee referred to G.M. as a boy named F.M. in a document that the Meads would see, Rockford would alter it to replace the masculine name with G.M.'s correct name before allowing the Meads to see it. (Compl. ¶¶ 118-36, PageID.17-20.) In this way, Rockford concealed its actions from the Meads for approximately two months. (Compl. ¶¶ 249, 275, PageID.36, 39-40.)

Eventually, because an employee accidentally failed to fully alter a document before sending it to the Meads, they discovered Rockford's deception. (Compl. ¶¶ 117-21, PageID.17-18.) The Meads then considered whether to withdraw G.M. from Rockford public schools. (Compl. ¶¶ 143-44, PageID.21.) Less than two weeks after learning of Rockford's deception, the Meads withdrew G.M. (Compl. ¶ 155, PageID.22.) A few days later, they met with Adam Burkholder, the principal of East Rockford Middle. (Compl. ¶¶ 159-64, PageID.23.) During this meeting, Principal Burkholder clarified that Rockford policy required employees to treat G.M. as a boy and to hide their actions from the Meads. (*Id.*) And he refused to guarantee that Rockford would not conceal information about G.M. again in the future. (*Id.*)

Rockford has a written policy governing how it decides to treat students as the opposite sex and when to hide that decision from their parents. (Compl. ¶¶ 170-89, PageID.24-27.) Rather than write a policy from scratch, Rockford adopted as its own policy non-mandatory guidance from the Michigan State Board of Education ("SBE"). (Compl. ¶¶ 177-79, PageID.25; *see* ECF No. 1-3 ("Policy") PageID.52-60.)

Rockford's policy generally requires that "school staff should engage in reasonable and good faith efforts to address students by their chosen name and pronouns that correspond to their gender identity," and that staff should do so without seeking parental consent or input. (Compl. ¶ 183, PageID.26.) But the policy establishes a discretionary mechanism for determining whether to hide those actions from parents. The policy provides that "a disclosure to parent(s) should be

3

carefully considered on *a case-by-case basis*, school districts should consider the health, safety, and well-being of the student, as well as the responsibility to keep parents informed. Privacy considerations may vary with the age of the students." (Compl. ¶ 186, PageID.26 (citing Policy PageID.55-56) (emphasis added).)

The complaint alleges that this policy authorizes Rockford to engage in a controversial psychosocial intervention for gender dysphoria sometimes called "social transition." (Compl. ¶ 190, PageID.27.) With citations to scientific evidence, the complaint alleges that parents are "essential" for diagnosing and treating gender dysphoria or any other mental health issues. (Compl. ¶ 204, PageID.29.) Conversely, encouraging a struggling child "to lead a 'double life'" where he or she "conceal[s] important life changes from his or her parents … imposes a serious risk of worsening the mental health of the child." (Compl. ¶ 205, PageID.30.) The complaint also discusses the risks of social transition, including the risk that it "'locks' the child into discomfort with his or her biological sex," thereby "greatly increas[ing] the likelihood that the child will continue on to puberty blockers, cross-sex hormones, or both." (Compl. ¶ 212, PageID.31.) And that, in turn, carries serious risks of long-term harm, including "sterility," "failure to develop and be able to enjoy healthy sexual responses and relationships," "impaired brain development," "increased risk of cardiovascular illness," and "dependence on regular hormone shots," among other risks. (Compl. ¶ 213 PageID.31.)

Unsurprisingly, no medical organization recommends subjecting children or adolescents to social transition without their parents' knowledge. (Compl. ¶ 206, PageID.30.) This Court need not adjudicate the scientific evidence to deny the motion to dismiss. But these portions of the complaint at least plausibly allege that, by socially transitioning G.M., Rockford recklessly engaged in a psychosocial intervention that increased the odds she would struggle with gender confusion into adulthood. (Compl. ¶ 216, PageID.32.)

4

Finally, the complaint also plausibly alleges that Rockford's actions violated the Meads' sincere religious beliefs. They are Christians who believe that God has tasked them, as G.M.'s parents, to instill those same beliefs in her. (Compl. ¶¶ 217-24, PageID.32-33.) That includes their beliefs about the unchangeability of every person's biological sex, which is contrary to Rockford's treatment of G.M. as a boy. (Compl. ¶¶ 225-28, PageID.33.)

## LEGAL STANDARD

All the complaint must do to defeat Rockford's motion to dismiss is allege "facts sufficient to state a claim for relief that is plausible on its face." *Country Mill I*, 280 F. Supp. 3d at 1038 (cleaned up). The Court construes the complaint's factual allegations "in the light most favorable to" the Meads, including by "accept[ing] the complaint's factual allegations as true and draw[ing] all reasonable inferences in the [Meads'] favor." *Meriwether v. Hartop*, 992 F.3d 492, 498 (6th Cir. 2021) (citation omitted). The Court should deny Rockford's motion "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief." *Id.* (quotation marks omitted). Because the Meads' factually detailed complaint alleges far more than "formulaic recitations of the elements of a cause of action," the Court should deny the motion to dismiss. *Country Mill I*, 280 F. Supp. 3d at 1038.

## ARGUMENT

The Meads allege that Rockford unilaterally decided how to resolve G.M.'s questions about her gender, which is a decision that the Constitution reserved for the Meads to make as her parents. And they allege that Rockford hid that decision from them for about two months, only revealing it accidentally, when an employee failed to completely alter one of G.M.'s education records.

These allegations, laid out in hundreds of factually detailed paragraphs in the complaint, state a plausible claim that Rockford violated the Meads' constitutional rights. First, Rockford interfered with their fundamental right under the Fourteenth Amendment to direct G.M.'s upbringing, education, and healthcare. To justify that interference, Rockford must satisfy strict scrutiny, which it cannot do on its motion to dismiss. Second, Rockford burdened the Meads' right to exercise their religion. Because Rockford's actions were not neutral or generally applicable, and because they burdened the Meads' deeply rooted parental rights, those actions also receive strict scrutiny under the First Amendment—again, a standard it cannot satisfy on its motion to dismiss. Third and finally, the complaint alleges that Rockford deprived the Meads of their protected liberty interests in raising their daughter without affording them procedural due process.

## I.   The complaint states a plausible claim that Rockford violated the Meads' fundamental right to direct their daughter's upbringing, education, and healthcare. (Second Cause of Action)

The Fourteenth Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citation omitted); *see* U.S. Const. amend. XVI, § 1. The Due Process Clause protects fundamental rights that are, "objectively, deeply rooted in this Nation's history and tradition." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 239 (2022) (quoting *Glucksberg*, 521 U.S. at 720-21). In particular, the Court has held for over a century that it protects the right "to direct the education and upbringing of one's children." *Glucksberg*, 521 U.S. at 720; *see Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (discussing right to "establish a home and bring up children"); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925) (explaining "the liberty of parents and guardians to direct the upbringing and education of children under their control"). This "is perhaps the

6

oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.). Some scholars and jurists have alternatively argued that a similar fundamental-rights analysis applies under the Privileges or Immunities Clause. *See Dobbs*, 597 U.S. at 240 n.22.

Under either clause, parental rights are fundamental. Parents like the Meads have "the right to make decisions about the education of one's children." *Id.* at 256. And they "possess a fundamental right to direct the medical care of their children." *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 419 (6th Cir. 2019). Rockford concedes these general propositions. (Br. PageID.92.) But it misapplies them.

The Meads have plausibly alleged that Rockford violated their fundamental rights to make both educational and healthcare decisions for their daughter by treating her as a boy and concealing that fact from them. These allegations "strike at the heart of parental decision-making authority on [a] matter[] of the greatest importance": the Meads' ability to help their daughter in the midst of confusion about her identity as a young woman. *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005).

Because the complaint alleges that Rockford has burdened the Meads' fundamental rights, its actions "are subject to strict scrutiny, and will be upheld only when they are narrowly tailored to a compelling governmental interest." *Kanuszewski*, 927 F.3d at 419 (quoting *Seal v. Morgan*, 229 F.3d 567, 574-75 (6th Cir. 2000)). Rockford has offered only generic justifications for preventing the Meads from helping their daughter—justifications that can't establish a rational basis, let alone satisfy strict scrutiny. The complaint states a fundamental-rights claim that is at least "plausible" enough to "survive[] a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citation omitted).

**A.    The complaint's allegations sufficiently plead that Rockford violated the Meads' fundamental rights.**

Regarding education, healthcare, or any other topic, parents have "a fundamental right to *make decisions*" on behalf of their children. *Kanuszewski*, 927 F.3d at 418 (emphasis added); *Blau v. Ft. Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395 (6th Cir. 2005) (discussing parents' educational decisionmaking rights); *see also Parham v. J.R.*, 442 U.S. 584, 602 (1979) ("The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions."). Parents have the "ultimate decision-making authority"—not the government. Martin Guggenheim, *The (Not So) New Law of the Child*, 127 Yale L.J. F. 942, 947 (2018).

Rockford's actions described in the complaint sufficiently plead a violation of the Meads' fundamental rights to make educational and healthcare decisions in two distinct ways: by *deciding* to treat their daughter as boy without their consent; and by *concealing* that decision from the Meads. The allegations easily state a cause of action at this motion-to-dismiss stage.

**1.    Allegations that Rockford treated the Meads' daughter as a boy without their consent sufficiently state a violation of the Meads' parental rights.**

The complaint alleges Rockford burdened the Meads' fundamental rights by substituting its own judgment for theirs when it decided to treat their middle-school daughter as a boy without their consent. Our Nation has a deeply rooted tradition of vesting parents with the authority to make such important decisions on behalf of their children. *See Parham*, 442 U.S. at 602 ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children."). Parents' decisionmaking authority over their children "is derived from … their duty" to their children. 1 William Blackstone,

*Commentaries on the Laws of England* \*452;[1] *see* 2 James Kent, *Commentaries on American Law* \*226 (10th ed. 1860) (linking parents' duties with their "right to such authority" to exercise those duties).[2] Parental rights do not rest on duty alone. "[H]istorically," the Constitution "has recognized that natural bonds of affection lead parents to act in the best interests of their children." *Parham*, 442 U.S. at 602.

Over the past century, the Supreme Court has applied parents' deeply rooted decisionmaking authority to a variety of topics. As to education, that includes academics, like what subjects a child will study, *Meyer*, 262 U.S. at 402-03, and what school a child will attend, *Pierce*, 268 U.S. at 534-35. But it also sweeps more broadly, "to include the inculcation of moral standards, religious beliefs, and elements of good citizenship." *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972). And as to healthcare, "[p]arents can and must make … judgments" about their children's "need for medical care or treatment," including appropriate mental-health treatment. *Parham*, 442 U.S. at 603; *see id.* at 602-04 (discussing parental authority to seek mental-health treatment for minors "in the voluntary commitment setting").

     *i.    The Sixth Circuit has held that parental consent is key.*

The complaint alleges how the Meads' daughter began struggling with the question of her identity as a girl. (*See* Compl. ¶¶ 77-113, PageID.11-16.) This question implicated the Meads' right to direct her upbringing and education consistently with their moral and religious views, including whether a person "is born with a fixed biological sex" or whether their daughter should embark "on a path that distances [her] from her biological sex." (Compl. ¶¶ 226, 233, PageID.33-34.) *See H.L. v. Matheson*, 450 U.S. 398, 411 (1981) (discussing parents' right to "counsel[]" their children "on important decisions"). Deciding how to address their

---

[1] https://bit.ly/3leX7za.

[2] https://bit.ly/3ttTN79.

daughter's struggles also implicated their right to direct her healthcare. (*See* Compl. ¶¶ 190-216, PageID.27-32 (summarizing different therapeutic approaches for addressing struggles with gender).) Indeed, Rockford's policy acknowledges that deciding how to address these questions raises serious "health" and "safety" issues. (Policy PageID.53.)

As the complaint details, Rockford made its own decisions about how to address G.M.'s struggles without notifying the Meads or seeking their consent. (Compl. ¶¶ 77-100, PageID.11-15.) By alleging that Rockford made such a morally fraught decision about G.M.'s identity, the complaint easily states a plausible claim that Rockford infringed the Meads' fundamental right to decide aspects of her life like the "moral standards" and "religious beliefs" that would guide her education. *Yoder*, 406 U.S. at 233. Rockford's decision also caused G.M. to undergo a so-called "social transition" without her parents' consent. Social transition is "a powerful psychosocial intervention that greatly reduces the chances that [a] young person will cease experiencing gender dysphoria." (Compl. ¶ 211, PageID.31.) Taking an action with such profound implications for a child's healthcare "without informed parental consent … constitute[s] a denial of the parents' fundamental right to direct the medical care of their children." *Kanuszewski*, 927 F.3d at 420.

*Kanuszewski* demonstrates that parental consent is the touchstone, not coercion, as Rockford argues. (*See* Br. PageID.96-98.) Without parental consent, Michigan "screen[ed] children's blood samples for diseases" and then "transfer[red] the samples to" a nonprofit corporation, which "store[d] the samples indefinitely for further use by the state or third parties." *Kanuszewski*, 927 F.3d at 420. The court reversed the dismissal of the plaintiffs' challenge to Michigan's use of their children's blood samples. *Id.* at 418-21. The central question in resolving that issue, the Sixth Circuit said, would turn on whether Michigan obtained "informed parental consent" to its decision "to sell the blood samples" of their minor children

10

"to third parties"—not whether it had coerced their child to do anything. *Id.* at 420. To defeat Michigan's motion to dismiss, the plaintiffs simply needed to "allege that these actions [were] undertaken without informed parental consent." *Id.* By contrast, if "the parents provided informed consent to [Michigan's] actions, no fundamental liberty interest would have been impinged." *Id.*; *see id.* at 420 n.13 (emphasizing that discovery should focus on "the precise nature and scope of any parental consent that occurred").

As in *Kanuszewski*, the Court here should allow this case to proceed to discovery about the scope of Rockford's actions burdening the Meads' parental rights. The Meads also challenge a government decision about their child's health-care made without their consent. (*See, e.g.*, Compl. ¶¶ 170-89, PageID.24-27.) And worse than *Kanuszewski*, which involved a misuse of children's healthcare information, the Meads plausibly allege that, by treating their daughter as a boy, Rockford engaged in "a psychosocial intervention that increased the odds G.M. would continue to struggle with gender confusion." (Compl. ¶ 216, PageID.32.)

Contrary to Rockford's suggestion, its employees did not merely offer "counseling" or "advice" to G.M. (Br. PageID.97.) Instead, Rockford made mental health-care decisions on her behalf—and without the Meads' informed consent—that risked "entrench[ing] rather than cur[ing] gender dysphoria," thereby "greatly increas[ing] the likelihood that [G.M.] will continue on to puberty blockers, cross-sex hormones, or both." (Compl. ¶ 212, PageID.31.) The Meads were "essential" to getting G.M. the help she needed. (Compl. ¶ 204, PageID.29.) But Rockford cut them out.

It matters not whether G.M. was ever diagnosed with gender dysphoria. (*See* Br. PageID.102.) According to the complaint's allegations, which must be taken as true here, social transition is "a psychosocial intervention *for gender dysphoria.*" (Compl. ¶ 279, PageID.40. (emphasis added)) So even if G.M. was never diagnosed

with gender dysphoria, Rockford still violated the Meads' rights. It's no different than if Rockford administered an ADHD treatment to a student that didn't have ADHD. Forcing a child to undergo an unnecessary intervention behind her parents' back is an affront to their constitutional rights.

> ii. *None of the decisions Rockford cites undermine the importance of parental consent.*

Nor does it help Rockford to point to nonbinding decisions that say "being transgender is not a psychiatric condition." (Br. PageID.100-01.) *See, e.g.*, *Foote v. Town of Ludlow*, No. 22-CV-30041-MGM, 2022 WL 18356421 (D. Mass. Dec. 14, 2022), *appeal filed*, No. 23-1069 (1st Cir. argued Sept. 13, 2023). This Court must consider only the allegations in this case, not whatever allegations were before other courts. And the Meads' complaint clearly alleges—with citations to relevant scientific literature—that Rockford's actions implicated their daughter's mental healthcare. (Compl. ¶¶ 190-216 & nn.4-23, PageID.27-32.)

Similarly, this Court should not follow out-of-circuit decisions like *Regino v. Staley*, which announced a rule inconsistent with *Kanuszewski*'s informed-consent requirement. *See* No. 2:23-CV-00032-JAM-DMC, 2023 WL 4464845, at *3 (E.D. Cal. July 11, 2023) (ruling that informed parental consent was not required). That's particularly true given the wealth of lower-court rulings contrary to *Regino*. For instance, a California federal court last year concluded, based on expert evidence offered in support of a preliminary-injunction motion, that a school district's "policy of confidentiality and non-disclosure to parents … is not conducive to the health of [the district's] gender incongruent students." *Mirabelli v. Olson*, No. 3:23-CV-00768, 2023 WL 5976992, at *7 (S.D. Cal. Sept. 14, 2023). And a Wisconsin trial court last year ruled on a summary-judgment record including expert evidence that "[t]his is undisputedly a medical and healthcare issue." *T.F. v. Kettle Moraine Sch. Dist.*, No. 2021CV1650, 2023 WL 6544917, at *5 (Wis. Cir. Ct. Oct. 3, 2023).

Because of the similarities between *Kettle Moraine* and this case, this Court should follow that court's reasoning. It ruled that a school district "can not change the pronoun of a student without parental consent without impinging on a fundamental liberty interest of the parents." *Id.* at *7. Like the Meads, the parents there had a middle-school daughter who began to question her identity as a girl. *Id.* at *1. Unlike the Meads, however, the *Kettle Moraine* parents learned about their daughter's struggles before her school district did, and they informed the district about the issue and instructed it to treat her as a girl. *Id.* But the district refused. *Id.* "[B]y disregarding the parents['] wishes," the district "violate[d] fundamental parental rights." *Id.* at *10. Relying heavily on federal precedent, *see id.* at *3-6, the court rendered summary judgment for the parents under the state constitution, *id.* at *10.

The complaint here alleges that Rockford has committed the same violations as the *Kettle Moraine* school district, and more. Just like that district, Rockford has disregarded the Meads' instructions against treating their daughter as a boy. (Compl. ¶¶ 161-64, 180, 187-88, PageID.23, 25-27.) But whereas the *Kettle Moraine* school district at least informed the parents it would disregard their wishes, 2023 WL 6544917, at *1, Rockford actively concealed its decision from the Meads (*e.g.*, Compl. ¶¶ 92, 98-100, PageID.13-15). Rockford's deceit even included altering G.M.'s records before sending them home to the Meads. (Compl. ¶¶ 125-36, PageID.18-20.) This Court should follow *Kettle Moraine*'s reasoning and allow the Meads to proceed with their case.

Other decisions support the Meads. For example, a state appellate court held that New York City's "distribution of condoms to high school students" violated parents' fundamental rights. *Alfonso v. Fernandez*, 606 N.Y.S.2d 259, 263 (N.Y. App. Div. 1993); *see id.* at 265-67 (treating protections under U.S. and New York Constitutions as essentially coextensive). The city "made a judgment that minors

should have unrestricted access to contraceptives" and then "forced that judgment" on parents. *Id.* at 266. Similarly, a federal court in Texas ruled that the federal government violated parents' fundamental rights by providing contraceptives to minors without parental consent. *Deanda v. Becerra,* 645 F. Supp. 3d 600, 627-29 (N.D. Tex. 2022), *aff'd in part, rev'd in part on other grounds*, No. 23-10159, 2024 WL 1059721, at \*12 & n.15 (5th Cir. Mar. 12, 2024). By making an "important life decision[]" about the Meads' daughter without involving them, 645 F. Supp. 3d at 627, Rockford likewise violated their fundamental rights.

Rockford's reliance on *Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000), is misplaced. (Br. PageID.97.) *Gruenke* involved a swim coach who violated a mother's rights by not notifying her before forcing her daughter to undergo a pregnancy test. 225 F.3d at 306-07. The crux of *Gruenke*'s analysis was not, as Rockford claims, the coach's "threats to bar" the girl "from swimming in the state championship." (Br. PageID.97 (quoting 225 F.3d at 306).) The mother had "sufficiently alleged a constitutional violation" because of the coach's "arrogation of the parental role" in navigating "a family crisis." 225 F.3d at 306. He had "usurp[ed]" the mother's authority to make an important decision for her daughter—how to handle a pregnancy—and he did so primarily by "his failure to notify her." *Id.* Likewise, here, the complaint details how Rockford usurped the Meads' authority to make an important decision for their daughter—how to address her gender confusion. (*E.g.*, Compl. ¶¶ 232-36, PageID.34.) So just like the parents in *Gruenke*, the Meads have stated a claim for violation of their parental rights. *See Tatel v. Mt. Lebanon Sch. Dist.*, 637 F. Supp. 3d 295, 332 (W.D. Pa. 2022) (denying qualified immunity based on *Gruenke* when school failed to notify parents of important information about their own children).

Like this case, those cases arose in an educational setting. "Families entrust public schools with the education of their children," who "are impressionable" and

whose "attendance is involuntary." *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987). It is "vital," therefore, "to keep out divisive forces" from public schools. *Id.* (quoting *Illinois ex rel. McCollum v. Bd. of Educ.*, 333 U.S. 203, 231 (1948) (opinion of Frankfurter, J.)). The unique relationship between parents and a public school distinguishes cases like this from the cases involving contraception provided to minors by government-run clinics. (*See* Br. PageID.92, 96, 101, 106 (discussing *Doe v. Irwin*, 615 F.2d 1162 (6th Cir. 1980), and *Anspach ex rel. Anspach v. City of Phila.*, 503 F.3d 256 (3d Cir. 2007)).) *Anspach* itself distinguished the public-school setting from the clinics at issue there and in *Irwin. Anspach*, 503 F.3d at 264 (discussing *Lee v. Weisman*, 505 U.S. 577 (1992)). Other government institutions do not share public schools' relationship with parents. *Cf. Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 141 S. Ct. 2038, 2046 (2021) (noting how schools "stand[] in the place of" parents when they "cannot protect, guide, and discipline" their children).

Finally, a recent Sixth Circuit decision underscores Rockford's violation of the Meads' fundamental rights. *See L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023). *Skrmetti* found "no historical support" for a claimed parental right "to obtain banned medical treatments for their children." *Id.* at 475-76. But the court noted "a material distinction" between that claimed right and a right to prevent the government from forcing medical treatment on "someone over their objection." *Id.* at 476. *Skrmetti* looked specifically to *Kanuszewski* to draw that distinction. Unlike the States in *Skrmetti*, which "*restrict*[*ed*] medical care," Michigan "*compelled* medical care" in *Kanuszewski*. *Id.* And Michigan's actions "violated *nonconsenting* parents' rights 'to make decisions concerning the medical care of their children.'" *Id.* (emphasis added) (quoting *Kanuszewski*, 927 F.3d at 418).

Healthcare decisions for children generally require their parents' informed consent. *Kanuszewski*, 927 F.3d at 420. The complaint alleges that Rockford failed to obtain the Meads' consent or even to notify them before deciding to treat G.M. as

the opposite sex—a course of action that can lead to a lifetime of medical consequences. (Compl. ¶ 213, PageID.31.) Those allegations sufficiently state a parental-rights claim. Not only that, a child's questions about her identity as female implicate parents' right to make important decisions, including those about "the inculcation of moral standards" or "religious beliefs." *Yoder*, 406 U.S. at 233. Because the Meads have plausibly alleged that Rockford burdened their fundamental rights, this Court should deny the motion to dismiss.

> ### 2. Allegations that Rockford concealed its actions from the Meads sufficiently state a violation of their parental rights.

Rockford's concealment of its actions from the Meads independently violates their fundamental right to the information they need to make decisions for their daughter. At a minimum, parental rights include the right "to be notified of their children's actions." *Hodgson v. Minnesota*, 497 U.S. 417, 483 (1990) (Kennedy, J., concurring and dissenting). Parents' right to make decisions for their children necessarily entails access to accurate information from the government about their children's actions—particularly when they have entrusted the government with temporary care of their children, as occurs at school. Parents can't "make decisions concerning the care, custody, and control of their children" when the government conceals information from them about their children's lives. *Troxel*, 530 U.S. at 66 (plurality).

Consider the Meads' situation. The complaint describes how Rockford initially burdened their fundamental rights by deciding to treat their daughter as a boy without notifying them or seeking their consent. (*E.g.*, Compl. ¶¶ 98-99, PageID.14.) Rockford then proceeded to conceal that decision from the Meads. (Compl. ¶ 100, PageID.15.) To illustrate, Rockford's neuropsychologist regularly referred to G.M. as a boy in communications with other Rockford employees—even

instructing other employees to do so. (*See* Compl. ¶ 142, PageID.21.) But when the neuropsychologist corresponded with the Meads about G.M.'s mental-health accommodations, which she often did, she "used G.M.'s correct name … and did not inform the Meads that she and other District employees had been referring to G.M. as a boy." (Compl. ¶ 106, PageID.15.) Worse yet, before giving records to the Meads, the neuropsychologist altered G.M.'s records to remove any references to the masculine name and male pronouns Rockford had decided to use for her. (Compl. ¶¶ 119-36, PageID.17-20.)

No matter, says Rockford, because the Meads eventually were able to withdraw G.M. from public school. (Br. PageID.95.) But the need to withdraw G.M. does not absolve Rockford of its unlawful actions—actions that eventually *caused* the Meads to withdraw G.M. Rather, it illustrates just how severe the violation was, and it establishes an additional injury that the Meads experienced. (Compl. ¶¶ 114-36, 153-55, PageID.16-20, 22.) Had Rockford not concealed its actions, the Meads would have had the opportunity to exercise their parental rights sooner—perhaps before their daughter underwent an unnecessary psychosocial intervention. (Compl. ¶ 275, PageID.39-40.) During the time that Rockford concealed its actions, it "deprive[d]" them "of the opportunity to counter influences on" G.M. that they "find inimical to their religious beliefs or the values they wish instilled in their children." *Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 305, 313 (11th Cir. 1989), *unrelated holding abrogated by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163 (1993). They could not remedy Rockford's burden on their right to raise their daughter because they didn't know about it yet.

Rockford relies (Br. PageID.99-100) on *Willey v. Sweetwater County School District*, but that case supports the Meads. *See* No. 23-CV-069-SWS, 2023 WL 4297186 (D. Wyo. June 30, 2023). The court there considered a challenge to a policy like the one challenged by the Meads, and the court viewed that challenge through

the lens of concealment. *See id.* at *13. Without reliable information about their children's education, "parents could not make a reasonable choice regarding the type of education" their children receive. *Id.* at *14. So when parents "are unaware of circumstances that have a significant bearing on that decision because of the school's withholding of information or active deception," the school's actions "create[] a likely constitutional problem." *Id.*

According to Rockford, its policy "specifically recommends that schools include parents." (Br. PageID.100 (citing Policy PageID.55-56).) That's beside the point. The Meads allege that when Rockford applied the policy to them, it did not "include" them. Rockford did not notify them of Rockford's decision to treat G.M. as a boy, and instead actively concealed that decision from them—even by altering school records. (*E.g.*, Compl. ¶¶ 170-89, PageID.24-27.) By "provid[ing] materially misleading … information" to the Meads, Rockford violated their rights. *Willey*, 2023 WL 4297186, at *15.

Rockford's citation to *Runyon v. McCrary*, 427 U.S. 160 (1976), doesn't help it, either. (*See* Br. PageID.93-94 (discussing *Runyon*).) The parents in that case argued that they had a "constitutional right to provide their children with private school education unfettered by reasonable government regulation." 427 U.S. at 178. But the scope of the government's power to regulate private schools—in particular, its power to stamp out racially segregated private schools, as in *Runyon*—has no bearing on whether Rockford violated the Meads' fundamental rights by concealing from them its treatment of their daughter as a boy.

Rockford also defends (Br. PageID.94) its deceit by misinterpreting the Sixth Circuit's decision in *Blau*, 401 F.3d at 395-96. The father there challenged a school dress code, claiming a fundamental right to decide that his daughter should "wear clothing that she likes." *Id.* at 386. Rockford can find no refuge in *Blau*. Unlike the school in *Blau*, Rockford concealed important information from the Meads about

18

their own child. (*See, e.g.*, Compl. ¶ 125, PageID.18.) Far from alleging concealment, the *Blau* father actively participated in public debates about the terms of the school district's dress code. 401 F.3d at 385. Rockford does not explain why *Blau* should control, given the differences between that father's and the Meads' claims.

Rockford cites *Blau* for its argument that the Constitution provides parents no say in "school decisions that would impact children once their parents have enrolled them" in public school. (Br. PageID.94.) But *Blau* did not cut off parental rights at the schoolhouse gate. To the contrary, it noted that parents' fundamental "right plainly extends to the public school setting." 401 F.3d at 395. As the Third Circuit has said: "Public schools must not forget that '*in loco parentis*' does not mean 'displace parents.'" *Gruenke*, 225 F.3d at 307. What's more, Rockford's argument that parents' fundamental rights are "limited to *whether* to send their child to public school" (Br. PageID.94) would nullify *Meyer*, *Pierce*, and *Yoder*. According to Rockford, its deceit concerns only "school operations" and thus does not violate the Constitution. (*Id.*) But if Rockford were correct, then schools would not need to provide parents any information about their children, even about critical issues like attendance or academic performance that fall within "school operations."

It is no "sweeping expansion" of parents' fundamental rights, as Rockford suggests (Br. PageID.95), to conclude that these rights prohibit a public school from concealing important information about a child—information a reasonable parent would need to make decisions on her behalf. Regardless, this Court doesn't have to determine the outer bounds of parents' fundamental rights to deny Rockford's motion to dismiss. This case is not about Rockford's "curriculum" or one of the countless "other school decisions" Rockford must make each day. (Br. PageID.94.) Rockford hid its decision to treat the Meads' daughter as a boy, a decision with potentially long-term and life-changing ramifications. (Compl. ¶¶ 211-13,

PageID.31.) Those allegations state a fundamental-rights claim that is more than sufficient to "survive[] a motion to dismiss." *Iqbal*, 556 U.S. at 679.

### B.    Rockford cannot satisfy strict scrutiny, nor even rational basis, particularly at this motion-to-dismiss stage.

Because the complaint alleges that Rockford burdened the Meads' fundamental right to direct the upbringing, education, and healthcare of their daughter, its actions receive strict scrutiny. *Kanuszewski,* 927 F.3d at 419-21. Rockford must show—based on the facts alleged—that applying its policy to the Meads "furthers a compelling governmental interest and is narrowly tailored to that end." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015); *see Fulton v. City of Phila.*, 593 U.S. 522, 541 (2021). Rockford can't meet that burden by resting on "broadly formulated interests." *Fulton*, 593 U.S. at 541. It must be specific: How was its treatment of the Meads in particular—as opposed to Rockford's policy in general—narrowly tailored to a compelling interest? Rockford comes nowhere near answering that question, so its application of the policy to the Meads fails strict scrutiny, particularly on a motion to dismiss.

As an initial matter, Rockford briefly suggests that the "shock the conscience" standard may apply to the Meads' fundamental-rights claim. (Br. PageID.103-04.) It does not. Binding Sixth Circuit precedent—*Kanuszewski*—applied strict scrutiny, and so must this Court. *See* 927 F.3d at 419-21. And in any event, altering G.M.'s records and thereby "failing to provide complete and accurate information" to the Meads "shocks the judicial conscience." *Willey*, 2023 WL 4297186, at *16.

Under the correct analysis, Rockford's strict-scrutiny arguments fail miserably.

### 1.   Rockford never asserts a compelling interest in deceiving the Meads in particular.

Rockford attempts to justify its Policy as a general matter but never connects its asserted compelling interests to the Meads in particular. (*See* Br. PageID.105-07.) Both its first two asserted justifications resemble arguments the *Fulton* Court rejected. There, the city argued that it needed to exclude the plaintiff from the program in question to "ensur[e] equal treatment of prospective foster parents and foster children." 593 U.S. at 541. But an interest stated at such "a high level of generality" could not satisfy strict scrutiny. *Id.* So too, here, Rockford asserts broad interests "in ensuring the safety of its students" and "in not discriminating against transgender and gender nonconforming students." (Br. PageID.105.) But Rockford never explains how seeking the Meads' consent to treatment of their daughter as a boy—or at least not concealing that treatment from them—bears any relationship to student safety or nondiscrimination. In fact, Rockford's strict-scrutiny argument doesn't refer to the Meads even once. (*See generally* Br. PageID.104-07.)

Rockford's other attempt to justify its burden on the Meads' fundamental rights again rests on a broadly formulated interest, this time in student privacy. (Br. PageID.106-07.) Aside from the level-of-generality problem, this interest is incoherent. "A student who announces the desire to be publicly known in school by a new name, gender, or pronoun and is referred to by teachers and students and others by said new name, gender, or pronoun, can hardly be said to have a reasonable expectation of privacy or expect non-disclosure." *Mirabelli*, 2023 WL 5976992, at *10. Indeed, it seems that the Meads were the only people from whom Rockford concealed this supposedly private information about G.M. (*See, e.g.*, Compl. ¶¶ 78-80, PageID.11-12.)

Rockford also passingly refers to "the school's obligations under Title IX and federal and state constitutions." (Br. PageID.104.) But it doesn't cite a single

authority even hinting that it would violate Title IX or a constitutional provision to give the Meads this crucial information about their daughter. *Cf. Kettle Moraine*, 2023 WL 6544917, at *8 ("Kettle Moraine's reliance on attempting to comply with state and federal laws as well as guidance is also unavailing because there is no definitive guidance on this issue from relevant jurisdictions and the federal guidance pertaining to Title IX is, at best, an unsettled question.").

### 2. Rockford also does not explain how it narrowly tailored its actions to the Meads.

Nor has Rockford explained how its actions were narrowly tailored. It has never claimed that the Meads "jeopardize[d] the health or safety of" G.M. *Yoder*, 406 U.S. at 234. Yet establishing "a particularized and substantiated concern of real harm" is necessary to satisfy the narrow-tailoring requirement in this context. *Ricard v. USD 475 Geary Cnty., Kan. Sch. Bd.*, No. 5:22-CV-04015, 2022 WL 1471372, at *8 (D. Kan. May 9, 2022); *see id.* at *9 (ruling that a teacher was likely to succeed on her free-exercise challenge to a policy like Rockford's). And Rockford could have chosen a less restrictive means to address students' gender struggles.

Many States have done just that. *See, e.g.*, Ala. Code § 26-26-5(2) (prohibiting schools from "[w]ithhold[ing] from a minor's parent or legal guardian information related to a minor's perception that his or her gender or sex is inconsistent with his or her sex"); Idaho Code § 33-6001(2)(d) (requiring schools to adopt a policy regarding their "responsibility for notifying a student's parent or legal guardian regarding known changes in the student's mental, emotional, or physical health or well-being"); Iowa Code § 279.78(2) (requiring parental disclosure of student requests for "an accommodation that is intended to affirm the student's gender identity," expressly including a request to "us[e] a name or pronoun that is different than the name or pronoun" in official records); N.C. Gen. Stat. § 115C-76.45(a)(5) (mandating "notice to the parent" "[p]rior to any changes in the name or pronoun

used for a student in school records or by school personnel"); N.D. Cent. Code § 15.1-06-21(4)(b) (prohibiting, as a general matter, "[w]ithhold[ing] or conceal[ing] information about a student's transgender status from the student's parent or legal guardian").

The actions of those other States demonstrate how Rockford has failed to narrowly tailor its actions here.

### 3. Rockford cannot even show how its actions would satisfy the rational-basis standard.

Finally, Rockford's actions here would even fail the rational-basis standard. *See Mirabelli*, 2023 WL 5976992, at *14 ("The reasons proffered by the defendants for the policy pass neither the strict scrutiny nor the rational basis tests."); *Ricard*, 2022 WL 1471372, at *8 n.12 (noting "there are real questions" whether a Kansas school district's similar policy "would satisfy even the rational basis standard"). Rockford's own documents acknowledge that students like G.M. are more likely to succeed with parental support. If "[p]arental and family support are key," then it is irrational to conceal from parents their children's struggles with gender. (Policy PageID.53.) Under any standard of review, the Meads have pleaded sufficient facts to defeat the motion to dismiss.

## II. The complaint also states a plausible claim that Rockford violated the Free Exercise Clause. (First Cause of Action)

Rockford's decision to treat G.M. as a boy—and its concealment of that decision from the Meads—burdened the Meads' religious exercise, including their right to direct their daughter's religious upbringing. *Yoder*, 406 U.S. at 231. And it has done so pursuant to a discretionary policy that is neither neutral nor generally applicable. Rockford's actions thus receive strict scrutiny. *Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 733 (6th Cir. 2021) ("*Dahl II*"), *denying motion to stay preliminary injunction available at* No. 1:21-CV-757, 2021 WL 12178384 (W.D.

Mich. Sept. 13, 2021) ("*Dahl I*"). But its motion-to-dismiss arguments are no closer to satisfying strict scrutiny under the First Amendment than they were under the Fourteenth.

### A.   The Meads allege that Rockford conditioned their access to public education on forgoing their religious exercise.

The complaint details how Rockford engaged in a course of conduct that burdened the Meads' exercise of their religion by thwarting them from instilling their faith in their daughter. (Compl. ¶¶ 217-36, 246-49, PageID.32-36.) Burdens on religious exercise "trigger scrutiny under the Free Exercise Clause" even when they result from "'indirect coercion or penalties … not just outright prohibitions.'" *Dahl II*, 15 F.4th at 731 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017)). So when the government "forces a person to choose between observing her religious beliefs and receiving a generally available government benefit for which she is otherwise qualified"—like a public education—it "burdens her free exercise rights." *Id.* According to the complaint, Rockford has done just that.

Rockford conditioned access to its public schools on the Meads' willingness to allow the school district to instill "moral standards" and "religious beliefs" in their daughter contrary to their own. *Yoder*, 406 U.S. at 233. Rockford's decision to treat G.M. as a boy contradicts the Meads' religious belief "that each of us is born with a fixed biological sex that is a gift from God, not an arbitrary imposition subject to change." (Compl. ¶ 226, PageID.33.) They also believe that they should not lead their children "on a path that distances [them] from [their] biological sex." (Compl. ¶¶ 233-34, PageID.34.) Yet Rockford "subjected their daughter to a social transition that directly violates their beliefs and concealed these actions from them." (Compl. ¶ 247, PageID.36.) And when the Meads asked whether Rockford would guarantee that it would not engage in a similar course of action in the future, it refused.

24

(Compl. ¶¶ 159-64, PageID.23.) Rockford's policy required it *not* "to notify the Meads of or obtain their consent to" treating their daughter as a boy. (Compl. ¶ 170, PageID.24.) Worse, the Policy required Rockford to "actively conceal[] its actions from the Meads." (*Id.*)

In other words, Rockford made clear that G.M. could not attend its schools unless the Meads forfeited their right to raise her consistently with their religious beliefs. This resembles the actions that this Court preliminarily enjoined in *Dahl I*. *See* 2021 WL 12178384, at *4. There, a university barred certain students from participating in intercollegiate sports unless they received a COVID-19 vaccination over their sincerely held objections. *Dahl II*, 15 F.4th at 730. Refusing to stay the preliminary injunction, the Sixth Circuit said that the university had "put plaintiffs to the choice: get vaccinated"—and thereby "violate [their] sincerely held Christian beliefs"—"or stop fully participating in intercollegiate sports." *Id.* at 732 (cleaned up). "By conditioning the privilege of playing sports on plaintiffs' willingness to abandon their sincere religious beliefs, the University burdened their free exercise rights." *Id.* Rockford has similarly "condition[ed] the privilege of" attending public school on the Meads' "willingness to abandon their sincere religious beliefs" about parenting and human identity, among other topics.

To argue otherwise, Rockford takes too narrow a view of the Free Exercise Clause. (*See* Br. PageID.108-11.) Rockford relies on *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988). Yet the *Lyng* Court distinguished the unsuccessful claims there from claims like the Meads'. The *Lyng* plaintiffs challenged "[t]he building of a road or the harvesting of timber on publicly owned land." *Id.* at 449. But they could not show how such "governmental action penalize[d] religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Id.* By contrast, the Meads have alleged that Rockford denied them access to public school unless they give up their right to

exercise their religion. At the very least, this is the sort of "indirect coercion" that supports a plausible free-exercise claim. *Dahl II*, 15 F.4th at 731 (quoting *Trinity Lutheran*, 582 U.S. at 451).

Rockford also argues that the Meads lack "an individual … right to dictate the conduct of the Government's internal procedures." (Br. PageID.108 (quoting *Bowen v. Roy*, 476 U.S. 693, 700 (1986)).) But Rockford can't shield its actions from constitutional review by calling it an "internal policy." (*Id.*) That would conflict with the longstanding principal that Rockford and other "local government[s]" may *only* be sued for their "policy or custom." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). It would also contradict the recent Supreme Court cases blocking government policies that "categorically disqualify[] churches and other religious organizations" from accessing various government benefits. *Trinity Lutheran*, 582 U.S. at 454; *see Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2255-56 (2020); *Carson ex rel. O.C. v. Makin*, 596 U.S. 767, 779-80 (2022). Missouri, Montana, and Maine could not defeat the free-exercise claims in those cases by dubbing their discriminatory programs an "internal policy." (Br. PageID.108.)

Moreover, the facts show that Rockford's concealment independently burdened the Meads' free-exercise rights. Hiding an action from parents leaves them unable to protect their child from it. Objecting parents might withdraw their child from a school in response to a policy that prompts the child to violate their parents' religious beliefs. But those same parents would have no such remedy if school employees conceal that policy.

During the two-month period when Rockford concealed its actions from the Meads, Rockford did in fact "reach[] into Plaintiffs' home." (Br. PageID.110.) The complaint alleges that the Meads would have done more to respond to Rockford's actions—and done it *sooner*—had Rockford not concealed them. Once they discovered what was happening to their daughter, they quickly withdrew her from

Rockford schools. (Compl. ¶¶ 153-69, PageID.22-24.) Rockford's two month of deception prevented the Meads from exercising that right sooner. (Compl. ¶¶ 248-49, PageID.36.)

The Meads do not challenge quotidian government decisions like "the size or color of the Government's filing cabinets." *Bowen*, 476 U.S. at 700. Nor do they challenge any effort to "expose their children to other forms of religion" or to views "that contradict [their] religious views." *Mozert v. Hawkins Cnty. Bd. of Educ.*, 827 F.2d 1058, 1062 (6th Cir. 1987). Instead, the Meads challenge Rockford's decision to "recklessly engag[e] in"—and to intentionally conceal from them—"a psychosocial intervention" that is directly contrary to their sincerely held religious beliefs. (Compl. ¶ 216, PageID.32; *see* Compl. ¶¶ 217-36, Page ID.32-34.) That alleges a plausible burden on the Meads religious exercise.

**B.     Rockford must satisfy strict scrutiny because it forces the Meads to choose between their faith and a public benefit, Rockford engaged in discretionary decisions, and Rockford burdens a hybrid of rights.**

After determining that Rockford's policy burdens the Meads' religious exercise, the next question is what level of scrutiny it triggers. For three independent reasons, Rockford's actions receive strict scrutiny under the Free Exercise Clause. First, by "conditioning the availability of benefits" on the Meads' willingness to violate their faith, Rockford "effectively penalizes the free exercise of religion" in a way that demands strict scrutiny. *Carson*, 596 U.S. at 780 (cleaned up). Second, a "law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Third, given the deeply rooted nature of parental rights, even "a neutral, generally applicable law" receives strict scrutiny when it implicates "the Free Exercise Clause in conjunction with … the right of

27

parents … to direct the education of their children." *Emp. Div. v. Smith*, 494 U.S. 872, 881 (1990).

The first of these three reasons is explained above. The second and third are addressed below. For the second, the complaint alleges that Rockford's actions were neither neutral nor generally applicable because it determines whether to conceal information from parents "on a case-by-case basis." (Policy PageID.54-57.) And for the third, the Meads claim that Rockford burdened not only their free exercise rights but also their right "to direct the religious upbringing of their children." *Smith*, 494 U.S. at 881 n.1 (quoting *Yoder*, 406 U.S. at 233).

### 1. According to the complaint, Rockford's policy is not neutral or generally applicable.

Because Rockford's policy "allow[s] for the exercise of discretion" to determine whether to conceal a decision to socially transition a student from parents, the policy is not neutral or generally applicable. *Country Mill Farms, LLC v. City of E. Lansing*, No. 1:17-CV-487, 2023 WL 5345236, at *5 (W.D. Mich. Aug. 21, 2023) ("*Country Mill II*"); *see Dahl I*, 2021 WL 12178384, at *3 (noting that "a law is not generally applicable when it 'invites the government to consider the particular reasons for a person's conduct'" (quoting *Fulton*, 593 U.S. at 533)). When a government policy includes a "mechanism for the exercise of discretion in granting exemptions," it is not generally applicable. *Country Mill II*, 2023 WL 5345236, at *4.

Rockford's policy contains such a mechanism for discretionary exemptions. Its briefing to this Court acknowledges as much. As it notes, the Policy "encourages parental involvement" but only "under the appropriate circumstances." (Br. PageID.107.) And whether it is "appropriate" to disclose a social transition to parents is "carefully considered on a case-by-case basis." (*Id.* (quoting Policy PageID.56).) The policy's language leaves no doubt about the discretionary nature of this determination. It contains a four-page discussion titled "Guidance to Support

Transgender and Gender Nonconforming (GNC) Students." (Policy PageID.54-57.)
Those four pages refer to the "case-by-case basis" for Rockford's determinations. *See
Country Mill II*, 2023 WL 5345236, at *6 (discussing how East Lansing's "case-by-
case basis to determine whether to invite or not invite a vendor" affected general
applicability).

This system of case-by-case determinations grants Rockford "functionally
unfettered discretion" to decide whether to conceal a student's social transition from
her parents. *Id.* And that discretion renders Rockford's actions towards the Meads
"not generally applicable" and "a mechanism for individualized decisions." *Id.*

Though Rockford concedes that it makes individualized decisions regarding
parents like the Meads (*see* Br. PageID.107 (arguing that the case-by-case nature of
its Policy helps it satisfy strict scrutiny)), it simultaneously argues that, because its
policy is "simply to adopt the SBE Guidance," that policy "contains no discretion at
all." (Br. PageID.113.) But the Michigan SBE doesn't require Rockford or any other
school district to decide on a case-by-case basis whether to conceal social transitions
from parents. (*See* Policy PageID.52 ("These guidelines are voluntary and should
not be considered mandates or requirements.").) Rockford can't blame SBE for its
decision to engage in individualized assessments.

Rockford's final attempt to show that its Policy is neutral and generally
applicable retreads its argument that it has not burdened the Meads' religious
exercise. (*Compare* Br. PageID.114 (arguing that it does not "subject[] Plaintiffs to
any coercion"), *with* Br. PageID.110 (arguing that there are no "improper penalties
or coercion").) This argument fails for the same reasons already discussed. Rockford
has forced the Meads "to choose between observing [their] religious beliefs"—
namely, those about how they must raise their daughter—"and receiving a
generally available government benefit"—a public education. *Dahl II*, 15 F.4th at
731. And the policy's discretionary nature means that Rockford determines on "a

case-by-case basis" whether to treat a student as the opposite sex and conceal that fact from his or her parents. (*See* Policy PageID.55.)

Arguing that Rockford would never exercise its discretion in a certain way "misapprehends the issue." *Fulton*, 593 U.S. at 537. Rockford's "creation of a formal mechanism for granting exceptions renders [its] policy not generally applicable, regardless whether any exceptions have been given." *Id.*

### 2.    The complaint alleges that Rockford's violates the Meads' right to direct the religious upbringing of their daughter.

Rockford's actions also trigger strict scrutiny because they burden the Meads' right to exercise their religion by "direct[ing] the education of their children." *Smith*, 494 U.S. at 881. This exception to *Smith*'s general rule respects the deep historical roots of parents' right "to direct the religious upbringing of their children." *See id.* at 881 n.1 (quoting *Yoder*, 406 U.S. at 233). Because of the "great authority and coercive power" exerted "through mandatory attendance requirements," and "the students' emulation of teachers as role models and the children's susceptibility to peer pressure," the government must carefully avoid infringing parents' right to instill their religion in their children. *Edwards*, 482 U.S. at 584. The Sixth Circuit has held that other constitutional rights do not affect the standard of review for a free-exercise claim. *See, e.g.*, *Kissinger v. Bd. of Trs. of Ohio State Univ.*, 5 F.3d 177, 180 (6th Cir. 1993) (rejecting veterinary school student's challenge to requirement that she operate on live animals). But it has no controlling precedent on whether the unique history and tradition of parental rights leads to a different result.

The Free Exercise Clause's special protection for parental rights recognizes how a child's religious upbringing "strike[s] at the heart of parental decision-making authority on matters of the greatest importance." *Ridgewood*, 430 F.3d at 184. Parents may find it frustrating if a public school contradicts their at-home instruction on subjects like grammar or history. But a school would cause more

30

than frustration if it contradicted parents' religious instruction of their children. Consider a school that taught a Christian student that the Scripture is not, in fact, the inspired Word of God, or one that taught a Muslim student that the Shahada is false. Whatever claim those students might have against such a school, cases like *Yoder* and *Smith* make clear their parents would have a free-exercise claim for interfering with the religious upbringing of their children.

Similarly, here, Rockford instructed G.M. that her parents' religious views were wrong. (*See* Compl. ¶¶ 217-36, PageID.32-34 (describing those views).) *Cf. Meriwether*, 992 F.3d at 509 (explaining how through the use of "titles and pronouns," the plaintiff "took a side in [a] debate" about whether sex can change). And that burden on the Meads' free-exercise rights triggers strict scrutiny.

## C.   Rockford cannot satisfy strict scrutiny, particularly at this motion-to-dismiss stage.

For the reasons explained above, Rockford's actions must satisfy strict scrutiny. Claiming it can, Rockford largely cross-references its earlier arguments on this point (Br. PageID.114-15), arguments that this brief has already addressed, *see supra* pp.20-23.

The only new point Rockford raises against the Meads' free-exercise claim returns to the argument that it has not burdened the Meads' religious exercise. (Br. PageID.115 (arguing that the Meads "have not alleged that they were denied an 'exception'").) Yet again this argument ignores the pleaded facts and fails to acknowledge that Rockford has burdened the Meads' religious exercise by forcing them to forsake their religious beliefs to access a public education for their daughter. "By putting that choice to" them, Rockford "impaired" their "ability to exercise [their] faith." *Dahl II*, 15 F.4th at 731.

31

III.   **The complaint alleges facts that state a plausible claim of a denial of procedural due process. (Third Cause of Action)**

"It is clearly established that the Constitution recognizes both a protectible procedural due process interest in parenting a child and a substantive fundamental right to raise one's child." *Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000). Rockford's cursory treatment of the Meads' procedural-due-process claim "fail[s] to fully appreciate this distinction." *Id.* (*See* Br. PageID.115-16.) But "the differences between the procedural interest in raising one's child and the substantive right … are significant." *Bartell*, 215 F.3d at 557. Because the government usually cannot "infringe fundamental liberty interests *at all*, no matter what process is provided," the Supreme Court requires "a careful description of the asserted fundamental liberty interest." *Glucksberg*, 521 U.S. at 721 (cleaned up). But it has not said the same about procedural due process. With procedural claims, a plaintiff must show only "a protected liberty or property interest," and a deprivation of that interest "without the requisite due process of law." *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 729 (6th Cir. 2011) (quotation marks omitted).

The Meads' allegations meet the procedural-due-process standard. At the very least, they have plausibly alleged "a protectible … interest in parenting [their] child." *Bartell*, 215 F.3d at 557. Rockford deprived the Meads of that interest by making important decisions about their daughter without their consent and concealing those decisions from them. (*E.g.*, Compl. ¶ 293, PageID.42.) And Rockford does not argue that it provided the Meads with any procedural protections before depriving them of that interest. (*See* Br. PageID.116.) That's because it didn't. (Compl. ¶ 298, PageID.42.) Consequently, the complaint states a plausible procedural-due-process violation.

32

## CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

Dated: April 8, 2024                    Respectfully submitted,

*/s/ Katherine L. Anderson*

DAVID A. CORTMAN                  JOHN J. BURSCH
Georgia Bar No. 188810            Michigan Bar No. P57679
ALLIANCE DEFENDING FREEDOM        ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E.,  440 First Street NW, Suite 600
  Suite D1100                    Washington, DC 20001
Lawrenceville, Georgia 30043      (202) 393-8690
(770) 339-0774                    jbursch@ADFlegal.org
dcortman@ADFlegal.org

KATHERINE L. ANDERSON             VINCENT M. WAGNER
Arizona Bar No. 33104             Virginia Bar No. 98663
ALLIANCE DEFENDING FREEDOM        ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street              44180 Riverside Parkway
Scottsdale, Arizona 85260         Lansdowne, Virginia 20176
(480) 444-0020                    (571) 707-4655
kanderson@ADFlegal.org            vwagner@ADFlegal.org

*Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the word limits in Local Civil Rule 7.2(b)(i), because it does not exceed 10,800 words. The word-processing software used to prepare this brief was Microsoft Word for Microsoft 365. According to the word-count feature of that software, excluding any case caption, cover sheets, table of contents, table of authorities, signature block, attachments, exhibits, and affidavits, it contains 9,911 words.

*/s/ Katherine L. Anderson*
KATHERINE L. ANDERSON
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
kanderson@ADFlegal.org

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on April 8, 2024, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to counsel of record for all parties.

*/s/ Katherine L. Anderson*
KATHERINE L. ANDERSON
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
kanderson@ADFlegal.org

*Counsel for Plaintiffs*