UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAN MEAD and JENNIFER MEAD,

    Plaintiffs,

v.

ROCKFORD PUBLIC SCHOOL
DISTRICT, *et al.*,

    Defendants.
_____/

Case No. 1:23-cv-1313

HONORABLE PAUL L. MALONEY

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

Plaintiffs Dan and Jennifer Mead have a daughter, G.M., who attended a middle school in the Rockford Public School district.[1] G.M. asked the school to refer to her using a masculine name and pronouns. The school followed G.M.'s request but did not inform G.M.'s parents of her request. Plaintiffs ultimately discovered the situation. Plaintiffs filed this lawsuit alleging that the school violated their constitutional rights by actively concealing from them information about their daughter. Plaintiffs sued the Rockford Public School District (District) and the Rockford Public School's Board of Education (collectively Defendants). Plaintiffs contend the actions of District employees reflected the District's policy and practice.

Defendants filed a motion to dismiss (ECF No. 12). The court concludes that the allegations in the complaint plead sufficient facts to survive the motion. The complaint contains sufficient factual allegations to support a claim for a violation of Plaintiffs' fundamental rights as

---

[1] The complaint identifies G.M. as the Meads' daughter and refer to G.M. using feminine pronouns.


parents in the care, custody and control of their child, a right protected by the Fourteenth Amendment. The court also finds the complaint states a claim under the Fourteenth Amendment for deprivation of liberty without due process. The court will, however, dismiss Plaintiffs' free exercise cause of action. The court will deny in part and grant in part Defendants' motion to dismiss for the reasons herein.

I.

Under the notice pleading requirements, a complaint must contain a short and plain statement of the claim showing how the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2); *see Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 750 (6th Cir. 2014). The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A defendant bringing a motion to dismiss for failure to state a claim under Rule 12(b)(6) tests whether a cognizable claim has been pled in the complaint. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988).

To survive a motion to dismiss, a plaintiff must allege facts sufficient to state a claim for relief that is "plausible on its face" and, when accepted as true, are sufficient to "raise a right to relief above the speculative level." *Mills v. Barnard*, 869 F.3d 473, 479 (6th Cir. 2017) (citation omitted). "The complaint must 'contain either direct or inferential allegations respecting all material elements necessary for recovery under a viable legal theory.'" *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 774 (6th Cir. 2015) (citation omitted). "A claim is plausible on its face if the 'plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011) (quoting *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a

defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). When considering a motion to dismiss, a court must accept as true all factual allegations but need not accept any legal conclusions. *Ctr. for Bio-Ethical Reform*, 648 F.3d at 369.

## II.

### A.

Plaintiffs plead the existence of a policy and a practice central to this lawsuit. As an exhibit to the complaint, Plaintiffs attach a 2016 document issued by the Michigan State Board of Education titled "Statement and Guidance on Safe and Supportive Learning Environments for Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ) Students" (Statement) (ECF No. 1-3.) Plaintiffs plead that District "adopted" the document "as the RPS policy for treating students as the opposite sex." (ECF No. 1 Compl. ¶ 177.) Plaintiffs plead that a school principal "confirmed that that District's policy was to follow state guidance regarding the use of opposite-sex pronouns and names" when requested by the student. (*Id.* ¶ 180.) Plaintiffs assert that the Statement "instructed District employees that they did not need to notify parents or seek their consent to using names or pronouns associated with the opposite sex to refer to a student." (*Id.* ¶ 185.) According to Plaintiffs, a different policy (a "policy for legal documents") required the District to use legal names and gender on all paperwork. (*Id.* ¶¶ 126 and 142). As a result of the two policies, Plaintiffs assert

> [t]he District's policy, practice, usage and custom is to refer to students by names and pronouns associated with the opposite sex without notifying their parents or seeking parental consent and to conceal these actions from their parents.

(*Id.* ¶ 188).

Plaintiffs enrolled G.M. in Rockford School District from kindergarten to eighth grade. (Compl. ¶ 19.) In 2020, G.M. started sixth grade at East Rockford Middle School. (*Id.* ¶ 28.) But shortly after starting, she began to struggle in her studies. (*Id.* ¶ 29.) To help her daughter, Mrs.

3

Mead reached out to G.M.'s teachers and other school employees. (*See id.* ¶¶ 30-31.) A few months later, Erin Cole, an East Rockford Middle School counselor, "became actively involved in G.M.'s education, communicating about her academic progress, health, and well-being with both Mrs. Mead and G.M.'s teachers." (*Id.* ¶ 32.) G.M. consistently met with Cole during her enrollment in the District. (*Id.* ¶ 34.) Their conversations ranged from missing school assignments to more sensitive personal issues. (*Id.* ¶ 35.) Cole updated Plaintiffs with G.M.'s progress and some of the topics G.M. and Cole talked about during their meetings. (*Id.* ¶¶ 37-41.) By the time G.M. finished sixth grade, Plaintiffs and Cole had a healthy relationship concerning G.M.'s progress at school. (*See id.* ¶¶ 42-45.)

In 2021, G.M. started her seventh-grade year at East Rockford Middle School. (*Id.* ¶ 46.) G.M. continued to meet with Cole regularly. (*See id.* ¶ 47.) And Cole continued to notify Plaintiffs about G.M.'s education, health and wellbeing. (*See id.* ¶ 48.) About halfway through G.M.'s seventh-grade year, Cole reported that G.M.'s mental health was getting worse. (*See id.* ¶¶ 50-52.) Plaintiffs sent G.M. to a third-party psychologist for an evaluation. (*Id.* ¶ 53.) The psychologist sent Plaintiffs the report of G.M.'s evaluation. (*Id.* ¶ 54.) The report "diagnosed [G.M.] with Autism Spectrum Disorder, along with Generalized Anxiety Disorder and Major Depressive Disorder." (*Id.* ¶ 56.) Plaintiffs shared this report with Cole and other school officials. (*See id.* ¶¶ 58-62.)

On May 4, 2022, near the end of her seventh-grade year, G.M. sent Cole a "short message" over the school's messaging system. (*Id.* ¶ 66.) G.M. requested that school officials and teachers refer to her by a masculine name. (*Id.* ¶¶ 67-68.) Cole started doing so, and she told G.M.'s teachers to do the same. (*See id.* ¶¶ 69-71, 75, 92.) But G.M. didn't tell her parents, and neither did Cole; "[f]rom [May 4] until the end of the school year . . . Cole corresponded multiple times

4

with Mrs. Mead but did not notify Mrs. Mead of G.M.'s request to use a masculine name." (*Id.* ¶ 69.)

G.M. started eighth grade at Rockford East Middle School in August 2022. (*Id.* ¶ 77.) G.M.'s teachers and other school employees all referred to G.M. by the masculine name and with male pronouns. (*See id.* ¶¶ 78-80, 86.) Also around this time, Heather Slater, a Rockford school neuropsychologist, began a "'Case Activity Log' [on] G.M." (*Id.* ¶ 82.) Slater's notes mention that "'G[] is female but transitioning to male. Goes by F[] . . . @ school & G[] @ home.'" (*Id.* ¶ 84.) The District continued to refer to G.M. "by her actual name and with female pronouns when speaking to or corresponding with the Meads." (*Id.* ¶ 92.) For instance, in an internal email between Cole and Slater, Slater called G.M. a "he." (*Id.* ¶ 104.) That same day in an email to Mrs. Mead, however, Slater referred to G.M. by her female name and biological pronouns. (*Id.* ¶ 106.)

Plaintiffs allege that they discovered the District's deceit a few months into G.M.'s eighth-grade year. In October 2022, Slater emailed Plaintiffs to schedule a meeting to discuss the District's "review of existing data" (known as a "REED" evaluation) for G.M. (*Id.* ¶ 105.) The REED evaluation "outlined [G.M.'s] academic performance and contained a series of comments from her teachers based on their experiences with her in their classrooms." (*Id.* ¶ 115.) A District employee deleted any instances where staff referred to G.M. as a boy or the masculine name and replaced each instance with references to G.M.'s female name or biological pronouns. (*See id.* ¶¶ 120-22.) On October 10, 2022, Mr. Mead and Slater met to discuss Rockford's REED evaluation of G.M. (*Id.* ¶ 107.) Near the end of the meeting, Slater gave Mr. Mead a copy of the District's REED evaluation for G.M. (*Id.* ¶ 111.)

Later that day, Plaintiffs reviewed the REED evaluation and were "surprised" by one teacher's notes. (*Id.* ¶ 116.) That teacher's notes referred to G.M. as a boy named "F[]." (*Id.* ¶

5

117.) That reference wasn't supposed to be in the copy to Plaintiffs, but Slater forgot to remove it. (*See id.* ¶¶ 120-22.) Mrs. Mead emailed Slater, asking her whether the teacher's reference was an error. (*Id.* ¶ 117.) Plaintiffs allege that Slater did not respond. (*Id.* ¶ 137.)

On October 23, 2022, Plaintiffs emailed East Rockford's Middle School principal to withdraw G.M. from school. (*Id.* ¶ 154.) Later that week, Plaintiffs and the principal met to discuss why they withdrew G.M. from Rockford. (*Id.* ¶¶ 159-60.) "The Meads wanted to ensure [the principal] knew about how employees at his school had concealed their actions[,] treating G.M. as a boy." (*Id.* ¶ 160.) The principal however "made clear that District policy and the District's understanding of voluntary guidance from the Michigan Department of Education required employees to treat G.M. as a boy—and to conceal their actions from [them]." (*Id.* ¶ 161.) Plaintiffs told the principal they would forego withdrawing G.M. from the District if he "guarantee[d] that the District would not hide information from [them] again about G.M." (*Id.* ¶ 163.) He said he couldn't make such a guarantee. (*Id.* ¶ 164.)

**B.**

The Meads filed this action on December 18, 2023. Plaintiffs assert that school employees acted pursuant to the District's policy and practice. Specifically, school officials do not reveal to parents a student's gender transition, except where the student consents to disclosure. Plaintiffs allege that the District's policy and practice violated their rights under the First and Fourteenth Amendments. Plaintiffs assert three constitutional violations. First, Defendants placed a substantial burden on Plaintiffs' free exercise of religion, in violation of the First Amendment. Second, Defendants infringed on Plaintiffs' fundamental right to direct their child's upbringing, education, and healthcare, in violation of the Fourteenth Amendment. And third, Defendants violated Plaintiffs' right to procedural due process, in violation of the Fourteenth Amendment.

The court will take each claim in turn, analyzing whether each claim satisfies the pleading requirements.

## III.

Defendants seek dismissal of each of the claims in the complaint. Defendants argue that the facts alleged do not state a claim upon which the court can grant relief. The court examines each of the three causes of action.

### A. Free Exercise

"Our Constitution proclaims that 'Congress shall make no law . . . prohibiting the free exercise' of religion." *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2350 (2025) (quoting U.S. Const. amend. I). Known as the "Free Exercise Clause," the clause applies to the States through the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). And "the right to free exercise . . . is not 'shed . . . at the schoolhouse gate.'" *Mahmoud*, 145 S. Ct. at 2350 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506-07 (1969)). So "[g]overnment schools, like all government institutions, may not place unconstitutional burdens on religious exercise." *Id.*

The Free Exercise Clause comes into play when governmental action imposes a burden on religious exercise. *Fulton v. City of Phila.*, 593 U.S. 522, 532-33 (2021). The Supreme Court has "long recognized the rights of parents to direct 'the religious upbringing' of their children." *Espinoza v. Mont. Dept. of Revenue*, 591 U.S. 464, 486 (2020) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 213-14 (1972)). And it has "held that those rights are violated by government policies that 'substantially interfer[e] with the religious development' of children." *Mahmoud*, 145 S. Ct. at 2350 (quoting *Yoder*, 406 U.S. at 218). In such circumstances, the court must proceed straight to "whether the policies can survive strict scrutiny." *Id.* at 2361. Because such policies "pose 'a very real threat of undermining' the religious belief and practices that the parents wish to instill in

their children." *Id.* (quoting *Yoder*, 406 U.S. at 218, 233). Accordingly, the first question is whether the District's policy and practice substantially interferes with religious beliefs such that strict scrutiny automatically applies.

### 1.

Free Exercise jurisprudence distinguishes between the freedom of individual beliefs and the freedom of individual conduct. *Bowen v. Roy*, 476 U.S. 693, 699 (1986). In *Bowen*, a parent challenged, on free exercise grounds, the requirement to obtain a social security number for his child, which was necessary to receive government benefits. *Id.* at 695. The parent argued that obtaining the number would violate his religious beliefs. *Id.* Our Supreme Court rejected the argument and explained that the Free Exercise Clause has not been interpreted "to require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family." *Id.* at 699 (emphasis in original). The plaintiff in *Bowen* could "no more prevail on his religious objection to the Government's use of a Social Security number for his daughter than he could on a sincere religious objection to the size or color of the Government's filing cabinets." *Id.* at 700. Plaintiffs here "may not demand that the Government join in their chosen religious practices by refraining from using a Social Security number [or pronoun] to identify their daughter." *Id.* at 700.

As pled in the complaint, the District's policy and practice does not compel students (or their parents) to believe or do anything. G.M. requested the school use a different name and pronouns when referring to her. The District's policy and practice merely directs how District employees act when Defendants receive such a request. The District did not compelled G.M. to use a different name or pronouns. Nor did the District compel *Plaintiffs to use a different name or pronoun. "The Free Exercise Clause affords an individual protection from certain forms of

8

government compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures." *Bowen*, 475 U.S. at 700.

Second, the facts here differ substantially and critically from Free Exercise jurisprudence where the Supreme Court found that schools have burdened a parent's right to religious exercise. The opinions where our Supreme Court found that schools violated the free exercise rights of typically involved compelled attendance, action or instruction. *See Mahmoud*, 145 S. Ct. at 2353 (involving a challenge by parents of several religions to the use of LGBTQ storybooks in elementary school without notice or the ability to opt out of the instruction); *Yoder*, 406 U.S. at 218 (involving a challenge by Amish parents to compulsory-attendance laws for students after the eighth grade); *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 629 (1943) (involving a challenge by Jehovah's Witness parents requiring public school students to participate in the salute honoring our Nation as represented by the flag). The District's policy and practice does not relate to attendance, does not compel action by the student or parents, and does not involve instruction or school curriculum.

Accordingly, the court does not proceed directly to review the alleged polices and practices under strict scrutiny.

## 2.

"Consequently, as is our usual practice with free exercise challenges, we 'ask whether the law at issue is neutral or generally applicable before proceeding to strict scrutiny.'" *John and Jane Doe No. 1 v. Bethel Local Sch. Dist. Bd. of Educ.*, No. 23-3740, 2025 WL 2453836, at *7 (6th Cir. Aug. 26, 2025) [hereinafter *Bethel*] (quoting *Mahmoud*, 145 S. Ct. at 2361). Typically, a policy is neutral if it doesn't "target[] religious conduct." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 534 (1993). And "a policy is generally applicable if it doesn't differentiate between religious and secular conduct." *Bethel*, 2025 WL 2453836, at *7. "[P]olicies that are

9

'neutral and generally applicable' and only 'incidentally burden[] religion' seldom violate the Free Exercise Clause." *Id.* at *6 (quoting *Fulton*, 593 U.S. at 532-33) (analyzing such policies under rational basis review).

The Sixth Circuit recently applied the rational basis test in *Bethel*. 2025 WL 2453836. There, the school district implemented a policy that allowed transgender students to use the communal restrooms for the gender they identified with. *Id.* at *1. Following the implementation of this policy, some Muslim and Christian students felt uncomfortable sharing a bathroom with the opposite biological gender, citing their religious beliefs. *See id.* After the school district refused to revoke the policy, the students and their parents sued the school district, alleging a violation of the Free Exercise Clause. *Id.* at *2. The court found that the school district's policy was "facially neutral." *Id.* at *7. Because (i) "it did not refer to religion or religious conduct" *id.*, (ii) it "was not adopted with any aim of restriction religious practice" *id.*, and (iii) "[a]ll hardships resulting from the implementation of the policy were treated the same, regardless of whether a student was secular or religious." *Id.* The court reviewed the bathroom policy for a rational basis.[2] *Id.* at *8.

The alleged policy here is neutral and generally applicable. Like the policy in *Bethel*, the District's policy and practice does not refer to any religion or religious conduct. (*See* Compl. ¶ 180 ("Mr. Burkholder confirmed that the . . . Policy was to follow state guidance regarding the use of opposite-sex pronouns and names for students like G.M."); Statement, PageID.52-55.) The Statement adopted by the District does not aim to restrict any religious practice. Plaintiffs are treated the same the same as any other parents, regardless of whether the parents have sincere

---

[2] The court found that the policy was rationally related to a legitimate government purpose. *Id.* at *9.

religious beliefs. Every parent, regardless of religious belief, could have their child's preferred gender concealed from them. (*See* Compl. ¶ 180.)

Plaintiffs argue that the District has conditioned the privilege of their child attending public school on their willingness to abandon their sincere religious beliefs. Not so. As parents, the Meads "are not being coerced or compelled into recognizing any individual in any particular way inconsistent with their religious beliefs." *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 680 F. Supp. 3d 1250, 1283 (D. Wyo. 2023). The District allows its students to request their preferred name and pronouns. (*See* The Policy, PageID.54-55.) In no way does that compel students or their parents to recognize a preferred name or pronouns of the opposite sex. Accordingly, the court finds the District's policy and practice to be neutral and generally applicable. As a result, the policy and practice are not subject to strict scrutiny but must have a rational basis. *See Fulton*, 593 U.S. at 533.

### 3.

The court reviews the policy and practice for a rational basis. *See id.* "Under that standard, we hold that, when it was in effect, the policy was constitutional so long as it was rationally related to a legitimate government purpose." *Bethel*, 2025 WL 2453836, at *8 (citing *Kowall v. Benson*, 18 F.4th 542, 548 (6th Cir. 2021)). Importantly, Plaintiffs bear the burden "to negat[e] every conceivable basis which might support" the alleged policies and practices. *See id.* (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)); *see also Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002) (finding a "strong presumption of validity" under rational basis review).

Plaintiffs have not met their burden. Defendants proffer the legitimate purpose of promoting a safe and supportive learning environment for LGBTQ students. (Defs.' Br. in Supp. of Mot. to Dismiss, ECF No. 13, PageID.103 (citing ECF No. 1-3, PageID.52).) Plaintiffs do not

11

dispute that the policy is rationally related to this purpose. Thus, the District's policy and practice survives rational basis review. The Court will dismiss Plaintiffs' free exercise claim (Count I).

### B. Substantive Due Process

The Fourteenth Amendment's Due Process Clause declares that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. That clause's explicit promise of "liberty" ensures certain fundamental rights. One of those fundamental rights is the right of parents to make decisions concerning "the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

To determine whether some government conduct has violated substantive due process, courts must undertake a layered inquiry. The first layer is whether the challenged government conduct concerns an executive or legislative act. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *Prater v. City of Burnside*, 289 F.3d 417, 431 (6th Cir. 2002) (distinguishing between the shocks the conscience test and the narrowly tailored to serve a compelling state interest test). The distinction matters because executive acts are reviewed under the shock-the-conscience standard. While legislative acts are categorized based on the fundamental right they restrict, they are then reviewed under the appropriate test, like strict scrutiny or rational basis. *See Prater*, 289 F.3d at 431; *see also Littlejohn v. Sch. Bd. of Leon Cnty., Fla.*, 132 F.4th 1232, 1239 (11th Cir. 2025) ("[W]e must first identify whether Defendants' challenged actions were 'legislative' or 'executive' in nature.").

### 1.

Executive action generally involves "a specific act of a governmental officer that is at issue." *Lewis*, 523 U.S. at 846. Put another way, "[e]xecutive acts characteristically apply to a limited number of persons (and often to only one person); [they] typically arise from the ministerial

to administrative activities of members of the executive branch." *McKinney v. Pate*, 20 F.3d 1550, 1557 n. 9 (11th Cir. 1994). In this context, the Due Process Clause is meant to stop government officials from abusing their authority or using it to oppress individuals. *See Lewis*, 523 U.S. at 846.

"Legislative acts, on the other hand, generally apply to a larger segment of—if not all of—society; laws and broad-ranging executive regulations are the most common examples." *Id.* As noted, what bucket the conduct falls in—executive or legislative—matters because each garners different examinations. *See id.* at 842-43. Importantly, legislative conduct need not be conscience-shocking for further inquiry. *See Washington v. Glucksberg*, 521 U.S. 702, 722 (1997).

The Court finds that the District's policy and practice falls in the legislative act bucket. The policy and practice applies to all students and parents in the Rockford School District and is administered by multiple governmental actors. (*See* Compl. ¶¶ 173-76, 180.) With that established, the court moves on to the next layer.

### 2.

The next layer of the substantive due process inquiry is whether Plaintiffs have alleged a fundamental right. *See Glucksberg*, 521 U.S. at 722. Plaintiffs plead they have a fundamental right to make decisions about their child's care, upbringing, and medical treatment.

The right of parents to direct their children's upbringing originated from three Supreme Court cases: *Meyer v. Nebraska*, *Pierce v. Society of Sisters*, and *Farrington v. Tokushige*. The *Meyer* Court held that parents have a fundamental right to "direct the education and upbringing of [their] children." *Glucksberg*, 521 U.S. at 720 (citing *Meyer*, 262 U.S. at 399). The *Pierce* Court, relying on *Meyer*, held the same; parents have a right to direct the upbringing of their children. 268 U.S. at 534-35 ("The child is not the mere creature of the state; those who nurture him . . . have the right, coupled with the high duty, to recognized and prepare him for additional

obligations."). A couple of years after *Pierce*, the Court decided *Farrington v. Tokushige*, the *Farrington* Court struck down a law that deprived parents of a "fair opportunity to procure for their children instruction which they think important." 273 U.S. 284, 298 (1927). Thus, "[i]t is cardinal . . . that the custody, care[,] and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1941).

The Court affirmed the life of this right in *Troxel v. Granville*. There, the Court held that "the interest of parents in the care, custody, and control of their children [] is perhaps the oldest of the fundamental liberty interest recognized by this Court." 530 U.S. at 65-66 (collecting Supreme Court cases). "In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Id.* at 66.

In addition, parents have a fundamental right to control their child's health. *See Parham v. J.R.*, 442 U.S. 584, 602 (1979). "The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Id.* So "[s]urely, [a parent's right] includes a 'high duty' to recognize symptoms of illness and to seek and follow medical advice." *Id.*

Plaintiffs have identified two fundamental rights. First, their fundamental right "to make decisions concerning the care, custody, and control of their children." *See Troxel*, 530 U.S. at 65-66. And related, their fundamental right "to recognize symptoms of illness and to seek and follow medical advice." *See Parham*, 442 U.S. at 602. The District's actions raise concerns regarding both rights. (*See* Compl. ¶¶ 191-216); *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 556 (E.D. Ky. 2024) ("It follows that parents retain a constitutionally protected right to guide their own children

14

on matters of identity, including the decision to adopt or reject various gender norms and behaviors."); *Mirabelli v. Olson*, 761 F. Supp. 3d 1317, 1331 (S.D. Cal. 2025) ("Matters of a child's health are matters of which parents have the highest right and duty of care."); *Landerer v. Dover Area Sch. Dist.*, No. 1:24-cv-566, 2025 WL 492002, at *2-3 (M.D. Pa. Feb. 13, 2025) (finding violation of fundamental parental right under substantive due process because school's gender policy exacerbated child's mental health issues).

### 3.

Defendants argue that an unconstitutional infringement of parental rights over their children occurs only when the state requires or prohibits some activity. Defendants cite *Doe v. Irwin*, 615 F.2d 1162 (6th Cir. 1980) to support its argument. Similar to *Doe* is *Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256 (3d Cir. 2007). Both cases involved a governmental entity providing minors with contraception without parental knowledge. *See id.* at 259-61; *Doe*, 615 F.2d at 1162-64. And both courts found no deprivation of the liberty interests of the parents in not notifying them of their child's voluntary decisions. *See Doe*, 615 F.2d at 1168-69; *Anspach*, 503 F.3d at 261-65. Because the government did not compel, coerce, or interfere with the parents' rights to care for control their children. *See id.* Thus, "the parents' liberty interest will only be implicated if the state's action 'deprived them of their right to make decisions concerning their child,' and not when the action merely 'complicated the making and implementation of those decisions.'" *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 934 (3d Cir. 2011) (quoting *C.N. Ridgewood Bd. of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005)).

There's a major distinction between those cases and the present case. Plaintiffs plead that the District intentionally deceived them. (*See* Compl. ¶¶ 8, 100, 187-88.) Plaintiffs claim that the District went beyond failing to notify them of their child's gender transition. (*Id.* ¶¶ 273-76.)

According to the complaint, the District "took affirmative steps to deceive the Meads." (*Id.* ¶ 281.) Taking complaint in its entirety, Plaintiffs' allegations show some amount of coercion or interference from the District, which implicates Plaintiffs' right to make fundamental decisions for G.M.

### 4.

The court must next determine whether Plaintiffs sufficiently allege that the District restricted those fundamental rights.

G.M. was an East Rockford Middle School student from August 2020 to October 2022. (Compl. ¶¶ 19, 28.) When the relevant events occurred, she was thirteen years old and in the seventh and eighth grades at Rockford. (*See id.* ¶¶ 46, 77.) Plaintiffs allege that pursuant to the policy, District officials regularly referred to G.M. by male pronouns and a masculine name despite her biological sex being female. (*See id.* ¶¶ 4-6, 84, 92.) And according to the policy, the District concealed this information from the Meads. (*See id.* ¶¶ 21-22, 100, 141-44.) The cover-up went so far as to alter any documents the District sent to the Meads by replacing any references to G.M.'s masculine name and pronouns with G.M.'s female name and biological pronouns. But outside of those meetings the District referred to G.M. by her requested masculine name and male pronouns. And when Plaintiffs raised the issue with the principal and requested that issues like this not be kept secret, the principal couldn't guarantee that. (*See id.* ¶¶ 161-64, 180.)

Plaintiffs also allege that the District's actions amount to medical health treatment. They plead that the District engaged G.M. in a "psychosocial intervention for gender dysphoria." (*Id.* ¶ 190.) Viewing the complaint in a light most favorable to the Meads, Rockford's "psychosocial intervention for [G.M.'s] gender dysphoria" can be seen when Ms. Slater engaged in a confidential evaluation on G.M.: "Ms. Slater's file on G.M. closed on November 14, 2022, with a handwritten note labeled 'Confidential File' at the top memorializing that '[e]vaul. Was not completed due to

parent withdrew student to be homeschooled.'" (*Id.* ¶¶ 104, 166); *see also Landerer*, 2025 WL 492002, at *8 (distinguishing contrary caselaw because in "this case" there is an allegation of school-provided counseling without the parent's knowledge). Plaintiffs plead this "intervention" began when school officials referred to G.M. by a masculine name and male pronouns for G.M.'s social and gender transition. (*See id.* ¶¶ 216, 279.) Gender dysphoria, they assert "is complex" and proper "diagnosis very commonly suffer[s] from other clinical mental health conditions, such as Autism Spectrum Disorder, Generalized Anxiety Disorder, and Major Depressive Disorder," three disorders G.M. allegedly suffers from. (*Id.* ¶¶ 56, 192.) The District's policy and practice allowed school officials to deceive the child's parents, which undermined their ability to choose appropriate medical treatment for their child (a third-party therapist or psychologist). The District's policy and practice "undermines a meaningful role for parents if the child decides his or her biological gender is not preferential." *Cardona*, 737 F. Supp. 3d at 556.

In sum, when viewing the complaint in a light most favorable to Plaintiffs, the allegations make plausible that the District's actions infringed upon Plaintiffs' fundamental parental rights in directing G.M.'s medical treatment, and G.M.'s upbringing and choice of education.

**5**

The court finds that Plaintiffs have plausibly alleged that the District's conduct infringed upon a fundamental right. Consequently, the court conducts a strict scrutiny analysis. *Reno v. Flores*, 507 U.S. 292, 301-02 (1993); *Glucksberg*, 521 U.S. at 720-21. When the level of scrutiny is strict, the government carries the burden of proving that its action was justified. *United States v. Virginia*, 518 U.S. 515, 533 (1996). Specifically, the government must show that "its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (citation omitted).

Defendants contend they have a compelling interest in "ensuring the safety of its students." (Defs.' Br. in Supp. of Mot. to Dismiss, PageID.105.) That interest, however, does not give school districts carte blanche to tell a child's parents nothing about their child's gender transition. Defendants do not suggest that G.M. faced harm from her parents if the District were to have informed the parents about G.M.'s request. Defendants have not met their burden to show how concealing a child's gender transition from its parents promotes that child's safety.

Defendants also argue they have a compelling interest in promoting student privacy. (*See id.*, PageID.104-05.) But school employees did not keep G.M.'s gender transition private. School employees used G.M. by her preferred masculine name openly and publicly at school.

Defendants fail to meet their burden under strict scrutiny. The court declines to dismiss Plaintiffs' substantive due process claim.

### C. Procedural Due Process

Plaintiffs allege that they were deprived of their liberty interest in directing the care, custody, and control without due process of law. To state a claim for a procedural due process violation under 42 U.S.C. § 1983, a plaintiff must establish "(1) that he has a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment, (2) that he was deprived of this protected interest within the meaning of the Due Process Clause, and (3) that the state did not afford him adequate procedural rights prior to depriving him of this protected interest." *Peterson v. Johnson*, 87 F.4th 833, 836 (6th Cir. 2023) (cleaned up). Because the court finds that Plaintiffs have sufficiently alleged a deprivation of a liberty interest at this stage, the court proceeds to the third prong.

Plaintiffs claim that the District's policy and practice fails to provide for notice to parents by allowing school officials to deceive parents concerning their child's request to be treated as the opposite sex. And they assert that they were provided with no process before the alleged

deprivation of their rights. (*See* Compl. ¶¶ 242, 292.) "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

Defendants challenge only the first element, whether the complaint pleads facts to show that Plaintiff's have a fundamental right. (ECF No. 13 PageID.116). Because the court already found that the complaint did plead sufficient facts to show the existence of a fundamental right, the court declines to dismiss the procedural due process claim.

### III.

The Supreme Court has long held that parents possess a right to direct their children's health care, upbringing, and education. Plaintiffs have pled sufficient facts to plausibly show that the District's policy and practice infringes on that right. Plaintiffs allege two fundamental rights under the Fourteenth Amendment's Due Process Clause, (1) the parental right to direct the upbringing of their child and their child's education, and (2) the parental right to direct their child's healthcare. Plaintiffs plausibly allege that the District infringed upon the first set of rights when it failed to inform them of their child's requested gender transition and when it deceived them so they wouldn't find out besides their child telling them. Plaintiffs plausibly allege that the District infringed upon the second set of rights when it conducted a "psychosocial intervention" to treat their child's gender dysphoria and other mental health disorders. Because Plaintiffs have sufficiently plead the existence of a fundamental right, Defendants' only challenge to the procedural due process claim fails. The court will, however, dismiss Plaintiffs' free exercise claim.

## **ORDER**

Consistent with the accompanying Opinion, the court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss. (ECF No. 12).   The court dismisses Plaintiffs' free exercise cause of action.  The court declines to dismiss Plaintiffs' substantive and procedural due process claims.


Dated: September 18, 2025                               /s/ Paul L. Maloney
                                                                            PAUL L. MALONEY
                                                                            UNITED STATES DISTRICT JUDGE